Evan Miller (*pro hac vice*)
Jacob M. Roth (*pro hac vice*)
G. Ryan Snyder (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-879-3939

Jennifer L. Del Medico
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: 212-326-3939

*Attorneys for Plaintiff*
*Manhattan Ford Lincoln, Inc.*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MANHATTAN FORD LINCOLN, INC., )<br>   *Plaintiff,* )<br>)<br>  v. )<br>)<br>UAW LOCAL 259 PENSION FUND, )<br>   *Defendant.* )<br>)<br>)<br>)<br>_____ ) | Case No. 2:17-cv-05076-KM-MAH<br><br>**DECLARATION** |

## DECLARATION IN SUPPORT OF MANHATTAN FORD LINCOLN, INC.'S MOTION FOR SUMMARY JUDGMENT

I, Jacob ("Yaakov") M. Roth, hereby attest as follows:

1. I am a partner at the law firm of Jones Day and counsel for Manhattan Ford Lincoln, Inc., in the above-captioned case.

– 1 –

2.      I make this declaration in support of Manhattan Ford Lincoln, Inc.'s motion for summary judgment in the above-captioned case.

3.      I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

4.      Attached as Exhibit A is a true and correct copy of the transcript of the hearing held in the underlying arbitration between Manhattan Ford Lincoln, Inc. and the UAW Local 259 Pension Fund.

5.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 16, 2017

Jacob ("Yaakov") M. Roth
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-879-7658
Facsimile: 202-626-1700
yroth@jonesday.com

Exhibit A

Page 1

1

2          AMERICAN ARBITRATION ASSOCIATION

3      INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

4              Case No. 01-15-0004-3027

5    ---------------------------------------x

6    MANHATTAN FORD LINCOLN, INC.,

7                          Claimant,

8        v.

9    UAW LOCAL 259 PENSION FUND,

10                          Respondent.

11   ---------------------------------------x

12

13   BEFORE:

14          MICHAEL McDOWELL, ESQ.

15          Tuesday, December 6, 2016

16

17

18

19

20   Reported by:

21   Amy A. Rivera, CSR, RPR, CLR

22   JOB NO. 116310

23

24

25

## Page 2

December 6, 2016

9:04 a.m.

Arbitration proceedings held at the office of the AMERICAN ARBITRATION ASSOCIATION, 150 East 42nd Street, 17th Floor, New York, New York, pursuant to Notice, before Amy A. Rivera, Certified Shorthand Reporter, Registered Professional Reporter, Certified LiveNote Reporter, and a Notary Public of the States of New York, New Jersey, and Delaware.

## Page 3

Proceedings

A P P E A R A N C E S :

JONES DAY
Attorneys for Claimant
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
BY: EVAN MILLER, ESQ.
    JACOB ROTH, ESQ.
    JENNA BROFSKY, ESQ.

CLEARY, JOSEM & TRIGIANI
Attorneys for Respondent
    325 Chestnut Street
    Philadelphia, Pennsylvania 19106
BY: WILLIAM JOSEM, ESQ.

ALSO PRESENT:
    Darren French
    Thomas Levy
    Diane Gleave

## Page 4

Proceedings

THE ARBITRATOR: Good morning, everyone. I don't think I had a chance to shake hands with everybody, hello, hello, hello. My name is Michael McDowell. I'm the arbitrator the parties have selected to hear and determine the dispute that brings us here today.

First, for purposes of the record, if we could go around the room and I'd ask everyone to identify themselves and their affiliation.

Why don't we start with you.

MR. MILLER: Evan Miller, Jones Day, Washington, D.C., and representing Manhattan Auto.

MR. ROTH: Jacob Roth, also from Jones Day in Washington, D.C., and also representing Manhattan Auto.

MS. BROFSKY: Jenna Brofsky, Jones Day, Washington D.C., the same.

THE ARBITRATOR: All right. Jenna, could you spell your last name, please?

MS. BROFSKY: B-R-O-F-S-K-Y, Brofsky.

THE ARBITRATOR: Thank you.

## Page 5

Proceedings

MR. FRENCH: Darren French, independent actuarial consultant and expert for the plaintiff.

THE ARBITRATOR: Thank you.

MR. JOSEM: William Josem, counsel for the UAW 259 Pension Plan.

MR. LEVY: Thomas Levy with the Segal Company, expert witness on behalf of the plan.

MS. GLEAVE: Diane Gleave, Segal. I'm the Pension Fund actuary.

THE ARBITRATOR: Just a couple of things, as we go through this, I wanted to talk to you about how I comport myself.

When we're on breaks, and things like that -- I'm not sure how long we'll be here. We may not be here for a long time. We may be for longer. I just don't know.

But we're going to take breaks every now and then, and when we're on breaks, you're going to find me to be, with the exception of a spokesman, standoffish, even to the point of being rude.

And the reason for that is that in

Page 6

Proceedings

1
2  other arbitration cases in the past, people
3  have seen an arbitrator chatting with a
4  witness from one side or the other when the
5  other side wasn't present.  And they thought
6  that there was some favoritism going on when
7  an award came out against them.
8      And I don't want to have that happen.
9  I don't want to have you concerned about
10  that, so I'm going to slam the door on that
11  possibility.
12      So please don't get offended if I
13  don't say hello to you in the hall or --
14  it's not because I don't like you, I don't
15  like your side, I don't like your testimony.
16  It's just that I've got to act this way.
17  And, of course, you understand, so I
18  appreciate that.
19      The other thing, too, is I have a
20  digital recorder here.  I record all my
21  hearings no matter what.  And when I get in
22  this situation -- there's no reflection on
23  the court reporter, of course.
24      When I get the transcript, in cases
25  where a court reporter has been present,

Page 7

Proceedings

1
2  when I receive the transcript, I'll destroy
3  this.  But in some cases I've had where the
4  transcriber has been there, I haven't gotten
5  a transcript.
6      So this is just to aid me in case that
7  happens.  I doubt if that is going to happen
8  in this case, but in any event, it's here.
9  I want you to know what's going to happen to
10  it and where it's going.
11      If I don't get a transcript, this
12  thing is going to be destroyed before the
13  time I issue an award.  It's going no place
14  else, so you now what happens to your
15  voices.
16      MR. JOSEM:  So we have an agreement,
17  though, that the transcript by the court
18  reporter is the official record ultimately
19  of the hearing?
20      THE ARBITRATOR:  Absolutely.  Right.
21  this is never the official record.  It's
22  only an aid for me.
23      When I say "this," that's my
24  recording.
25      Okay.  We have -- we talked

Page 8

Proceedings

1
2  preliminarily about some preliminary
3  matters.  The first matter has to do with a
4  joint factual stipulation that I received,
5  which included, in addition -- that's dated,
6  it looks like, November 17 by Attorney
7  Miller and November 18th by Attorney Josem.
8      And attached there are the factual
9  allegations that were included in the
10  summary judgment interim award with some
11  typo corrections as being facts that are
12  admitted for purposes of this proceeding --
13      MR. JOSEM:  Yes.
14      THE ARBITRATOR:  -- and I'd like to
15  make that Arbitrator's Exhibit No. 1 for
16  this proceeding.
17      (Arbitrator's Exhibit 1 received in
18  evidence at this time.)
19      THE ARBITRATOR:  Of course, we're all
20  aware that there was an interim award
21  denying the parties' motions for summary
22  judgment that summarized the parties'
23  contentions and made references to the
24  record.
25      This joint factual situation -- excuse

Page 9

Proceedings

1
2  me -- stipulation includes in the record, as
3  I understand it by agreement of the parties,
4  all the documents that were submitted in
5  support of their summary judgment motions as
6  being deemed admitted without a question of
7  authenticity and without having to author
8  them.  They can still be referred to in
9  terms of what you do later on --
10      MR. MILLER:  That's correct.
11      THE ARBITRATOR:  -- as part of the
12  record.
13      MR. JOSEM:  Yes, sir.
14      THE ARBITRATOR:  And I noticed that in
15  the interim award, I listed just generally
16  what those exhibits were, so we have a
17  record of what that is.
18      So having said that, the next question
19  is how we proceed.  Things have been limited
20  in terms of what we need to prove here today
21  because of the work that you've done on the
22  factual stipulations, and I appreciate that.
23      Normally, as I understand it through
24  the multiemployer rules of the AAA, the
25  method of proceeding would be that the

Page 10

Proceedings

1 complaining party, the charging party -- I
2 keep forgetting which one that is, but in
3 any event, it's the employer would have
4 the -- would have the opportunity to go
5 first and present their opening statement
6 and their witnesses, and -- well, first of
7 all, I guess what we have is an agreement of
8 a 10-minute opening statement limitation for
9 the parties.
10 
11       MR. JOSEM:  Yes.  I may defer, but
12 right.
13       THE ARBITRATOR:  That's quite all
14 right.  I was just going to mention that,
15 that I'd ask you to do your opening
16 statement, and then I'd look to you, and you
17 may want to defer, if you'd like, or you may
18 open at that point, and then we'd have your
19 evidence subject to cross-examination.  When
20 you've rested your case, then your opening,
21 if you've deferred, your evidence subject to
22 cross-examination, any rebuttal, and then we
23 figure out how we close.
24       Now, that's normally how we proceed,
25 but sometimes there's a reason to vary that.

Page 11

Proceedings

1 
2       Any particular reason to vary that at
3 this point?
4       MR. MILLER:  No, no, sir.  We don't
5 see any on behalf of the employer.
6       MR. JOSEM:  We're fine with that.
7       THE ARBITRATOR:  All right.  Well,
8 thank you.
9       Are there any other preliminary
10 matters that I may have neglected?
11       MR. MILLER:  I don't think so, not on
12 behalf of Manhattan Auto.
13       MR. JOSEM:  No, sir.
14       THE ARBITRATOR:  We did take care of
15 the fact that we're going to consider part
16 of the record the documents that were
17 submitted in the summary judgment motions --
18       MR. MILLER:  That's correct.
19       THE ARBITRATOR:  -- by all parties,
20 all of those documents?
21       MR. MILLER:  That's correct --
22       MR. JOSEM:  Yes, including the
23 deposition transcripts and all of the other
24 various exhibits with all parties reserving
25 the right to obviously object to relevance,

Page 12

1       Opening Statement by Mr. Miller
2 and certainly, you will give weight to those
3 documents as you deem fit.
4       MR. MILLER:  That's correct.
5 Depositions are included among the
6 agreed-upon admitted documents, and each
7 party will reserve the right to make its
8 arguments about weight to be given to
9 certain documents.
10       THE ARBITRATOR:  Okay.  Is there
11 anything else more specific we ought to put
12 on the record about your preliminary
13 agreements in this respect?
14       MR. MILLER:  I don't believe so.
15       MR. JOSEM:  Not that I can think of.
16       THE ARBITRATOR:  Okay.
17       All right.  Attorney Miller, you may
18 open, if you'd like, on behalf of the -- of
19 Manhattan Auto.
20       MR. MILLER:  Thank you,
21 Mr. Arbitrator.
22       The fundamental issue in this
23 arbitration is whether, under the
24 circumstances here involving this
25 multiemployer Fund, it was reasonable for

Page 13

1       Opening Statement by Mr. Miller
2 the Local 259 Pension Fund to calculate
3 withdrawal liability using a discount rate
4 materially lower than its actuary's best
5 estimate of what the actual assets in the
6 Fund would earn over the long-term, which
7 best estimate was 7.5 percent.
8       As applied to the unusual
9 circumstances of this case, where the Fund's
10 own actuary certified that the Fund was
11 111 percent funded, indeed, where the
12 actuary concluded that her best estimate of
13 the anticipated experience of this Pension
14 Fund was that it would earn a long-term
15 return on assets sufficient to create a
16 cushion above what was needed to meet its
17 long-term obligation to pay benefits.
18       The failure in that circumstance to
19 use the Fund's actual investment return
20 assumption of 7.5 percent is, we believe,
21 unreasonable and egregiously so.
22       For purposes of determining annual
23 employer contributions, for purposes of
24 advising the pensioners of the Local 259
25 Fund about the safety of their pensions, for

Page 14

1    Opening Statement by Mr. Miller
2    purposes of advising employers about the
3    funding status of the plan, for all these
4    purposes, Mr. Arbitrator, the actuary
5    examined the anticipated experience of this
6    pension plan and concluded that the plan was
7    more than fully funded.
8       But when it came to calculating
9    withdrawal liability, the story was
10   different.  The assets in the Fund were
11   deemed to be insufficient to pay the
12   anticipated benefits.  So how could this be?
13      It occurred because for withdrawal
14   liability purposes only, the Fund engaged in
15   a fiction.  Ms. Gleave, the Fund's actuary,
16   assumed a hypothetical situation in which
17   the assets of the Fund would not be invested
18   in their actual manner, but instead, in a
19   manner that would earn a far lower return
20   based on rates published by the PBGC, which
21   rates are proxies for a portfolio of very
22   conservative bonds.
23      She then applied that much lower rate
24   to value the liabilities up to the market
25   value of this Fund's assets, and then all

Page 15

1    Opening Statement by Mr. Miller
2    the future benefit liabilities in excess of
3    the current market value of the Fund's
4    assets were present valued at 7.5 percent.
5       So this blending of both PBGC rates
6    and the 7.5 percent, this so-called blended
7    approach was based on a fiction of an
8    investment portfolio that did not exist
9    within the Fund trust at the time of the
10   withdrawal calculation and for which there's
11   no evidence it will ever exist in this
12   Pension Fund.
13      But application of that so-called
14   blended approach resulted in this Fund being
15   deemed to be only 73 percent funded instead
16   of 111 percent funded in the context of
17   withdrawal liability.
18      And so in the context of withdrawal
19   liability, employment of this fiction
20   suddenly had the same pension plan being
21   $31.7 million underfunded with unfunded
22   vested benefits and, viola, Manhattan Auto's
23   share of those unfunded vested benefits was
24   deemed by the Fund to be $2.55 million.
25      Now, you'll hear from Mr. Josem and

Page 16

1    Opening Statement by Mr. Miller
2    his witnesses that this artificial exercise
3    is actuarially justified and it's
4    reasonable, because they'll claim that
5    there's a special purpose in calculating
6    withdrawal liability.
7       And specifically, the Pension Fund
8    will contend that when an employer
9    withdraws, it no longer bears the risk
10   associated with the Pension Fund's assets
11   and, therefore, those assets should not be
12   used to present value the liabilities.
13      But ERISA specifically requires in the
14   context of withdrawal liability that
15   actuaries select assumptions that "offer the
16   best estimate of anticipated experience
17   under the plan."
18      It doesn't ask for the PBGC's
19   anticipated experience with its underlying
20   assets or the experience of assets to
21   support annuities that might be issued by a
22   commercial insurance carrier, like
23   Prudential or MetLife.
24      By Ms. Gleave's own certification, her
25   best estimate of the anticipated long-term

Page 17

1    Opening Statement by Mr. Miller
2    experience of the assets of this Fund is
3    7.5 percent.
4       For a pension plan that for virtually
5    all purposes is overfunded, that is has a
6    cushion of assets in excess of what's needed
7    to pay future projected liabilities, for a
8    plan in that context to look not at the
9    plan's anticipated experience, but to
10   conjure up a hypothetical situation only to
11   determine withdrawal liability is to engage
12   in conduct that directly conflicts with this
13   statutory test that I just identified for
14   selecting assumptions in withdrawal
15   liability matters.
16      And in this particular case, given the
17   overfunding of the plan, it's highly unfair.
18   And the effect in this case, causing a $2.55
19   million liability to exist where there
20   otherwise would be none is so great that,
21   even assuming all of the other assumptions
22   that the Pension Fund actuary used to
23   calculate withdrawal liability were
24   reasonable, this one flaw is so egregious it
25   causes the actuarial assumptions in the

Page 18

D. French - Direct - Mr. Miller

1    aggregate to be unreasonable.
2        So at bottom, we believe that the
3    Fund's actuary has selected a discount rate
4    assumption for withdrawal liability purposes
5    that is highly biased in favor of either
6    other contributing employers or their
7    employees and retirees.  And this bias
8    judgment should not stand.  Thus, we request
9    that the assessment should be ordered to be
10   recalculated to zero and withdrawn.
11       Thank you, Mr. Arbitrator.
12       THE ARBITRATOR:  Thank you.
13       Would you like to open on behalf of
14   the Pension Fund?
15       MR. JOSEM:  No, I'll defer.
16       THE ARBITRATOR:  All right.
17       MR. JOSEM:  Thank you.
18       MR. MILLER:  All right.  In that
19   case --
20       THE ARBITRATOR:  Would you like to
21   present your case?
22       MR. MILLER:  -- right -- we will call
23   our first witness, Mr. Darren French.
24
25

Page 19

D. French - Direct - Mr. Miller

1    D A R R E N   F R E N C H, having been duly sworn,
2    testified as follows.
3    DIRECT EXAMINATION
4    BY MR. MILLER:
5        Q.   Good morning, Mr. French.
6        A.   Good morning, Mr. Miller.
7        Q.   What is your profession, sir?
8        A.   I am an actuarial consultant on
9    multiemployer pension funds.
10       Q.   And are you a so-called "enrolled
11   actuary"?
12       A.   Yes, I am.
13       Q.   And just briefly describe for the
14   Arbitrator your general qualifications as an
15   actuary.
16       A.   I spent about 30 years with Buck
17   Consultants, which is one of the large actuarial
18   firms, in the last 25 years or so working
19   predominantly on multiemployer plans in a variety
20   of contexts.
21       Q.   And are you a member of any of the
22   professional societies in connection with the
23   actuarial profession?
24       A.   Yes, I am.  I'm a member of the
25

Page 20

D. French - Direct - Mr. Miller

1    American Academy of Actuaries, and I am a
2    retired -- inactive member of Society of
3    Actuaries.
4        Q.   Okay.  And did you ever serve in any
5    leadership role in any of those professional
6    societies?
7        A.   Yes, I did.  I was a member of the
8    multiemployer subcommittee of the American Academy
9    of Actuaries from about 2008 to about 2014.
10       Q.   Okay.  And during your lengthy career
11   with Buck, could you briefly summarize your
12   experience in connection with multiemployer
13   pension funds?
14       A.   I was involved in pretty much
15   everything.  I did valuations.  I consulted with
16   employers.  I consulted with funds.  I did benefit
17   design.  And I did an enormous amount of work
18   related to withdrawal liability.
19       Q.   And in your last several years at --
20   at Buck, roughly how many multiemployer funds did
21   you perform actuarial work for?
22       A.   Oh, over the last 10 years at Buck,
23   probably -- I was probably the enrolled actuary on
24   maybe 15 or so funds.
25

Page 21

D. French - Direct - Mr. Miller

1        Q.   And beyond serving as the formal
2    enrolled actuary, did you also provide actuarial
3    services to other multiemployer plans where you
4    were not the formal enrolled actuary?
5        A.   Yes, I did.
6        Q.   And very briefly, again, for the
7    Arbitrator, can you describe the responsibilities
8    of a so-called enrolled actuary of a multiemployer
9    fund?
10       A.   Right.  Well, there's a -- you know, a
11   variety of responsibilities, but just to -- you
12   know, most importantly, it's kind of the buck
13   stops with you.  You sign the forms.  You are
14   ultimately responsible for choosing the
15   assumptions, and you are ultimately responsible
16   for the results.
17       Q.   Okay.  And what are the primary forms
18   that the enrolled actuary is responsible for in
19   connection with a multiemployer pension?
20       A.   Probably the most critical one is the
21   Schedule MB to the Form 5500, which is an annual
22   filing required with the government.
23       Q.   And in addition to the so-called MB,
24   are valuation reports routinely prepared by
25

Page 22

D. French - Direct - Mr. Miller

actuaries for funds?

A. Yes, actuaries who are members of the American Academy are required to perform reports and certify results in a certain fashion.

Q. And those reports, would they include the annual actuarial valuation report?

A. Yes, they would.

Q. So would it be fair to say that the enrolled actuary for a multiemployer plan is responsible for the preparation of and certification of assumptions that are contained in an annual actuarial valuation report?

A. Yes, that would be a fair statement.

Q. And you mentioned that you also have experience with respect to withdrawal liability under ERISA.

Why don't you briefly summarize for the Arbitrator that experience.

A. Oh, I have -- I worked -- I probably personally did or supervised hundreds of calculations for 10 or 15 funds, and I was also often involved in checking auditing of other actuaries of other funds on behalf of contributing employers to funds that I was not the actuary on.

Page 23

D. French - Direct - Mr. Miller

I was -- probably did 50 to 100 of those on many, many, many funds, I believe, quantifier.

Q. You indicated that you're currently -- or that you are retired from Buck Consulting.

Are you working part-time or otherwise these days?

A. Yes, I am a part-time independent consultant with my own firm, and I am also currently, and have been since August of 2015, been a visiting actuary at the Pension Benefit Guarantee Corporation, or PBGC as it's known for short.

Q. Do you have a formal title at PBGC these days?

A. Actually, my formal title is "visiting actuary," although I think I'm mostly described as the multiemployer expert that helps with everything --

Q. Okay.

A. -- multiemployer liability related.

Q. And why don't you summarize for the Arbitrator what your actuarial duties and responsibilities are currently at the PBGC?

A. Basically, I'm a -- I'm an employee

Page 24

D. French - Direct - Mr. Miller

who's really a consultant to all the various divisions mostly helping out with implementation of a new pension law that's been out there, MEPRA 2014, as well as any withdrawal liability issues that come up trying to understand the real-world implications of decisions, helping to get regs out.

And I'm also lent out to the DOL and Treasury to help them when those issues come up, because they don't have the kind of expertise that they need, for example, the central state application.

Q. And by "DOL" -- you mean?

A. I'm sorry. The United States Department of Labor.

Q. Okay. All right. In general, what do you understand to be the purpose of withdrawal liability?

A. The purpose -- you know, in short, the purpose of withdrawal liability is to make sure that an employer who negotiates out of a Fund or leaves a Fund doesn't leave other employers holding the bag. They pay their fair share of the liabilities, if they are, in fact, unfunded.

Page 25

D. French - Direct - Mr. Miller

Q. Okay. And does the withdrawal liability scheme look at and address a payment of unfunded vested benefits? Is that a term, "unfunded vested benefits," that you've heard before?

A. Yes, it is.

Q. Okay. And can you explain what is meant by the term "unfunded vested benefits"?

A. Okay. I'll try to keep this as basic as I can.

There's really two pieces of that calculation. One is you look at the assets of the Fund, and that's typically not an actuary's job. That's an auditor or accountant's job. That's one number.

The actuary's job is to determine what's known as the present value of vested benefits. So these are the accrued benefits under the plan that are due based on what's been accrued to date. And based on various different assumptions, we determine what that present value is.

So you've got a liability, you've got an asset value. If the liability exceeds the

Page 26

D. French - Direct - Mr. Miller

1  asset value, then there's what's known as an
2  "unfunded vested benefit obligation."
3
4      Q.   And how does an actuary go about
5  measuring the present value of a pension plan's
6  benefit liabilities?
7      A.   Okay.  I guess the -- the clearest way
8  I could try to describe this is there's two -- a
9  two-step process.
10         One is based on all kinds of
11  assumptions about retirement, how long people are
12  going to live, how long they're going to stay with
13  the employer, figuring out at each point in time
14  in the future how much dollars to benefits need to
15  be paid out, so from now 'til 100 years from now,
16  what the Fund's likely to pay out each year.
17  That's step 1, and that's a very big, complicated
18  step.
19         Step 2 is to take each of those
20  numbers and bring them back, discount them back,
21  to today, and that's what makes it a present
22  value.
23     Q.   And why don't you elaborate a little
24  on what it means to discount a future benefit
25  liability or future payment to present value.

Page 27

D. French - Direct - Mr. Miller

1
2      A.   Okay.  So the Fund has a trust fund
3  with assets in it, and you want to know today how
4  much you need in that Fund in order to pay all
5  those obligations.  So you need to make an
6  assumption about, well, how are those assets going
7  to grow in the future?  What kind of investment
8  return will they get?
9          So if the Fund gets that investment
10 return, what you want to do is look at each of
11 those payments way out and bring them back by that
12 same investment return, so that if the Fund
13 actually achieves what you think it's going to
14 achieve, you'll have exactly the right amount of
15 money at each point in time.
16         That's the concept.
17     Q.   What then is in your judgment the
18 relationship between the discount rate that you
19 used to present value liabilities and the
20 investment return rate on the assets that will pay
21 those liabilities?
22     A.   I sort of think of them as opposite
23 sides of the same coin.  They're almost the same
24 thing.  You can't have one without the other.
25     Q.   And why don't you elaborate on that a

Page 28

D. French - Direct - Mr. Miller

1
2  little bit.
3      A.   Well, in other words, if you assume --
4  let's say, for example, you've got a hundred
5  dollars, and it's going to grow 10 percent a year.
6  It will be 110 next year, and maybe 120 and change
7  the next year.  To get back, you need to divide by
8  that same number in order for all the calculations
9  to be internally consistent.
10     Q.   For withdrawal liability purposes,
11 what is your understanding of how ERISA directs
12 actuaries to select a discount rate to present
13 value vested benefits?
14     A.   Okay.  Well, I think the language
15 under the statute is pretty clear.  The actuary
16 needs to use their best estimate of the
17 anticipated experience under the plan.
18     Q.   And what is your understanding of what
19 that phrase means, "best estimate of the
20 anticipated experience under the plan"?
21     A.   Okay.  Well, the best estimate part
22 means it's your boast estimate.  It's not high.
23 It's not low.  It's not conservative.  It's not
24 optimistic.  It's you had to pick a number, that's
25 your best guess.

Page 29

D. French - Direct - Mr. Miller

1
2          The anticipated experience under the
3  plan for purposes of the discount rate or the
4  interest rate has to be the return on the assets,
5  because there is no other experience that you
6  could be looking at.
7          That is what you're measuring.  That
8  is the assumption that will -- that's what the
9  experience will be.  The assets will earn whatever
10 they earn.  That's the experience they're talking
11 about.
12     Q.   So I want you to elaborate on that a
13 little bit more for the Arbitrator.  Why should
14 the discount rate for purposes of calculating
15 present value vested benefits in a withdrawal
16 calculation be based on the investment return
17 assumption that the plan's actuary anticipates for
18 the assets in the plan?
19     A.   Okay.  The best thing I can do is with
20 an example.
21         If you need $110 a year from today,
22 and you think you're going to earn 10 percent, to
23 make up a hypothetical, then you need $100 today,
24 that grows to 10 percent, that will get you to
25 110.  So you've got to discount back by that same

Page 30

D. French - Direct - Mr. Miller

rate so that you have the right number in the Fund.

It's -- in order to have 110, you think you're going to earn 10 percent, then you've got to discount that 110 back to today based on what you think the assets are going to achieve going forward.

Q. If an actuary employs a discount rate for withdrawal liability purposes that is lower than the actuary's best estimate of the anticipated investment return on the pension fund's assets, what is the effect of that on the Pension Fund?

A. The effect is, if the Fund, in fact, achieves what we think it's going to achieve, it's going to overfund the plan. So you're going to have more money in the plan than what you actually need to pay the benefits.

Q. And in the context of a pension plan is there a particular interest rate that the pension plan uses to predict how much its current assets will grow through investments? Is there a term for that?

A. Yes. The investment return

Page 31

D. French - Direct - Mr. Miller

assumption.

Q. Okay. And so is it fair to say that, in your opinion, the investment return assumption should be used to discount the plan's future benefit obligations for withdrawal liability purposes?

A. Yes.

Q. Okay.

Are you familiar, sir, with the concept of -- strike that.

Are you familiar with the concept in the actuarial profession of "actuarial bias"?

A. Yes, I am.

Q. Okay. And is that phrase, "actuarial bias," is that a phrase that is one that has a common understanding in the actuarial profession?

A. I think it does, and it's, in fact, I think, even described in one of the actuarial standards, and it means an assumption that has some significant optimism or some significant conservatism.

In other words, if you think you're going to get 7 and a half, it's your best estimate, but you use 6, well, that's clearly a

Page 32

D. French - Direct - Mr. Miller

bias. Because you're saying, well, maybe we're not going to get 7 and a half. Maybe we'll get 6, maybe we'll get 10, but we want to use 6 to be conservative. That would be the definition of a "bias."

Q. So it is a -- an actuarial bias assumption an assumption that is either more likely to underestimate or overestimate what will happen than an accurate prediction?

A. Than your best estimate prediction, yes.

Q. If an actuary's best estimate of how a pool of trust fund assets is anticipated to perform is 7.5 percent, but it assumes a different estimate for a withdrawing employer, in your judgment is the actuary engaging in bias?

A. Absolutely.

Q. Why?

A. Because of the definition of "bias." They are using a lower rate to be conservative on purpose. You think you're going to get 7 and a half but you're using 6 or 5.

Q. Okay. Is your opinion that actuaries should generally use the investment return

Page 33

D. French - Direct - Mr. Miller

assumption to discount future liabilities when calculating withdrawal liability, is that opinion, in your view, consistent with actuarial principles?

A. It is absolutely consistent with actuarial principles.

Q. And I think you mentioned in regard to your answer to another question the concept of actuarial standards or actuarial standards of practice.

Are there, in fact, actuarial principles there are embodied in certain standards that -- that dictate how actuaries should go about selecting a discount rate for the purpose of discounting liabilities?

A. There are standards that, say, dictate or guide and you are supposed to follow if you are a member of that actuarial organization.

Q. So let's talk about that a little bit.

You've heard of the term "actuarial standards of practice," correct?

A. Yes, I have.

Q. Okay. And actuarial standards of practice, I take it, are also known in the

Page 34

D. French - Direct - Mr. Miller

profession as -- by the acronym "ASOP."  Is that
correct?

A.   ASOPs or A-S-O-P.

Q.   What are ASOPs, or actuarial standards
of practice?

A.   They are promulgated by the Actuarial
Standards Board, and they give mandatory guidance
to actuaries who are members of the Academy, which
everybody in this room is, or every actuary in
this room is, I should say -- sorry -- on how you,
if you were if going to hold yourself out as a
member of the Academy and attest to that in your
reports, which you must do, you must follow.

Q.   Mr. French, I'm going to ask the court
reporter to mark as, I think, Arbitrator
Exhibit 2 --

MR. MILLER:  Is that right?

(Arbitrator's Exhibit 2, was marked
for identification at this time.)

Q.   So, Mr. French, I've just handed to
you what's been marked by the court reporter as
Arbitrator Exhibit 2, and can you identify this
document, please?

A.   Yes.  This is Actuarial Standards of

Page 35

D. French - Direct - Mr. Miller

Practice No. 27, issued by the Actuarial Standards
Board.

Q.   Okay.  And are you familiar with
Actuarial Standard of Practice No. 27?

A.   Oh, yes.

Q.   Okay.  And do you routinely use this
ASOP in connection with your practice?

A.   Yes, I do.

Q.   And does this ASOP, Actuary Standards
of Practice, 27, does this standard provide
guidance or requirements to actuaries who are
members of the Actuarial Standards Board in
connection with how they should go about selecting
a discount rate for purposes of discounting
pension liability?

A.   Yes, I believe it does.

Q.   What is the date of the ASOP that I've
handed you and which has been marked as Arbitrator
Exhibit 2?

A.   It says it was adopted September 2007,
updated for deviation language effective May 1,
2011.

Q.   Okay.  Am I correct that there is a
later iteration, a more recent iteration, of

Page 36

D. French - Direct - Mr. Miller

ASOP 27?

A.   That is correct.

Q.   Okay.  But this particular version of
ASOP 27, which has been marked as Arbitrator
Exhibit 2, would this have been the version of
ASOP 27 that would have been in force at the time
the Pension Fund here calculated the withdrawal
liability imposed on Manhattan?

A.   Yes, that is my understanding.

Q.   All right.  Can you turn to
Section 3.6 of ASOP 27?

A.   Yes.

Q.   Which begins --

MR. MILLER:  It begins,
Mr. Arbitrator, on page 5.  Thank you.

Q.   And, Mr. French, why don't you just
read to yourself the first three paragraphs of
3.6.

A.   Okay.

Q.   Okay.  So in your judgment, what's the
general proposition that's stated by Section 3.6
regarding selecting a discount rate?

A.   It's basically that the discount rate
is generally the same as the investment return

Page 37

D. French - Direct - Mr. Miller

assumption.

Q.   Okay.  And am I correct that
Section 3.6 also states certain exceptions to that
general principle?

A.   Yes, it does.

Q.   Okay.  And am I right that there are
two exceptions that are noted here?  Is that
correct?

A.   That's correct.

Q.   Okay.  And what's the first exception?

A.   The first exception is for purposes
such as SFAS No. 87, which is a --

Q.   Go ahead.

A.   I'm sorry -- which is a corporate
accounting standard that governs pension plan
footnotes and pension plan accounting for
corporations.

Q.   Okay.  And does this Section 3.6
acknowledge that for certain purposes accounting
standards require a different discount rate than
the investment return?

A.   I think that's what they're saying,
yes.

Q.   Okay.  And this second exception, what

Page 38

D. French - Direct - Mr. Miller

1  is that all about?
2      A.   The second exception is for unfunded
3  plan valuations.
4      Q.   And what do you mean by an "unfunded
5  plan valuation"?
6      A.   It would mean a plan that does not
7  have a dedicated portfolio of assets behind it.
8  In other words, you can't look to any pool of
9  assets, or legally anyway, or to a trust fund to
10  pay the benefits out of it.  So that would be
11  referred to as an "unfunded plan" or a "non-funded
12  plan."
13      Q.   And so where a benefit arrangement
14  does not have a trust fund of assets or an
15  otherwise dedicated pool of assets, in that
16  circumstance, am I right there is no investment
17  return assumption to potentially use?
18      A.   There's nothing you can look at
19  because there are no assets.  There would be no
20  investment policy.  It just wouldn't make any
21  sense to try to use an investment return
22  assumption because there's nothing to measure.
23      Q.   But in the -- in the context of the
24  Pension Fund in this matter, there is a trusted
25

Page 39

D. French - Direct - Mr. Miller

1  fund of assets, correct?
2      A.   Trusted fund of assets by law, and
3  yes, there is.
4      Q.   In the absence of the two exceptions
5  that are identified in ASOP 27, Section 3.6, do
6  you believe it is appropriate to select as a
7  discount rate in valuing benefit liabilities a
8  rate other than the investment return assumption?
9      A.   Not in this case.
10      Q.   And why is that?
11      A.   Because there is a pool of assets that
12  is clearly dedicated and must be dedicated to it
13  and because the statute doesn't point you to
14  something other than this.  It in fact says you
15  must use the anticipated experience under the
16  plan, so the statute itself is directing you to
17  the investment return.
18      Q.   Okay.  Just to clarify the record, am
19  I correct that the investment return assumption
20  for the Local 259 Pension Fund in this case was
21  7.5 percent at the time of the withdrawal in this
22  case, correct?
23      A.   Well, that is the actuary's certified
24  assumption in -- on the Schedule MB and on the --
25

Page 40

D. French - Direct - Mr. Miller

1  in the actuarial valuation report certainly for
2  that year and quite a few years prior to that.
3      Q.   And let me clarify the record on that
4  point as well.
5         So the 7.5 percent investment return
6  assumption that the Pension Fund's actuary here
7  had certified as her best estimate of anticipated
8  returns, that number, 7.5 percent, that had been
9  in effect not merely in the year of withdrawal but
10  in several years prior thereto?
11      A.   In every year they looked at.
12      Q.   And approximately how many years of
13  actuarial reports did you examine?
14      A.   Five years.
15      Q.   Okay.  Beginning in what year, sir?
16      A.   I think it was '10, 2010.
17      Q.   Okay.  Back to 2010?
18      A.   Right.
19      Q.   Okay.  From 2010 through 2014?
20      A.   '14.
21      Q.   Thank you.
22         And, indeed, does the 7.5 percent
23  investment return assumption necessarily have to
24  be the actuary's best estimate of future
25

Page 41

D. French - Direct - Mr. Miller

1  anticipated returns?
2      A.   7.5 doesn't have to be the number, but
3  that is the number that she derived and,
4  therefore, that is -- that is her -- that is
5  certified as her best estimate.
6      Q.   And the number itself, 7.5 percent, in
7  your experience was that an unusual investment
8  return assumption for a multiemployer pension plan
9  to have in 2013, '14?
10      A.   For a plan of this size and invested
11  the way this plan is is not at all unusual.  In
12  fact, it's probably the most common way.
13      Q.   Did the Pension Fund here also use
14  that same rate to discount benefit liabilities
15  when calculating withdrawal liability?
16      A.   No.
17      Q.   And we'll get into specifics in a
18  moment, but for now, did the Fund use a higher or
19  lower effective discount rate than 7.5 percent
20  when calculating withdrawal liability?
21      A.   They used a lower effective discount
22  rate.
23      Q.   You're familiar with the term "Segal
24  Blend," are you not?
25

D. French - Direct - Mr. Miller

A.  Yes, I am.

Q.  And what do you understand the Segal Blend to mean?

A.  The simplest terms, the easiest to understand terms for non-actuaries, it's basically just an averaging of the regular funding rate, which in this case is 7.5 percent, and the PBGC rates, which in this case are a little above 3 percent.

Q.  And these so-called PBGC rates, how do actuaries go about learning what the PBGC rates are?

A.  The PBGC publishes them every month on their website.

Q.  And in your judgment, what do the interest rates that are published monthly by PBGC on their website, what do they represent?

A.  To the best of my understanding, I don't work on them, but my understanding is that they are supposed to represent annuity pricing rates.

They go out -- the PBGC goes out to a group of insurers collecting information and kind of backs into what kind of a discount rate would

D. French - Direct - Mr. Miller

produce those prices.

Q.  Meaning what kind of discount rate insurance companies in the commercial markets would charge for issues -- for valuing a pension annuity product?

A.  Correct.

Q.  And what is your understanding of how, if you have one, commercial insurance companies themselves know about deriving these annuity rates that they use and the PBGC surveys for purposes of coming up with its published rates?

A.  Again, I've never worked in an insurance company, but my understanding is --

MR. JOSEM:  Well, I'm going to object to that, obviously, if he doesn't have direct knowledge.

MR. MILLER:  But why don't we -- why don't we -- I would suggest the following: Let's have the witness answer and give the basis for his understanding, and then, in light of the basis that he articulates, we can make a determination whether to allow it in and for you to give it whatever weight you deem appropriate.

D. French - Direct - Mr. Miller

THE ARBITRATOR:  All right.  At this point, the objection is premature.  We'll allow you to establish that foundation.

MR. MILLER:  Okay.  All right.

A.  My understanding from many decisions and being involved in many annuity purchases on the other side is that they basically look toward high-quality corporate bonds and government bonds to determine the pricing.

MR. MILLER:  Okay.  So let me lay a foundation and just to get him to elaborate a little bit more.

Q.  So am I correct, sir, that you do have experience representing pension funds when they go into the commercial market and seek to purchase annuities?

A.  Correct.

Q.  Okay.  And in connection with that experience, you have obtained information about the process by which the commercial insurance carriers themselves develop discount rates for pricing the annuities that your clients, the pension funds, have purchased?

A.  Yes.  And I've even been able to kind

D. French - Direct - Mr. Miller

of test it because we could check the calculations based on that understanding, and we hit out pretty close to their pricing, so...

Q.  And just to elaborate on that, the checking that you mean is to take the discount rate pricing that the commercial insurance annuity companies has offered and check it against the corporate bond rates, or more particularly, investment-grade corporate bond rates?

A.  Basically.

Typically, the insurance company gives you a price, this is how much we will charge you to take this on.  Well, we know what the benefit payments they're taking on are, we know what mortality they're kind of using, so we can back into what must have been the discount rate they used.

Q.  Then I want you to go to the next step, though, and then do you also test that discount rate against corporate bond rates to see if there's a correlation between the discount rate that they're quoting you and corporate bond?

A.  Yes.  And it's not always perfect. Again, there's all kinds of variations in annuity

Page 46

D. French - Direct - Mr. Miller

1  markets for market pressures and what have you.
2  D. French - Direct - Mr. Miller
3      Q.  But they are correlated?
4      A.  But they are absolutely correlated.
5      Q.  Okay.  In addition to the knowledge
6  that you've developed about how commercial
7  insurance annuity rates are derived in connection
8  with representing pension plans when they purchase
9  annuities, I think you also mentioned
10 participation in the presentations where the
11 subject of insurance company annuity rates and how
12 they're derived is discussed.  Is that right?
13     A.  Yes.  And I've been to seminars.  It's
14 pretty widely believed that they use corporate --
15 high-quality corporate bonds and government bonds
16 in their pricing.
17     MR. MILLER:  Mr. Arbitrator, I submit
18     that the witness has provided a sufficient
19     foundation to demonstrate that he has
20     adequate knowledge of how of the
21     relationship between how insurance companies
22     derive their discount rates and the
23     investment benchmarks that they -- they use
24     in connection with that.
25     MR. JOSEM:  I'm not sure where you're

Page 47

1  D. French - Direct - Mr. Miller
2  going with this, so I don't understand how
3  to respond to this.
4      You're asking about the testimony he's
5  provided?  I'm not objecting at this stage.
6      THE ARBITRATOR:  All right.  I don't
7  hear an objection at this stage, so continue
8  and until we do, if we do.
9      MR. MILLER:  Okay.
10 BY MR. MILLER:
11     Q.  So, again, what is your understanding
12 of how insurance company annuity rates are
13 derived?
14     A.  They are, I believe, derived based on
15 high-quality corporate bond and government bond
16 rates.
17     Q.  And would it, therefore, be fair to
18 say that PBGC's published rates are a rough proxy
19 for rates on a portfolio of high-grade corporate
20 bonds?
21     A.  That would be a fair statement based
22 on what PBGC says on their website.
23     Q.  Are you familiar with the term
24 "risk-free rates," sir?
25     A.  Yes, I am.

Page 48

1  D. French - Direct - Mr. Miller
2      Q.  And what does "risk-free rate" mean?
3      A.  Risk-free rate means the discount rate
4  or yield on a bond that you would get when there
5  is little or no risk of default.
6      Q.  And are high-grade corporate bonds and
7  high-grade corporate bond rates typically in the
8  market deemed to be a type of risk-free rate, sir?
9      A.  Risk free or very close.
10     Q.  In connection with the work you've
11 done in this case and the expert report that
12 you've submitted, did you review the investment
13 policy guidelines for the Pension Fund here, sir?
14     A.  Yes, I did.
15     Q.  Okay.  And based on that review of the
16 investment policy guidelines, is the Pension Fund
17 here either exclusively or significantly invested
18 in either high-grade corporate bonds or
19 treasuries?
20     A.  Certainly not -- not the majority of
21 the investments, no.
22     Q.  Have you yourself ever used the Segal
23 Blend when calculating or estimating withdrawal
24 liability for multiemployer funds for which you
25 were the enrolled actuary?

Page 49

1  D. French - Direct - Mr. Miller
2      A.  No.
3      Q.  Ever?
4      A.  No.
5      Q.  Why do you not use the Segal Blend?
6      A.  Well, two reasons:  One is more of a
7  technical problem.  It just, to me, doesn't have a
8  great basis in theory, but that's a secondary
9  reason.
10     The main reason is because it doesn't
11 even purport to represent the anticipated
12 experience under the plan unless -- unless the
13 plan has said or represented that it is, in fact,
14 going to purchase annuities or it is, in fact,
15 going to take those withdrawal liability payments
16 and put it into a separate investment vehicle that
17 is only invested in corporate bonds, and I have
18 never seen that situation.
19     It could happen, in which case I
20 might -- I might consider that an acceptable
21 method under those circumstances.  But I don't
22 know how anybody with a straight face can say that
23 that method is deriving the anticipated investment
24 return of the plan.  It just isn't.
25     And I was never comfortable, I'm not

13

Page 50

D. French - Direct - Mr. Miller

an attorney, but I can read the words of the law,
I mean...

Q.   And why don't you elaborate on your
level of comfort in potentially using the Segal
plan?

A.   I would not be comfortable.  Maybe if
an attorney said to me, absolutely, the law
doesn't mean what you think it means, it says
something else, and, therefore, you can use it,
maybe I would consider it.  But I've never had
that situation.

Q.   And as an actuarial matter, not as --
I don't want your legal opinion, as an actuarial
matter, do you believe that use of the Segal Blend
is reasonable to be applied to determine the
present value of benefit liabilities in a
withdrawal liability calculation?

A.   Not in this case in this Fund.

Q.   In light of the Fund's 7.5 percent
investment return assumption, in your judgment,
did the Pension Fund here need any withdrawal
liability payments by Manhattan Auto in order to
meet its future accrued benefit obligations?

A.   No.  The actuary's report shows the

Page 51

D. French - Direct - Mr. Miller

plan has more than adequate assets based on her
best estimate assumptions.

Q.   And do you have an understanding of
how much more than fully funded this plan was at
the time the withdrawal liability calculation was?

A.   My recollection is it was about 111,
112 percent funded.  So it had 11 or 12 percent
more assets, a cushion, even from the best
estimate assumption.  So there was room for error
even.

Q.   And to have a funding level of
111 percent in -- I believe that the applicable
plan year for withdrawal liability purposes would
be the plan year ending December 31, 2013.  Is
that correct?

A.   That's correct.

Q.   To have a 111 percent funded plan, in
your experience, was that typical for
multiemployer plans at that time?

A.   In 2014, not at all.  It's rare.

Q.   And based on your experience, how
would you characterize the funding status of this
plan?

A.   For 2014, I would characterize it as

Page 52

D. French - Direct - Mr. Miller

extraordinary or very good at least.

Q.   Okay.  So by calculating withdrawal
liability for Manhattan Auto using the Segal
Blend, as opposed to the 7.5 percent rate, what
will be the impact on this Pension Fund?

A.   The withdrawing employer is putting
more money -- the plan is already overfunded on
the actuary's best estimate assumptions and the
employer is making it even more overfunded.  And
she said Manhattan Ford is being forced to make it
more overfunded.

Q.   And who does that potentially benefit?

A.   Certainly could benefit the other
continuing contributing employers.  They could
conceivably lower their contribution rate as a
result of that.

Q.   Okay.  In this context, with an
overfunded plan by obtaining withdrawal liability
payments from Manhattan Auto that, in your
judgment, adds to this cushion of overfunding,
would that also allow the union and the employers
in bargaining to potentially bargain for higher
pensions -- high pension accruals?

A.   Conceivably, sure.

Page 53

D. French - Direct - Mr. Miller

Q.   And could they do so in a manner that
favors only the active employees of its remaining
contributing employers and, thus, not the
participants in the plan that had been previously
employed at Manhattan Auto?

A.   Well, not only could they but based on
my experience of many years, they almost certainly
would, and for good reason.

I mean, the active employees and the
active employers are the ones that you need to
keep happy.  That's the people that the union
that's behind the plan wants to keep happy.

I've rarely seen benefit increases,
when they happen at all, which is rare as well,
applied to employees of someone who's not a
contributing employer.

Q.   In your judgment, in these
circumstances, would Manhattan auto be paying more
or less than its allocable share of the benefits
in this Fund?

A.   More.

Q.   Okay.  Did you review the other
actuarial assumptions that the Pension Fund
actuary here employed in estimating and valuing

Page 54

D. French - Direct - Mr. Miller

1    D. French - Direct - Mr. Miller
2    the Pension Fund's unfunded vested benefits for
3    the withdrawal liability assessment?
4         A.   Yes, I did.
5         Q.   And did you find that -- well, strike
6    that.  Let me lay a foundation.
7         Can you elaborate for the Arbitrator
8    what sum of those other actuarial assumptions are
9    that are also embedded in the withdrawal liability
10   calculation?
11        A.   Yes.  Aside from the discount rate or
12   investment return rate, the other key assumptions,
13   the ones that really affect, are how long the
14   mortality table is, which is to say how long we
15   expect participants to live and collect their
16   benefits.  And when a retiree or non-retired
17   person is going to choose to start collecting
18   their benefit and what form of payment, to the
19   extent there's optional forms, which form of
20   payment that participant is going to choose.
21   Those are the key other assumptions.
22        Q.   Okay.  And, sir, in your examination,
23   did you find that any of the other assumptions
24   that were selected were, in your view, actuarially
25   unreasonable?

Page 55

D. French - Direct - Mr. Miller

1    D. French - Direct - Mr. Miller
2         A.   No, they seemed fairly mainstream, as
3    I recall.
4         Q.   Okay.
5              THE ARBITRATOR:  It was their Factual
6    Agreement No. 12.  So essentially --
7              MR. MILLER:  I'm just laying a
8    foundation.
9              THE ARBITRATOR:  Oh, okay.
10             MR. MILLER:  I'm sorry, I was just
11   laying a foundation for the --
12             THE ARBITRATOR:  I was just confused.
13   Is there going to be a problem with that?
14             MR. MILLER:  No, not at all --
15             THE WITNESS:  I don't think there's
16   any disagreement on this.
17             MR. MILLER:  -- it's just the
18   foundation to give you the context for what
19   is now coming.
20             THE ARBITRATOR:  Okay.  I'm with you.
21             MR. MILLER:  I apologize for the long
22   runway.
23             THE ARBITRATOR:  It's all right.
24        Q.   So with that in mind, would you say
25   that the actuarial assumptions used to compute the

Page 56

D. French - Direct - Mr. Miller

1         D. French - Direct - Mr. Miller
2    unfunded vested benefits here were unreasonable in
3    the -- unreasonable in the aggregate?
4         A.   Yes.
5         Q.   So let me understand this:  Your
6    opinion is, other than the discount rate, the
7    other assumption were reasonable, correct?
8         A.   Correct.
9         Q.   And that's now been stipulated to.
10        How could the unreasonableness of one
11   assumption make the assumptions in the aggregate
12   unreasonable?
13        A.   Well, it almost has to be, right?  If
14   everything else is right and one thing is wrong,
15   that in and of itself, but in particular, because
16   this is such an important assumption, it is by far
17   the key assumption that affects the liabilities in
18   a very significant way, and when that one
19   assumption is wrong but everything else is right,
20   it's going to have a severe effect on the numbers.
21        And you can see in this case, it
22   caused the -- you know, a plan that's over 100
23   percent funded to look like it's 70 percent
24   funded.  That's unreasonable in the aggregate,
25   almost by definition.

Page 57

D. French - Cross - Mr. Josem

1         D. French - Cross - Mr. Josem
2         Q.   Okay.  And just for completeness then,
3    Mr. French, what is your expert opinion regarding
4    the actuarial assumptions used by the Fund here to
5    compute its unfunded vested benefits?
6         A.   The actuarial assumptions in my
7    opinion are unreasonable in the aggregate.
8              MR. MILLER:  Thank you, sir.
9              No additional questions.
10             THE ARBITRATOR:  Would you like to
11   cross-examine?
12             MR. JOSEM:  Yeah.  Could we have a
13   5-minute break?
14             THE ARBITRATOR:  Certainly can.
15             Let's take a 5-minute break.
16             MR. JOSEM:  Thank you.
17             (Recess taken from 10:08 a.m. until
18   10:22 a.m.)
19             THE ARBITRATOR:  Are you ready to pass
20   the witness?
21             MR. MILLER:  Yes, I am.
22             THE ARBITRATOR:  Okay.  You may
23   cross-examine.
24             MR. JOSEM:  Thank you.
25

Page 58

D. French - Cross - Mr. Josem

CROSS-EXAMINATION

BY MR. JOSEM:

Q. Mr. French, as you testified, and, obviously, exact numbers in the valuation that's already part of this record, the plan was roughly 111 percent funded on an actuarial accrued liability basis?

A. One of the bases in the report that's a standard one, yes.

Q. And I think, as you certainly testified at your deposition, and I don't think quite anything remarkable, the valuation is a snapshot of a particular period of time?

A. Correct.

Q. In this case, December 31 of '13?

A. Yes.

Q. And that calculation using -- let's stick with the 111 percent. Obviously, there are a variety of ways to measure, and they're reflected in the valuation, but that funded percentage assumes that -- a variety of assumptions, including investment return, mortality, retirement patterns, you've talked about, will occur as anticipated?

Page 59

D. French - Cross - Mr. Josem

A. That is correct.

Q. Okay. And if the assumptions are not met either on the upside or the downside, then the plan can either become under or overfunded?

A. It could become lesser funded or better funded, theoretically, with equal probability or equal likelihood.

Q. So on that score, let's talk a little bit about the investment return assumption, in this case, 7-and-a-half percent, but wouldn't matter.

So when the actuary selects an investment return assumption, you said, essentially, they're looking at a range but they have to pick a figure, is that --

A. That's my understanding.

Q. Okay. All right. And as an actuary, are you essentially at least attempting to pick a figure where the likelihood that that investment return will be exceeded is equal to the likelihood it won't, in other words, 50-50?

A. That is my understanding of what you are supposed to do, that that is essentially the concept of a best estimate.

Page 60

D. French - Cross - Mr. Josem

Q. That's what you're trying -- you're trying to do that?

A. That's what you're trying -- that's what you should be trying to do.

Q. So in that best-estimate scenario, you -- 50 percent of the time you would achieve or exceed that investment return?

A. That's the concept, yes.

Q. And 50 percent of the time you would not?

A. That's the concept, yes.

Q. Okay.

A. And maybe some percentage you would actually get it right.

Q. Have you ever seen that?

A. At some point in time, sure.

Q. Now, as you testified, the withdrawal liability calculation requires a calculation of the present value of vested benefits of a plan so that you can then determine the unfunded vested benefits for withdrawal liability purposes?

A. That's correct.

Q. And when we talk about vested benefits at that stage, those are benefits that

Page 61

D. French - Cross - Mr. Josem

participants have earned and are entitled to?

A. Correct. If they terminated employment today, that's what they'd be -- their entitlement for future benefits whenever they happen to be eligible to get them is fixed.

Q. Right. Okay. And so those vested benefits that are being measured include the vested benefits of this employer's employees or former employees?

A. Yes, of course.

Q. And even if a plan does not meet its assumptions going forward, those participants -- retired participants are entitled to those benefits?

A. There's a legal obligation if the plan has sufficient assets.

Q. Okay. Absent a mass withdrawal or absent a failure to fund. Okay.

A. Well, absent an insolvency, which happens, as you well know.

Q. Absolutely.

Now, if a plan does not meet its assumptions over time, if it falls short, again, whether investments, mortality, retirement rates,

Page 62

D. French - Cross - Mr. Josem

1  D. French - Cross - Mr. Josem
2  any combination of those, the ongoing employers
3  might need to increase their contributions and/or
4  future benefit accruals might need to be decreased
5  or both?
6      A.  That is a theoretical possibility if,
7  in fact, the union will negotiate it and the
8  employer will agree to it.
9      Q.  Okay.  But if -- fine.
10         There is an obligation under ERISA for
11  a plan to meet its minimum funding requirements?
12      A.  There is an obligation under ERISA,
13  but unfortunately these days, because of PPA 2006,
14  it effectively has no teeth.
15      Q.  I'm not going to debate with you plans
16  that may not be subject to PPA 2006.  I think that
17  gets us on a sideline we don't need here.
18      A.  Right, in general, yes.
19      Q.  In general, there's a minimal funding
20  obligation?
21      A.  The short answer to your question is
22  yes.
23      Q.  The law may affect how badly you are
24  punished for not meeting it?
25      A.  You are not punished at all.

Page 63

1  D. French - Cross - Mr. Josem
2      Q.  And those minimum funding assumptions
3  are based -- again, are -- vary depending on a
4  plan's performance vis-a-vis its assumptions?
5      A.  I'm sorry?
6      Q.  The minimum funding obligation is
7  reported each year, first of all?
8      A.  Yes.
9      Q.  The actuary calculates that the plan
10  requires X dollars to meet its minimum funding
11  obligation?
12      A.  Yes.
13      Q.  And let's leave aside credit balances
14  for the moment.  I don't think we need to --
15      A.  Why would you leave them aside?
16      Q.  Well, in terms of my questions.
17      A.  Okay.
18      Q.  Ultimately, in terms of a plan, you're
19  not going to leave them aside.
20      A.  I'm not sure I'll be able to answer it
21  that way, but okay.
22      Q.  Well, that's fine.  If you can't, you
23  carve out your answer.  That's not a problem.
24         But an employer is obligated -- or --
25  I'm sorry -- a plan's obligated and the employer

Page 64

1  D. French - Cross - Mr. Josem
2  is, therefore, are obligated to meet the minimum
3  funding obligation, which is a set number, which
4  may take into account a credit balance of the
5  funding standard account, if there is one?
6      A.  Correct.
7      Q.  And if a plan, let's say, doesn't have
8  a credit balance of any substance -- substantial
9  size and it is falling short of its minimum
10  funding obligation, what would the law require
11  that plan to do and those employers to do?
12      A.  If it is not meeting that normal cost
13  plus amortization of unfunded liabilities by its
14  current contribution rates and withdrawal
15  liability payments, the law would anticipate that
16  the employers negotiate a contribution increase,
17  or duty to negotiate on behalf --
18      Q.  I understand.
19         Now, when -- when investment returns
20  of a plan such as the Local 259 plan are expected
21  to exceed risk-free rates -- certainly been the
22  case for many years at this stage, fair?
23      A.  Fair.
24      Q.  Okay.  Then the use of that investment
25  assumption that exceeds those risk-free rates

Page 65

1  D. French - Cross - Mr. Josem
2  results in lower required contributions from
3  employers, does it not?
4      A.  Lower legally required minimum
5  contributions, yes.
6      Q.  Okay.  But by investing in a portfolio
7  of -- that does not entirely consist of high-grade
8  corporate bonds, as is here, and as -- well, as is
9  here, there is an added risk of either excess
10  investment returns or insufficient investment
11  returns?
12      A.  Compared to what?
13      Q.  Compared to using the corporate bond,
14  the risk for the PBGC risk-free rate, which we've
15  talked about.
16      A.  I think it depends on what time period
17  you look at.  If you look at returns of corporate
18  bonds and government bonds right now, expected
19  returns over a 10- or 15-year period, they're
20  never going to exceed investment returns on an
21  equity portfolio by any reasonable guess.
22         So it certainly depends on how you're
23  defining risk and over what period.
24      Q.  All right.  But the point is that if I
25  invest in a portfolio of stocks and bonds with an

Page 66

D. French - Cross - Mr. Josem

1    anticipated long-term return of 7-and-a-half
2    percent, there's some risk inherent in that
3    portfolio, is there not?
4        A.   Well, by "risk," you mean there is a
5    chance that it is not going to return 7-and-a-half
6    percent, either higher or lower, absolutely.
7        Q.   You've already said 50-50?
8        A.   Right.  If that's how you're defining
9    risk, absolutely.
10       Q.   Okay.
11            Okay.  Now, going forward, the plan
12   that has that 7-and-a-half assumption based on an
13   investment portfolio as with the Local 259 plan --
14   strike that.  Strike that.
15            Withdrawal liability is assessed only
16   once in the absence of a mass withdrawal.  Is that
17   correct?
18       A.   For a particular employer?
19       Q.   Yes.
20       A.   In a complete withdrawal, yes.
21       Q.   I appreciate the --
22       A.   Nobody else probably does.
23       Q.   Understood.  Understood.
24            And in this case, when this employer

Page 67

D. French - Cross - Mr. Josem

1    withdrew from the plan, it was assessed a
2    withdrawal liability, which called for a stream of
3    payments over a certain number of years?
4        A.   Correct.
5        Q.   Under the law, no more than 20?
6        A.   Correct.
7        Q.   And that stream of payments remains
8    fixed under the law.  Is that correct?
9        A.   Once it's either been litigated, or
10   what have you, yes.
11       Q.   Assuming there's no controversy about
12   the number?
13       A.   Correct.
14       Q.   Okay.  All right.  And so the employer
15   pays that same amount, typically, in quarterly
16   payments, but it can vary by fund --
17       A.   Correct.
18       Q.   -- for as long as is required under
19   the assessment, is that correct?
20       A.   Not to exceed 20 years, but yes.
21       Q.   Okay.  And that's the case regardless
22   of the future performance of that fund?
23       A.   Correct, up or down.
24       Q.   Yep, yep.  Okay.

Page 68

D. French - Cross - Mr. Josem

1            Now, you had testified in your
2    deposition that use of other than the investment
3    return assumption of the plan when calculating
4    withdrawal liability is appropriate, I believe you
5    said, in only two situations:  One where there is
6    an expectation of a change in the investment mix,
7    and two, and I think related, where there is an
8    expectation of a large withdrawal which may also
9    drive that kind of change?
10       A.   Or the expectation of an annuity
11   purchase, which I would count almost as a
12   subcategory of an investment change in mix.
13            Those are the two I can think of
14   offhand that I would think are legitimate reasons.
15   There may be others.
16       Q.   Okay.  So when -- as the actuary --
17   enrolled actuary to a multiemployer plan, it is
18   the actuary that selects the investment return
19   assumption for purposes of the valuation.  Is that
20   correct?
21       A.   That is what the law says.
22       Q.   And I take it -- and correct me if I'm
23   wrong -- that you do that by looking at the
24   various asset allocations in the investment

Page 69

D. French - Cross - Mr. Josem

1    portfolio and the investment guidelines?
2        A.   Certainly, that's what I did, and I --
3    my understanding is that is what the vast majority
4    of actuaries do.
5        Q.   Okay.  And you base it on some survey
6    studies, whatever you use in determining what
7    projections of different asset classes are
8    expected to return over longer periods of time?
9        A.   Again, that's what I do, and again,
10   that's what I believe most actuaries do.
11       Q.   Okay.  And so long as a plan is not
12   anticipating or expecting a change in those
13   investments and in that investment allocation, I
14   understand that, again, your position is the
15   withdrawal liability calculation, the calculation
16   of fund-invested benefits, needs to use the
17   investment return assumption as the discount rate
18   to calculate withdrawal liability?
19       A.   It has to use a return assumption that
20   is the best estimate of anticipated experience
21   under the plan, and almost by definition that
22   would be an investment return assumption.
23       Q.   Okay.  So whether a plan is
24   100 percent funded or 50 percent funded, if the

Page 70

D. French - Cross - Mr. Josem

1
2  investment return assumption is not being changed,
3  isn't it your view that the investment return
4  assumption of the plan still needs to be used to
5  calculate the unfunded vested benefits for
6  withdrawal liability purposes?
7      A.  I'm sorry.  It's a circular question.
8      You said if an assumption is not being
9  changed, isn't it true you have to use the
10  investment return assumption?
11      THE ARBITRATOR:  I'm sorry.  That's my
12  phone.
13      Q.  So let me ask this a little
14  differently:  Let us assume that we have a plan
15  that is funded at 50 percent rather than
16  111 percent, based on the same calculation, based
17  on actuarial --
18      A.  At what kind of an interest rate?
19      Q.  At 7-and-a-half percent, same -- let's
20  assume the same investment return assumption, one
21  plan is 100 percent funned, one plan is 50 percent
22  funded.
23      A.  Okay.
24      Q.  Okay?  Let's further assume that the
25  investment return assumptions for both plans are

Page 71

D. French - Cross - Mr. Josem

1
2  anticipated to remain unchanged, to remain at
3  7-and-a-half --
4      A.  The policy of the funds are
5  anticipated to remain unchanged, is that what
6  you're --
7      Q.  Yes.  They're not looking to change
8  the investments.  They're not doing any of the
9  things that you've testified about that would lead
10  you as the actuary to change the investment return
11  assumption.
12      A.  Okay.
13      Q.  Okay.  Now, in that situation, if an
14  employer withdrew in either case, it is your
15  opinion, is it not, that the unfunded, vested
16  benefits for withdrawal liability purposes must be
17  calculated using a discount rate that is equal to
18  the investment return assumption?
19      A.  Unless there's some other thing that
20  I'm not thinking of that might be a legitimate
21  reason, yes, that is my opinion.
22      Q.  Okay.  Now, you are aware, obviously,
23  that there are actuaries out there who disagree
24  with you?
25      A.  I do understand that.

Page 72

D. French - Cross - Mr. Josem

1
2      Q.  And you are aware certainly that some
3  actuaries use the PBGC rate to calculate
4  withdrawal liability?
5      A.  I'm aware of that.
6      Q.  And certainly you're aware that some
7  actuaries use some form of blended rate, whether
8  the Segal Blend or some other blended rate, to
9  calculate withdrawal?
10      A.  I'm aware.  I'm just not aware of a
11  justification that works.
12      Q.  Okay.  Okay.  And you're also aware,
13  obviously, and I think you as a practical matter
14  testified, in view of the very low interest rate
15  environment in which we now live and have lived
16  for a number of -- a number of years, if the
17  actuary in this case had calculated Manhattan
18  Ford's withdrawal based on the PBGC rate, their
19  withdrawal liability would have been -- the
20  assessment would have been even higher?
21      A.  Yes, that's undisputed.
22      Q.  Okay.  And...
23      THE ARBITRATOR:  By that you meant not
24  using a blended rate, using the adjusted
25  PBGC rate?

Page 73

D. French - Cross - Mr. Josem

1
2      MR. JOSEM:  Yes, yes, yes.
3      THE ARBITRATOR:  I got you.  Okay.
4  BY MR. JOSEM:
5      Q.  You are aware, are you not, that when
6  the Segal Blend was first utilized in the 1980s,
7  it resulted in a lower withdrawal liability
8  assessment for many employers than those employers
9  would have received had the investment return
10  assumption of the funds been used?
11      A.  I have heard that.  That is my
12  understanding.
13      Q.  Okay.  And based on your testimony, am
14  I correct that it would be your opinion that
15  nonetheless that would still be unreasonable under
16  the law because it didn't follow -- because it
17  wouldn't follow the investment return assumption?
18      A.  If it doesn't represent the actuary's
19  best estimate of the investment return, then yes,
20  it would be unreasonable.
21      Q.  Okay.  Have you previously testified
22  in any arbitration cases involving either the
23  Segal Blend or some form of blended interest rate?
24      A.  Yes.
25      Q.  And have you done so during any period

## Page 74

D. French - Cross - Mr. Josem

1  of time when you were the enrolled actuary for a
2  multiemployer plan?
3  A.  No, I don't think so.
4  Q.  Okay.  So these would have been after
5  you left Buck?
6  A.  Yes, the best of my recollection.
7  Q.  One -- one other just quick question,
8  which is a little surprising to me:  You are
9  familiar, are you not, with plans that have in the
10  past given retirees a benefit increase?
11  A.  Of course.  I haven't seen it in a
12  long time.
13  MR. JOSEM:  Nothing further.
14  THE ARBITRATOR:  Would you like to
15  redirect?
16  THE WITNESS:  And by the way, just to
17  be clear, sometimes they do break out which
18  retirees are retired from a contributing
19  employers and which didn't.  Not always.
20  It's hard to do.
21  MR. JOSEM:  I want to make sure Evan
22  heard that.
23  MR. MILLER:  I'm sorry, was this on
24  the record?

## Page 75

D. Gleave - Direct - Mr. Miller

1  MR. ROTH:  Apparently.
2  THE ARBITRATOR:  We weren't off, he
3  just continued to answer the question, even
4  though I offered you the opportunity --
5  THE WITNESS:  I know.  I'm sorry about
6  that.
7  THE ARBITRATOR:  Would you please read
8  back the full answer that he gave?
9  (Record read.)
10  THE ARBITRATOR:  Now, would you like
11  to redirect?
12  MR. MILLER:  I have no question.
13  THE ARBITRATOR:  All right.  Thank
14  you, sir.
15  (Witness excused.)
16  MR. MILLER:  I'm prepared to call the
17  next witness.
18  THE ARBITRATOR:  Yes, go ahead.
19  MR. MILLER:  Ms. Gleave, you can hear
20  me, correct?
21  D I A N E   G L E A V E, having been duly sworn by
22  the Notary Public, testified as follows:

## Page 76

D. Gleave - Direct - Mr. Miller

1  DIRECT EXAMINATION
2  BY MR. MILLER:
3  Q.  Good morning, Ms. Gleave.
4  Could you please state your name for
5  the record?
6  A.  Diane Gleave.
7  Q.  And spell that, please.  Thanks.
8  A.  D-I-A-N-E, G-L-E-A-V-E.
9  Q.  Okay.  And you're currently employed
10  at the Segal Company?
11  A.  Yes.
12  Q.  And your pension practice focuses
13  primarily on multiemployer pension plans, correct?
14  A.  Yes.
15  Q.  And you're an enrolled actuary,
16  correct?
17  A.  Yes.
18  Q.  And whether -- what other actuarial
19  designations do you have?
20  A.  I am an associate in the Society of
21  Actuaries.  I am a member of the American Academic
22  Academy of Actuaries.  And I am a fellow of the
23  consulting -- the Conference of Consulting
24  Actuaries.

## Page 77

D. Gleave - Direct - Mr. Miller

1  Q.  Okay.  And for how many multiemployer
2  pension plans do you currently serve as the
3  enrolled actuary?
4  A.  I believe it's about 10 to 12
5  currently.
6  Q.  And that was also the case roughly in
7  2013 and 2014?
8  A.  Was probably about the same, yes.
9  Q.  Okay.  And the aggregate over the
10  course of your career, approximately how many
11  multiemployer plans have you served as the
12  enrolled actuary?
13  A.  In excess of 50.
14  Q.  And you're the enrolled actuary for
15  the UAW Local 259 Pension Fund?
16  A.  Yes.
17  Q.  And sometimes I'll refer to that
18  pension fund as simply the "Fund" for purposes of
19  this examination.  Okay?
20  A.  That's fine.
21  Q.  Okay.  And you signed the so-called
22  Schedule MB to the Fund's Form 5500 government
23  filing?
24  A.  Yes, I did.

Page 78

D. Gleave - Direct - Mr. Miller

1
2    Q.   And you performed the -- strike that.
3         And do you supervise with colleagues
4    of yours at the Segal Company the annual actuarial
5    valuations for the Fund?
6    A.   Yes.
7    Q.   And do you either calculate or
8    supervise with your colleagues the calculation of
9    withdrawal liability estimates and formal
10   assessments for the Fund?
11   A.   Yes.
12   Q.   And am I correct that you supervise
13   the calculation of withdrawal liability assessed
14   against Manhattan Auto in this case when it
15   withdrew from the Fund in December of 2014?
16   A.   Yes.
17   Q.   In the course of your work as an
18   enrolled actuary for multiemployer plans, am I
19   correct that you develop an investment return
20   assumption for the respective plan's assets,
21   correct?
22   A.   Yes.
23   Q.   And in that regard, let's get a
24   document labeled and we'll talk to you about it
25   briefly.

Page 79

D. Gleave - Direct - Mr. Miller

1
2         (Arbitrator's Exhibit 3, was marked
3    for identification at this time.)
4    BY MR. MILLER:
5    Q.   So, Ms. Gleave, the court reporter has
6    handed you what she's marked as Arbitrator
7    Exhibit 3, and it's a copy of the actuarial
8    valuation and review report as of January 1, 2014,
9    for the multiemployer fund in this case.
10        Do you see that document?
11   A.   Yes, I do.
12   Q.   Okay.  And you're familiar with this
13   document, correct?
14   A.   Yes.
15   Q.   And am I correct that you supervised
16   and oversaw its preparation?
17   A.   Yes.
18   Q.   Okay.  Let's first turn to, I believe,
19   page 64 of the document, and it's also labeled --
20   Ms. Gleave, these are called "Bates labels" --
21   labeled 719.
22        Are you there?
23   A.   Yes.
24   Q.   Oh, great.  Thank you.
25        MR. JOSEM:  Hold on, I'm not as fast

Page 80

D. Gleave - Direct - Mr. Miller

1
2    as you, Evan.
3         MR. MILLER:  Oh, okay.  Tell me when
4    you're --
5         MR. JOSEM:  We're good.  We're good.
6    Thank you.
7    BY MR. MILLER:
8    Q.   So turning to page 64, under the
9    heading "Net Investment Return," do you see that?
10   A.   Yes.
11   Q.   Okay.  So it indicates that the net
12   investment return is 7.5 percent.
13        That was the investment return
14   assumption that you had selected for this Fund at
15   that time, correct?
16   A.   Yes.
17   Q.   Okay.  And what is the function of the
18   investment return assumption?
19   A.   It is used to discount the projected
20   benefits stream to come up with the present value
21   of the plan's liabilities.
22   Q.   And how do you go about selecting an
23   investment return assumption?
24   A.   Well, you use a number of data points,
25   the building blocks being one primary function,

Page 81

D. Gleave - Direct - Mr. Miller

1
2    which looks at the plan's investment policy and
3    looks at the capital market assumptions for those
4    various asset classes and basically comes up with
5    what is an expected return under that portfolio,
6    but you also are looking at historical experience
7    and the like.
8    Q.   Okay.  So is it fair to summarize the
9    approach as one in which you look at the
10   investment policy guidelines to see what the
11   intended asset class investments are for the
12   Pension Fund?
13        You then make projections, so-called
14   capital market projections, about what the
15   long-term returns will be on those asset classes,
16   and then you would potentially compare those
17   projected long-term returns on those asset classes
18   with historical data?
19        MR. JOSEM:  I'm going to object to the
20   compound nature of the question because
21   there are some --
22        MR. MILLER:  I know, and I don't want
23   to get too bogged down here, but I was
24   trying to see if I could summarize
25   accurately what the process was.

Page 82

D. Gleave - Direct - Mr. Miller

1
2  BY MR. MILLER:
3      Q.   Is that a relatively accurate summary?
4          THE ARBITRATOR:  Hang on.  Hang on.
5  There's an objection.
6          Sustained.
7          MR. MILLER:  Okay.  Let me see if I
8  can ask these questions in an unbundled
9  manner.
10     Q.   So am I correct that the first step is
11 for you to examine the investment policy
12 guidelines of the Fund?
13     A.   The asset allocation -- the expected
14 asset allocation is what we look at.
15     Q.   And those expected asset allocations
16 will be contained in policy statements --
17 investment policy statements?
18     A.   They should be, but that's not
19 generally what I do look at.
20     Q.   Okay.  But you look at the expected
21 asset allocations for the Pension Fund?
22     A.   I do.
23     Q.   And then is it fair to say that the
24 next step is to look at capital market surveys
25 about what the expected asset allocations for the

Page 83

D. Gleave - Direct - Mr. Miller

1
2  Fund will potentially return in the future?
3      A.   We have at Segal a capital -- a set of
4  capital market assumptions.  I don't personally go
5  out and do a survey of the various capital markets
6  to come up with my own.  We do have a promulgated
7  set of capital market assumptions that ought to be
8  used for this purpose.
9      Q.   So you apply the proprietary capital
10 market assumptions developed by the Segal Company
11 for the selected asset classes, correct?
12     A.   Yes.
13     Q.   And from that, I assume you'll derive
14 a -- depending on the weighting of the intended
15 investments in asset classes, you'll derive a
16 tentative investment return assumption?
17     A.   This is a data point that we use to
18 come up with the investment return assumption.
19 Ultimately, it is the actuary's judgment to come
20 up with that assumption.
21         There are other data points beyond
22 that, but this is a data point, and a significant
23 one.
24     Q.   Okay.  And briefly summarize the other
25 data points that you apply.

Page 84

D. Gleave - Direct - Mr. Miller

1
2      A.   Well, if you have a plan that
3  significantly outperforms because they have
4  investment managers that feel that they can
5  significantly outperform capital markets, and it's
6  a demonstrated track record of doing that, I might
7  put a premium on that.
8          If the plan is, even though it has a
9  policy statement, not in compliance with the
10 policy statement, I might look at their actual
11 asset allocation.
12         There are a number of data points that
13 are looked at.
14     Q.   And you mentioned that another one of
15 the data points that you would look at would be
16 the historical returns of the fund, right?
17     A.   Yes, yes.
18     Q.   And I gather that in connection with
19 this particular Fund at issue in this case,
20 employing these data points as you've articulated
21 them, you concluded that, in connection with this
22 actuarial valuation, that the long-term investment
23 return assumption for this Pension Fund would be
24 7.5 percent, correct?
25     A.   For purposes of plan funding, I have

Page 85

D. Gleave - Direct - Mr. Miller

1
2  concluded my judgment that 7-and-a-half percent is
3  the appropriate investment return assumption.
4      Q.   Okay.  Well, putting aside for a
5  moment plan funding and focusing on the assets
6  that were contained in this Fund at the time and
7  the expected asset class investments, isn't it the
8  case that employing the data points that you just
9  identified you concluded that this Fund's assets
10 based on the expected asset class investments
11 would have a long-term expected return of
12 7.5 percent, correct?
13     A.   I don't think I can put aside the
14 purpose that this judgment was made for.
15     Q.   And explain that for a moment to the
16 Arbitrator.
17     A.   Because the ASOPs, in fact, and every
18 actuary needs to look at the purpose of the
19 measurement before you know what assumptions you
20 can use.  That is a guiding principle of ASOPs.
21 It is a guiding principle of what we do.
22         If a plan is terminating, it has a
23 different set of investment return assumptions.
24 Even if it's a long-term pension plan, the assets
25 will be around for the long-term, it could be a

Page 86

D. Gleave - Direct - Mr. Miller

different set of assumptions they could use.

So you can't divorce the selection of the assumption from what the purpose of the measurement is.

Q.   On the question of termination, at the time you calculated the withdrawal liability in this case, had this Pension Fund terminated?

A.   No.

Q.   Was there an expectation that it would be terminated?

A.   Not to my knowledge, no.

Q.   Let me ask you this question:  If you were asked -- strike that.

If you were advised that a pension fund such as this one wanted you to calculate what the long-term investment return assumption would be, assuming that the plan would remain ongoing and would not be terminated, wouldn't you employ the same process that you just described to determine the investment return assumption?

A.   Yes.

Q.   So in this case, and in connection with the actuarial valuation report that we're looking at, you determined that the investment

---

Page 87

D. Gleave - Direct - Mr. Miller

return assumption would be 7.5 percent, correct?

A.   Yes.

Q.   Now, the actual long-term investment return could turn out to be higher than that assumption, right?

A.   Yes.

Q.   And it also could turn out to be lower, correct?

A.   Correct.

Q.   But that 7.5 percent investment return assumption that you selected in connection with this actuarial valuation report, that did represent your best estimate of the potential return outcomes for this particular plan, correct?

A.   Yes, for purposes of the funding of the plan.

Q.   Is it fair to say that an investment return assumption, as you described it in your testimony, represents the anticipated experience of the multiemployer plan's actual invested assets, correct?

A.   Can you repeat that?

Q.   Yes.  Is it fair to say that an investment return assumption, as you've previously

---

Page 88

D. Gleave - Direct - Mr. Miller

described it in your testimony, represents the anticipated experience of the multiemployer plan's actual invested assets, correct?

A.   Yes, for purposes of the funding.

Q.   Am I correct that all actuarial assumptions are required to reflect the actuary's best estimate, right?

A.   Yes.

Q.   As opposed to a biased estimate, correct?

A.   Yes.

Q.   And the 7.5 percent investment return that you selected in connection with the actuarial valuation report as of January 1, 2014, that's the investment return assumption that you've selected for this plan for a number of years now, correct?

A.   Yes.

Q.   And the investment return assumption remains 7.5 percent today, correct?

A.   Yes.

Q.   And that return assumption was reflected on the so-called Schedule MB to the Fund's Form 5500 filing?

A.   Yes.

---

Page 89

D. Gleave - Direct - Mr. Miller

I'd like to just clarify and go back to the last question.  When you said "today" --

Q.   Yes.

A.   -- what were you referring to?

Q.   Oh, this plan year.

A.   The current plan year?

Q.   Yes.

A.   We haven't completed the current plan year's actuarial valuation, so I can't answer that.

Q.   Just allow me to quickly clarify the record.

For what plan year -- what is the most recent plan year for which you've completed the actuarial valuation?

A.   2015.

Q.   And for that plan year, you continued to select the 7.5 percent investment return assumption?

A.   Yes.

Q.   Does 7.5 percent represent your best estimate of the anticipated experience of this Fund's assets?

A.   For purposes of the ERISA funding

---

Page 90

D. Gleave - Direct - Mr. Miller

1 requirements, it represents my best estimate.
2 Q.   The assets in this particular plan's
3 trust, these are the assets that you anticipate to
4 be used to pay the promised benefits for this Fund
5 in the future, correct?
6 A.   These assets plus future assets.
7 Q.   And those future assets would be
8 through contributions, correct?
9 A.   Contributions and investment income,
10 yes.
11 Q.   Right.  So the current assets, the
12 investment income under current assets, and the
13 current contributions, those remain -- those are
14 the pool of assets that you anticipate to be used
15 by this plan to pay its promised pension benefits?
16 A.   Current and future contributions,
17 current and future investment earnings, and
18 current assets.
19 Q.   Okay.  That mix that you've just
20 identified, that is the mix of assets that will be
21 used to pay this pension fund's promised benefits
22 in the future, correct?
23 A.   Yes.
24 Q.   Okay.  Assets of the PBGC are not

Page 91

D. Gleave - Direct - Mr. Miller

1 intended or anticipated by you to be used to pay
2 any of these plan's -- this plan's benefits in the
3 future, correct?
4 MR. JOSEM:  Objection.
5 Could you define what you mean by
6 "assets of the PBGC"?
7 Q.   PBGC -- strike that.
8 You do not anticipate that the PBGC
9 will come in and use its assets in the future to
10 pay the projected benefits of this Fund, correct?
11 A.   At this time, I do not have that
12 expectation.
13 Q.   And you did not have that expectation
14 were you calculated the withdrawal liability in
15 this case, correct?
16 A.   Yes.
17 Q.   So when you prepared the withdrawal
18 liability calculation in this case, you did not
19 anticipate that the future experience of this plan
20 would be one in which the PBGC would pay with its
21 assets any of the plan's liabilities, correct?
22 A.   Yes.
23 MR. JOSEM:  We'll stipulate the plan's
24 not anticipated to go insolvent.

Page 92

D. Gleave - Direct - Mr. Miller

1 Q.   But in assessing withdrawal liability,
2 you did not use the 7.5 percent investment return
3 assumption as the interest rate to measure
4 unfunded liabilities, correct?
5 A.   Correct.
6 Q.   Instead, you used what's known as the
7 Segal Blend, correct?
8 A.   Yes.
9 Q.   And you blended in, along with the
10 7.5 percent investment return assumption, PBGC
11 published discount rates, correct?
12 A.   What we do is blend the liabilities
13 determined at the 7-and-a-half and at the PBGC.
14 We determine two sets of liabilities and they
15 get -- it's a weighted average.
16 We're not blending the interest rates.
17 We're coming up with two separate liabilities and
18 blending the liabilities.
19 Q.   Okay.  And let's explore that a
20 little.
21 First, let's turn back to the
22 actuarial valuation report, page 37, which is
23 Bates stamped 692.
24 MR. JOSEM:  Thirty-seven, you said?

Page 93

D. Gleave - Direct - Mr. Miller

1 MR. MILLER:  Yes -- Bill, just let me
2 know --
3 MR. JOSEM:  I'm good.  I'm good.
4 THE ARBITRATOR:  I'm not.
5 MR. MILLER:  Mr. Arbitrator -- I'm
6 sorry --
7 THE ARBITRATOR:  That's okay.
8 MR. MILLER:  -- 37.
9 THE ARBITRATOR:  All right.
10 I have it.  Go ahead.
11 MR. MILLER:  Great.
12 BY MR. MILLER:
13 Q.   So am I correct, Ms. Gleave, that the
14 actual PBGC rates that you employed in applying
15 the Segal Blend were rates of 3 percent for
16 liabilities up to 20 years and 3.31 percent for
17 liabilities beyond that?
18 A.   It's really 3 percent for benefits up
19 to 20 years, and 3.31 for benefits beyond that.
20 That's how we determine the liability at the PBGC
21 interest rates.
22 Q.   Right.  And can you briefly summarize
23 into the record essentially how the Segal Blend
24 works and what portion of the liabilities are

Page 94

D. Gleave - Direct - Mr. Miller

1  valued using PBGC rates and what portion would
2  then be valued using, in this case,
3  7.5 percent?
4      A.   We look at the market value of assets
5  and we compare that to the present value of vested
6  benefits at the PBGC interest rates.  So to the
7  extent that there are assets on hand to cover
8  those liabilities, that's the portion that's
9  valued using the PBGC rates.  To the extent that
10  there are not, the unfunded portion of the
11  liabilities are valued using the 7-and-a-half
12  percent.
13      So, in effect, you're using the market
14  value of assets as the rating between the PBGC
15  interest rates and the long-term funding interest
16  rates.
17      Q.   Thank you.
18      And -- and, again, just to clarify for
19  the record, in connection with the actual
20  withdrawal calculation that you made in this case
21  employing methodology you just identified, the
22  PBGC rates were 3 percent for liabilities up to 20
23  years and then 3.31 for liabilities beyond that?
24      A.   For benefits, up to 20 in benefits,

Page 95

D. Gleave - Direct - Mr. Miller

1  yes.
2      Q.   Yes.  And am I correct that in
3  employing this Segal Blend, and particularly its
4  use of the PBGC rates that you've just described,
5  it had the effect of reducing the overall interest
6  rate that was used for discounting purposes below
7  the 7.5 percent investment return assumption?
8      A.   Yes.
9      Q.   Is it your understanding that PBGC
10  rates are designed to approximate the cost of
11  buying annuities to settle a pension obligation?
12      A.   That is my understanding, yes.
13      Q.   And would you describe PBGC rates as
14  either risk-free rates or pretty close to
15  risk-free rates?
16      A.   That is how they are intended to be
17  viewed.
18      Q.   And would it be fair to say that PBGC
19  rates are essentially a proxy for rates on a
20  portfolio of investment-grade bonds or
21  treasuries -- treasury instruments?
22      A.   I think that's fair, yes.
23      Q.   Okay.  Has the Pension Fund here ever
24  used any of its assets to annuitize benefits?

Page 96

D. Gleave - Direct - Mr. Miller

1      A.   Not to my knowledge.
2      Q.   And to your knowledge, does the
3  Pension Fund here intend to buy annuities to fund
4  its benefits?
5      A.   Not that I am aware of.
6      Q.   And to your knowledge, the Pension
7  Fund here is not going to -- would not use --
8  strike that.
9      To your knowledge, the Pension Fund
10  here would not use any of Manhattan Auto's
11  withdrawal liability payments to buy annuities
12  either, correct?
13      A.   Not to my knowledge.
14      Q.   And, in fact, am I correct that any
15  withdrawal liability payments that Manhattan Auto
16  would make here would be pooled with the rest of
17  the trust fund's assets and invested in the same
18  asset allocations that other employer
19  contributions are invested?
20      MR. JOSEM:  Well, I'm going to object,
21  unless you -- if you change it to say that
22  that is her expectation at this stage.
23  Obviously, that's a trustee decision, not
24  her decision.

Page 97

D. Gleave - Direct - Mr. Miller

1      MR. MILLER:  I'm fine with that --
2  that qualification.
3  BY MR. MILLER:
4      Q.   Is it your expectation that the
5  withdrawal liability payments that might be made
6  here would -- would be pooled together with the
7  rest of the Fund's assets and invested consistent
8  with the investment policy guidelines?
9      A.   That is my expectation at this time.
10      Q.   Okay.
11      Ms. Gleave, I'm going to ask you a
12  question or two about the impact of using the PBGC
13  rates, but I'm going to do something that lawyers
14  call laying a foundation and I'm going to do that
15  by asking you to look at and to read into the
16  record a couple of questions and answers that you
17  gave in your deposition.  Okay?
18      MR. MILLER:  So I'm going to ask the
19  court reporter to mark your deposition in
20  this case.
21      THE ARBITRATOR:  Four, I think.
22      MR. MILLER:  Which would be 4, that's
23  correct.
24      (Discussion off the record.)

Page 98

D. Gleave - Direct - Mr. Miller
1
2      (Arbitrator's Exhibit 4, was marked
3  for identification at this time.)
4      MR. MILLER:  Mr. Arbitrator, you've
5  got a copy of the deposition?
6      THE ARBITRATOR:  I have and we're
7  ready to go.
8      MR. MILLER:  Okay.  Good.
9  BY MR. MILLER:
10     Q.  Ms. Gleave, can you turn your
11 attention to page 57 of your deposition
12 transcript, and can you read into the record,
13 please, the transcript that begins with the
14 question on line 6 of page 57 through line 8 of
15 the next page, 58?
16     A.  Starting when?  I'm sorry.
17     Q.  That's quite all right.
18         Starting with the question that begins
19 on line 6, and the questions that proceed
20 thereafter ending with your answer on line 8 on
21 page 58.  Thank you.
22     A.  Okay.
23         "Q.  With respect to the interest
24     rate assumption in particular, does the
25     Segal Blend reflect anticipated

Page 99

D. Gleave - Direct - Mr. Miller
1
2  experience under the plan?
3      "A.  It reflects anticipated
4  experience for the portion of the
5  liability that uses the funding interest
6  rate.
7      "Q.  Does the effective discount
8  rate that results from application of
9  the Segal Blend reflect anticipated
10 experience under the plan?
11     "A.  It would in part.
12     "Q.  And what do you mean by 'in
13 part'?
14     "A.  To the extent that there is an
15 effective interest rate, it is developed
16 by blending the liabilities under the
17 two interest rates that are used.  So
18 the portion, again, that's using the
19 7-and-a-half percent will reflect that.
20     "Q.  So let me make sure I
21 understand.  The 7-and-a-half portion
22 reflects anticipated experience under
23 the plan?
24     "A.  Yes.
25     "Q.  And the PBGC portion does not

Page 100

D. Gleave - Direct - Mr. Miller
1
2  reflect anticipated periods of
3  experience under the plan?
4      "A.  Yes."
5      Q.  Okay.  Am I correct that at your
6  deposition, you were asked those questions and you
7  gave those answers, correct?
8      A.  Yes.
9      Q.  Okay.  Now, let's turn to page 10 of
10 the actuarial valuation report and the line
11 that -- the horizontal line for withdrawal
12 liability.
13         Do you see that?
14     A.  Yes.
15     Q.  Okay.  And it indicates, am I right,
16 that for purposes of the withdrawal liability in
17 this case, you calculated the present value of
18 liabilities at roughly $117.8 million, correct?
19     A.  Yes.
20     Q.  And you see that the assets that you
21 used were roughly $86.1 million, correct?
22     A.  Yes.
23     Q.  And those assets represented about
24 73 percent of the liabilities, correct?
25     A.  Yes.

Page 101

D. Gleave - Direct - Mr. Miller
1
2      Q.  So in employing the Segal Blend, am I
3  correct that roughly 73 percent of the liabilities
4  you calculated were calculated using PBGC rates --
5  using PBGC rates, correct?
6      A.  It's not exactly the way it works.
7  That's ultimately where we wound up --
8      Q.  Yes.
9      A.  -- but on the pure PBGC basis, the
10 funding was less than that.
11     Q.  Yes, I understand that.  I'm just
12 trying to understand that -- strike that.
13         The $117 million liability figure,
14 that represents the figure that you came up with
15 in both the discounted figure using the PBGC rates
16 for a portion of that liability calculation and
17 then using the 7.5 percent, correct?
18     A.  Correct.
19     Q.  Okay.  And the portion of the
20 liabilities that you've calculated using the PBGC
21 rate, that portion I think you just testified
22 would be the portion equivalent to the current
23 value assets, correct?
24     A.  Yes.
25     Q.  Okay.  And my point is am I correct

D. Gleave - Direct - Mr. Miller

1  that a significant majority of the liability
2  calculation that you came up with here was done
3  using PBGC rates, correct?
4      A.   Yes.
5      Q.   And given your sworn testimony that
6  the PBGC portion of the calculation does not
7  reflect anticipated experience under the plan,
8  isn't it the case that a significant majority of
9  the liability calculation you came up with here
10  does not reflect the anticipated experience under
11  the plan, correct?
12      A.   Well, the clarification I would make
13  is that the anticipated experience under the plan
14  for purposes of funding.
15      Q.   I'm not asking you about funding.  You
16  said in your deposition that -- which you read
17  into the record -- that the PBGC portion of the
18  calculation of the liabilities for withdrawal
19  purposes does not reflect anticipated experience
20  under the plan.
21          Do you see that testimony?
22      A.   That's what I said, yes.
23      Q.   Okay.  And you've just testified here
24  that a significant majority of the withdrawal
25

D. Gleave - Direct - Mr. Miller

1  liability calculation amount of $117.8 million was
2  made employing the PBGC rates, correct?
3      A.   Yes.
4      Q.   And, thus, am I correct that a
5  significant majority of the withdrawal liability
6  calculation in this case does not reflect
7  anticipated experience under the plan?  Yes or no.
8          MR. JOSEM:  Well, I'm going to object.
9  Because, again, you know, you asked
10  her to read part of her deposition
11  transcript and you keep going over and over
12  the same asked-and-answered issue.
13          There's obviously a disagreement here
14  over what that means.  She's testified over
15  and over again that it's the purpose of the
16  calculation that becomes important here.
17  You keep wanting to gloss over this.
18          We can go over this 20 times, you're
19  going to get the same answer, or 100 times.
20  Go ahead.
21          MR. MILLER:  Mr. Josem is going to
22  have his opportunity on redirect.  You, I
23  think, well understand, Mr. Arbitrator, what
24  I'm getting at here:  She had conceded in
25

D. Gleave - Direct - Mr. Miller

1  her deposition, she concedes today that the
2  PBGC portion of the withdrawal liability
3  calculation does not reflect anticipated
4  experience.
5          I'm just asking her to state on the
6  record that in this case that portion is a
7  substantial majority of the calculation.
8  That's all I'm getting at.
9          THE ARBITRATOR:  Objection overruled.
10  BY MR. MILLER:
11      Q.   Can you answer the question?
12          THE ARBITRATOR:  If you can remember
13  it, we can read it back, if you'd like.
14  It's an important question.
15          Can you read it back, please?
16          (Record read.)
17      A.   The -- I go back to the purpose of the
18  calculation, and for purposes of withdrawal
19  liability, the anticipated experience would be
20  different than for purposes of funding.
21          MR. MILLER:  With all due respect,
22  Mr. Arbitrator, it was not a responsive
23  question -- not a response to my question.
24          THE ARBITRATOR:  It's the response you
25

D. Gleave - Direct - Mr. Miller

1  got.  I'll have to leave it up to you to do
2  the best you can to get your facts.
3          I'll make a determination on what I
4  believe and what I don't and what I credit
5  and what I don't.
6  BY MR. MILLER:
7      Q.   Do PBGC rates reflect anticipated
8  experience under the plan for any purpose?
9      A.   Under this plan?
10      Q.   Yeah, for any purpose at all under
11  this plan?
12      A.   I don't follow the question.
13      Q.   For what purpose do PBGC rates reflect
14  the anticipated experience under this plan?
15      A.   If the plan was to be settling or
16  terminating, the PBGC rates would reflect that.
17      Q.   You testified the plan is not
18  terminating.
19          Is the plan intending to settle its
20  obligations?
21      A.   As a whole, not to my knowledge.
22      Q.   And at the time you prepared the
23  withdrawal liability, not to your knowledge,
24  correct?
25

Page 106

D. Gleave - Direct - Mr. Miller

1
2    A.   That's correct.
3    Q.   You incorporate PBGC rates into your
4  actuarial assumptions for withdrawal liability for
5  all the multiemployer plans that you serve,
6  correct?
7    A.   Yes.
8    Q.   And this is regardless of the
9  underlying multiemployer plans' particular
10 investments, correct?
11   A.   Yes.
12   Q.   So, for example, in connection with a
13 pension fund that had only a 5 percent asset
14 allocation to treasuries and only a 5 percent
15 asset allocation to investment-grade bonds, in
16 connection with withdrawal liabilities for that
17 pension plan, you'd still employ PBGC rates as
18 part of the Segal Blend method, correct?
19   A.   Correct.
20   Q.   And you would also do that in
21 connection with a pension fund that had a very
22 significant weighting in investments with
23 investment-grade bonds and treasuries, correct?
24   A.   Correct.
25   Q.   And that's because it really doesn't

Page 107

D. Gleave - Direct - Mr. Miller

1
2  matter what the investment portfolio is of the
3  multiemployer plan, you're going to still use the
4  then-published PBGC rates in valuing at least a
5  portion of the liabilities for withdrawal
6  purposes, correct?
7    A.   Yes.
8    Q.   You would agree, would you not, that
9  the interest rate assumptions are very important
10 assumptions in calculating withdrawal liability,
11 correct?
12       MR. JOSEM:  You mean, the investment
13 return assumption?
14   Q.   Well, let's go first with interest
15 assumptions.  Okay?
16   A.   Yes.
17   Q.   And the same with investment return
18 assumptions, correct?
19   A.   We would use those interchangeably,
20 but, yes.
21   Q.   And they were very important in
22 connection with this withdrawal liability
23 calculation, correct?
24   A.   Yes.
25   Q.   And they had a material impact,

Page 108

D. Gleave - Direct - Mr. Miller

1
2  correct?
3    A.   Yes.
4    Q.   In fact, they were the difference
5  between having no withdrawal liability at all and
6  a multi-million-dollar withdrawal liability,
7  correct?
8    A.   Can you just clarify what the "they"
9  is in that question?
10   Q.   Yes.  The use of the Segal Blend as
11 the interest assumption had an impact in this case
12 of excusing what would otherwise have been no
13 withdrawal liability if the investment return
14 assumption had been used to a multi-million-dollar
15 withdrawal liability, correct?
16   A.   Correct, if the investment return
17 assumption for purposes of ongoing funding of the
18 plan had been used.
19   Q.   Let's turn back to the actuarial
20 valuation report.  And why don't you turn to
21 page 8 of the actuarial valuation report, and
22 there's a discussion under the heading "Cash
23 Flow."
24       Do you see that?
25   A.   Yes.

Page 109

D. Gleave - Direct - Mr. Miller

1
2    Q.   And it says -- I'll just read this
3  quickly into the record just to lay the
4  foundation.  It says:
5        "The current value of assets plus
6  future investment earnings and contribution income
7  is projected to exceed benefit payments and
8  administrative expenses assuming experience is
9  consistent with the January 1, 2013, assumptions
10 and there are no future changes in the plan
11 provisions, law, regulations, or actuarial
12 assumptions."
13       Do you see that?
14   A.   Yes.
15   Q.   What does that sentence mean?
16   A.   It means that the plan is not
17 projected to be insolvent on the current
18 assumptions used for purposes of the funding, the
19 valuation -- the valuation of the plan, that the
20 asset plus future contributions and future
21 investment earnings are sufficient to cover the
22 expected benefit payments and administrative
23 expenses.
24   Q.   And you made that statement based in
25 part on the 7.5 percent investment return

Page 110

D. Gleave - Direct - Mr. Miller

1  assumption, correct?
2
3      A.    Correct.
4      Q.    So based on the 7.5 percent investment
5  return assumption, this Fund is, and was at the
6  time you prepared this actuarial valuation report,
7  more than fully funded, correct?
8      A.    That's true, but that's not what that
9  statement says.
10     Q.    But it is -- I was migrating from that
11  statement.
12     A.    Okay.
13     Q.    So that is correct?
14     A.    Yes.
15     Q.    Okay.  Let's turn to page 36 of this
16  actuarial valuation report.  And why don't you
17  turn your attention to the section under the
18  heading "Annual Funding Notes."
19         THE ARBITRATOR:  I'm sorry.  Which
20     page are you on, Evan?
21         MR. MILLER:  I'm sorry.  Page 36,
22     Mr. Arbitrator.
23         THE ARBITRATOR:  I'm not there yet.
24     Thirty-six, okay, I am now.  Go ahead.
25     Q.    So there is a discussion under "Annual

Page 111

D. Gleave - Direct - Mr. Miller

1  Funding Notice."
2
3         Do you see that, Ms. Gleave?
4      A.    Yes.
5      Q.    And what is that discussion?  Can you
6  summarize that for us?
7      A.    The PPA requires that a notice be sent
8  to the participants and the employers and
9  government agencies about the funded level of the
10  plan, and it dictates the assumptions that should
11  be used for purposes of the termination.
12     Q.    And it says that the actuary's best
13  estimate assumptions are the basis for this
14  measurement of the funding notice percentage,
15  correct?
16     A.    Yes.
17     Q.    And in connection with this
18  measurement of the funding notice percentage, you
19  used a 7.5 percent interest rate, correct?
20     A.    Yes?
21     Q.    And that represented your best
22  estimate assumption for purposes of the funding
23  notice measurement, correct?
24     A.    Yes.
25     Q.    And in employing that 7.5 percent, as

Page 112

D. Gleave - Direct - Mr. Miller

1  well as other assumptions, you determined that the
2  plan's funded percentage was 111.7 percent,
3  correct?
4
5      A.    Yes.
6      Q.    And in making that calculation and
7  employing the 7.5 percent best estimate
8  assumption, you did so, did you not, because that
9  7.5 percent assumption was your best estimate of
10  the long-term returns on this fund's assets,
11  correct?
12     A.    For purposes of funding the plan, yes.
13     Q.    For purposes of determining the
14  funding notice percentage as discussed here,
15  correct?
16     A.    Yes.
17     Q.    So if the Fund's investment experience
18  turns out to be consistent with your 7.5 percent
19  best estimate, as well as your best estimate of
20  the other actuarial assumptions, this Fund will
21  have more than enough money to pay its projected
22  benefits, correct?
23     A.    This is a measurement that says this
24  Fund has more than enough money to pay current
25  accrued benefits.

Page 113

D. Gleave - Direct - Mr. Miller

1      Q.    So let me ask the question in a
2  somewhat revised way as a consequence of your
3  clarification.
4
5         So at the time you prepared this
6  actuarial valuation statement, if the Fund's
7  investment experience turned out to be consistent
8  with your best estimate anticipation, and all
9  other actuarial assumptions turned out as
10  anticipated, your projection was that this Fund
11  would have more than enough money to pay the
12  accrued benefits as of the date that you had
13  prepared the valuation, correct?
14     A.    Correct.
15     Q.    Therefore, assuming that the Fund's
16  investment experience turns out as anticipated, it
17  does not need any withdrawal liability payments
18  from Manhattan Auto in order to pay the accrued
19  benefits as they existed at the time you prepared
20  this actuarial report, correct?
21     A.    If the plan remains an ongoing plan,
22  yes.
23     Q.    And at the time you prepared this
24  report, you understood the plan would remain an
25  ongoing plan, correct?

Page 114

D. Gleave - Direct - Mr. Miller

1  A.  That was my understanding.
2  Q.  Okay.  And you have not changed that
3  understanding since then, correct?
4  A.  Correct.
5  Q.  So in light of the Fund's belief on
6  the status, any withdrawal liability paid by
7  Manhattan Auto, assuming that the investment
8  experience and other assumptions turn out as
9  expected, would essentially add to the cushion
10  that you had already projected for the Fund,
11  correct?
12  A.  If the assumptions worked out as we
13  expected, yes.
14  MR. MILLER:  No further questions.
15  THE ARBITRATOR:  I don't know what to
16  call it, redirect or what, but you have an
17  opportunity to question --
18  MR. JOSEM:  Can we take 5 minutes?
19  Because I was --
20  THE ARBITRATOR:  Yes.
21  MR. JOSEM:  I mean, I'm planning just
22  to question Ms. Gleave and not separately
23  call her.
24  MR. MILLER:  I agree.  I agree.  We

Page 115

D. Gleave - Cross - Mr. Josem

1  don't have technically call it cross --
2  MR. JOSEM:  Whatever we call it, I
3  don't care, I just thought that would be
4  simpler, so...
5  THE ARBITRATOR:  All right.  That's
6  fine.  Why don't we do it that way.
7  And we'll take whatever break you
8  need.  Just let us know when you want to
9  reconvene.
10  MR. JOSEM:  Five minutes.
11  (Recess taken from 11:37 a.m. until
12  11:51 a.m.)
13  THE ARBITRATOR:  Are we ready to
14  proceed?
15  MR. MILLER:  Yes.
16  THE ARBITRATOR:  Are you ready to pass
17  the witness?
18  MR. MILLER:  Yes, I am.
19  THE ARBITRATOR:  Okay.
20  CROSS-EXAMINATION
21  BY MR. JOSEM:
22  Q.  Ms. Gleave, you were here for
23  Mr. French's testimony this morning, and he
24  referred to the fact that he sat for some period

Page 116

D. Gleave - Cross - Mr. Josem

1  of time on a multiemployer subcommittee for -- I
2  don't remember if it was the American Academy of
3  Actuaries or some other organization?
4  A.  Yes.
5  Q.  Are you familiar with that body?
6  A.  Yes, yes.
7  Q.  Have you served on that body as well?
8  A.  I have, yes.
9  Q.  Now, for approximately how long have
10  you been the actuary for the Local 259 plan?
11  A.  Since 1987.
12  Q.  And for approximately how long have
13  you been an actuary at Segal?
14  A.  Approximately 36 years.
15  Q.  Since the development of the Segal
16  Blend have you always used the Segal Blend in
17  calculating withdrawal liability for the plans for
18  which you were the enrolled actuary?
19  A.  Yes.
20  Q.  And so I take it that means then that
21  you've also always used the Segal Blend during
22  your tenure as actuary to this plan?
23  A.  Yes.
24  Q.  And have you used the Segal blend

Page 117

D. Gleave - Cross - Mr. Josem

1  regardless of the funded status or funded
2  percentage of the particular plan?
3  A.  Yes.
4  Q.  And if we talk about this particular
5  plan, the Local 259 Pension Plan, over your 29
6  years of being the enrolled actuary, can you
7  estimate how many employers have withdrawn?
8  A.  Quite a few.  I don't -- I don't have
9  a count.  I don't know.
10  Q.  And, again, was the Segal Blend always
11  used to calculate withdrawal liability for those
12  employers -- those withdrawing employers.
13  A.  Yes.
14  Q.  And were there any assessments that
15  didn't use the Segal Blend?
16  A.  No.
17  Q.  You've testified in response to some
18  of Mr. Miller's questions -- many of his
19  questions -- that the investment return assumption
20  for the plan represents your best estimate of how
21  the plan's assets will perform over the long term?
22  A.  Yes.
23  Q.  Now, you here have selected a
24  7-and-a-half percent investment return

Page 118

D. Gleave - Cross - Mr. Josem

1
2  assumption --
3     A.  Yes.
4     Q.  -- correct?  Okay.
5        And, again, you heard Mr. French's
6  testimony this morning that in selecting that
7  assumption, one would then expect that,
8  essentially, 50 percent of the time you will meet
9  or achieve that investment return, 50 percent of
10 the time you won't.
11       Do you agree with that?
12    A.  Yes.
13    Q.  Now, if that long-term assumption,
14 that 7-and-a-half percent assumption, is not met
15 over a long period of time, what happens?
16    A.  Well, the annual cost -- the plan
17 incurs losses.  The annual costs will go up, and
18 at some point, depending on the funding, we would
19 have to perhaps go to the trustees and talk about
20 adjusting benefits or recommending to the
21 bargaining parties higher contributions.
22    Q.  And when you're talking about
23 adjusting benefits, am I correct -- and leaving
24 aside benefit suspension issues under MEPRA --
25 that you cannot adjust vested benefits?

Page 119

D. Gleave - Cross - Mr. Josem

1
2     A.  That's correct.
3     Q.  So that to the extent, for example,
4  benefits -- future benefit accruals need to be
5  adjusted after the withdrawal of Manhattan Ford,
6  those would not affect the form of Manhattan Ford
7  participants?
8     A.  Correct.
9        And putting aside the PDA remedies, I
10 think you said?
11    Q.  Yes.  Understood.
12       Now, in response to a number of
13 Mr. Miller's questions, you distinguished between
14 the purpose when calculating liabilities for
15 funding purposes versus calculating for withdrawal
16 liability purposes.
17       Why do you make that distinction?
18    A.  Because that dictates how you should
19 establish the assumptions.  The purpose -- for
20 purposes of ongoing funding, I use the
21 7-and-a-half percent.  For purposes of withdrawal
22 liability, which I view to be a settlement with an
23 employer at the point of withdrawal, I will use
24 the Segal Blend assumptions, and that is my best
25 estimate assumptions for withdrawal liability

Page 120

D. Gleave - Cross - Mr. Josem

1
2  purposes.
3     Q.  Okay.  When you say, it's a settlement
4  with the employer, what do you mean?
5     A.  It means you have one shot to assess
6  the employer, settlements, at the point of
7  withdrawal.  It's done using this blend, which is
8  reflective of current market conditions, because
9  you have no ability to go back to that employer
10 and get additional money should the plan incur
11 losses.
12       Likewise, on -- you know, on the
13 upside as well.  There's no ability, after the one
14 assessment is done, that's the settlement at that
15 point in time for that employer as to what their
16 obligations to the plan would be.
17    Q.  Now, would you agree that a valuation
18 is essentially a snapshot of the plan at a
19 particular date?
20    A.  Yes.
21    Q.  And so when you answered one of
22 Mr. Miller's questions where he asked was the plan
23 fully funded, is the plan fully funded for all
24 purposes for all time?
25    A.  No.

Page 121

D. Gleave - Cross - Mr. Josem

1
2     Q.  Why don't you explain.
3     A.  Well -- and this is -- there's many
4  ways, as Darren explained earlier, it's a
5  projection of benefit payments.  We first
6  calculate a projection of benefit payments, then
7  we discount that back to today using that discount
8  rate, that investment return assumption.
9        And it's really the purpose of the
10 measurement will determine those assumptions.  It
11 is not uncommon that you would be using different
12 assumptions for different purposes.
13    Q.  Okay.  And fully -- does fully funded
14 today, mean fully funded tomorrow?
15    A.  No.
16    Q.  And, again, can you explain?
17    A.  There's additional accruals.  There's
18 gains and losses.  There's changes in assumptions.
19 There's changes in law.  There's a lot of things
20 that could happen that could change the
21 measurement, but it's a snapshot as of today based
22 on the data as of today, based on the assumption
23 as of today, and tomorrow, it could be different.
24       MR. JOSEM:  No further questions.
25       MR. MILLER:  Just give me a moment.

Page 122

D. Gleave - Redirect - Mr. Miller

2  We don't need a break.
3      THE ARBITRATOR:  Yes.
4      (Pause.)
5  REDIRECT EXAMINATION
6  BY MR. MILLER:
7      Q.   All right.  Ms. Gleave, just a couple
8  of additional questions.
9      You used the Segal Blend only for
10 withdrawal liability purposes, not for any other
11 purpose, correct?
12     A.   Yes.
13     Q.   And you testified a moment ago that
14 you view withdrawal liability as a settlement with
15 the employer, and I think your words were this
16 is -- "and we have only one shot to obtain money
17 from the employer."
18     Do you remember that testimony?
19     A.   Yes.
20     Q.   And you went on to say, "There's no
21 ability to go back to an employer and get more
22 money if the actuarial assumptions fall short of
23 projections," right?
24     A.   There is no ability to go back to a
25 withdrawn employer and get more money.

Page 123

D. Gleave - Redirect - Mr. Miller

2      Q.   Yes.  By "employer," I meant the
3  withdrawn --
4      A.   And absent a mass withdrawal or
5  anything extreme.
6      Q.   But am I also correct that if the
7  actuarial assumptions turn out to be in error in
8  favor of the multiemployer plan, there's no
9  obligation to refund to the withdrawn employer any
10 of the withdrawn employer's withdrawal payments,
11 correct?
12     A.   I take issue with the error, but --
13 but, yes, there's no obligation to refund.
14     Q.   I can phrase the question a different
15 way:  If the actuarial assumptions turn out to be
16 more favorable to the pension fund than the
17 projections, there's no obligation to return to
18 the withdrawn employer any of the monies that the
19 withdrawn employers paid in liability, correct?
20     A.   Yes.
21     Q.   I think you testified earlier that you
22 employ the Segal Blend as the approach to
23 calculate withdrawal liability in connection with
24 every multiemployer fund that you're an enrolled
25 actuary for, correct?

Page 124

D. Gleave - Redirect - Mr. Miller

2      A.   Yes.
3      Q.   And that would be there for all the
4  multiemployer plans for which you and your team at
5  Segal is responsible for calculating withdrawn
6  liability, correct?
7      A.   Yes.
8      Q.   In your experience, has there been any
9  instance in which you were the enrolled actuary
10 for the multiemployer plan but you did not have
11 the responsibility for calculating the withdrawal
12 liability assessment?
13     A.   Yes, yes.
14     Q.   Yes?
15     And how many instances -- how many
16 benefit plans did this occur in connection with?
17     A.   I'm aware of two.
18     Q.   Two?
19     And in these two instances where you
20 were the enrolled actuary but you did not
21 calculate the withdrawal liability amounts in case
22 of withdrawal, was there a different actuary who
23 was responsible for calculating withdrawal
24 liability?
25     A.   Yes.

Page 125

D. Gleave - Redirect - Mr. Miller

2      Q.   Different actuary who was not employed
3  at Segal?
4      A.   No.
5      Q.   A different Segal actuary?
6      A.   Yes.
7      Q.   And in those situations, did the Segal
8  actuary use the Segal Blend method?
9      A.   No.
10     Q.   No?
11     What method did they use?
12     A.   In those situations, they used the
13 funding assumptions.
14     Q.   So you've been an enrolled actuary in
15 connection with two pension plans.  You didn't
16 perform the withdrawal liability calculation, a
17 different Segal actuary was charged with that, and
18 the Segal actuary used the investment return
19 assumptions?
20     A.   They used the long-term investment
21 return assumptions for those two plans, yes.
22     Q.   What was the reason they did that in
23 those two cases?
24     A.   It was just the way it was -- it
25 worked out with that particular fund.  It was a

Page 126

1    D. Gleave -
2  situation where I was the ERISA funding actuary
3  and there was a second actuary responsible for
4  withdrawal liability.
5    Q.   And that actuary was the Segal actuary
6  and did not use the Segal Blend?
7    A.   Yes.
8    Q.   He used the method that would be
9  consistent with the method that Mr. French
10  testified he would use, correct?
11    A.   Yes.
12    MR. MILLER:  No further questions.
13    MR. JOSEM:  No questions.
14    THE ARBITRATOR:  I have -- I think I
15  have one, and I apologize if I missed this.
16    At the time of the effective date of
17  the withdrawal, which would have been
18  December 31, I guess, 2013 --
19    THE WITNESS:  The withdrawal was in
20  2014, so the calculation was December '13.
21    THE ARBITRATOR:  I'm sorry.  You're
22  ahead of me.  You understand where I'm
23  going, the calculation was -- thank you.
24    With respect to the assets that the
25  fund had at the time, how many of those

Page 127

1    D. Gleave -
2  assets were investment-grade bonds or
3  treasuries, if you know?
4    THE WITNESS:  If I could refer to the
5  valuation report, it might be in there.
6    THE ARBITRATOR:  Yes.  And you're
7  referring to A-3.  And if you can show me
8  where it says that in there.
9    THE WITNESS:  I'm not sure if it's
10  going to give fact pattern detail.
11    On page 42.
12    THE ARBITRATOR:  Let me get there.
13  Go ahead.
14    THE WITNESS:  It does not really have
15  investment grade in and of itself, but under
16  the investments, it will show you that the
17  plan had $23 million in debt securities
18  under the investments, and then $27 million
19  in mutual funds and $32.6 million in common
20  stock.
21    THE ARBITRATOR:  Does that tell us
22  anything about whether they -- these
23  investments would be investment-grade bonds
24  or treasuries?
25    THE WITNESS:  Not in this report.

Page 128

1    D. Gleave -
2    THE ARBITRATOR:  So you can't -- so
3  you don't know?
4    THE WITNESS:  No.
5    THE ARBITRATOR:  I don't know whose
6  witness, you can ask, I'm going to ask you
7  for follow-ups.  I usually refer to the
8  witness.
9    So why don't I go to you first.  Do
10  you have any questions based upon what I
11  asked?
12    MR. MILLER:  No, but I have a request.
13    More detailed information about the
14  asset investments would be contained in the
15  Form 5500 for that plan year.  That's a
16  publicly available document.
17    Technically, the entirety of the form
18  5500 for that plan year is not yet in the
19  record, only portions of it, but I would
20  move that we provide you with the full
21  Form 5500 for that plan year.
22    It is a publicly available document.
23    MR. JOSEM:  I have no objection to
24  authenticity.  Obviously, I have some issues
25  about the relevance --

Page 129

1    D. Gleave -
2    THE ARBITRATOR:  Absolutely right.
3    MR. JOSEM:  -- but that's fine.  Not a
4  problem.  I have no objection.
5    THE ARBITRATOR:  I don't want
6  everybody to go off crazy just because of
7  this question that I asked.  It was
8  something that occurred to me that I wrote
9  down as you were talking.  That's all it is.
10    But if you can supplement the record,
11  I guess, to add that particular one, I'll
12  ask you to work it out with counsel and
13  submit it through the AAA to me so that you
14  have the correct and accurate document so we
15  have no problem.
16    MR. MILLER:  Thank you.
17    MR. JOSEM:  So we're talking about the
18  2013 Form 5500?
19    MR. MILLER:  Plan year -- 2013 plan
20  year Form 5500, correct?
21    MR. JOSEM:  And you and I can discuss
22  whether I give that --
23    THE ARBITRATOR:  Yeah, that will
24  show -- it will show -- I mean, if you can
25  agree to that aspect of it --

Page 130

1    Opening Statement by Mr. Josem
2    MR. JOSEM: Yeah, we may be able to
3    limit it so you don't get a huge document.
4    MR. MILLER: That's correct.
5    THE ARBITRATOR: Right, because that's
6    the only thing that I'd be interested in.
7    MR. MILLER: I have no additional
8    questions based on your questions.
9    MR. JOSEM: No additional questions.
10   THE ARBITRATOR: All right. Thank you
11   very much.
12   (Witness excused.)
13   MR. MILLER: We have no additional --
14   we have no additional witnesses. We submit.
15   THE ARBITRATOR: You rest?
16   MR. MILLER: We rest. We submit our
17   case.
18   THE ARBITRATOR: Would you like to
19   open? You had deferred.
20   MR. JOSEM: Well, very, very briefly.
21   THE ARBITRATOR: If you like. You
22   know, you don't have to open. If you
23   don't -- thank you, sir.
24   MR. JOSEM: I understand.
25   We did not and do not intend to

Page 131

1    Opening Statement by Mr. Josem
2    relitigate in this day of hearing the
3    determination you previously made in the
4    beginning.
5    Our view of the testimony and the
6    argument made by the employer at this stage
7    is, essentially, from a statutory point of
8    view, you have to use the investment
9    assumption.
10   While Mr. Miller has talked about how
11   supposedly well-funded this plan has been,
12   his expert has admitted the actual funded
13   status of the plan would be irrelevant in
14   his view. If the investment return
15   assumption, 7-and-a-half percent, it doesn't
16   matter whether the plan is 100 percent
17   funded, 50 percent funded, whatever, you
18   have to use that, and anything else is
19   unreasonable.
20   We have never claimed in this
21   proceeding -- and the deposition transcripts
22   certainly bear this out -- that use of the
23   funding rate to calculate withdrawal
24   liability would be unreasonable. But we
25   have also taken the position there are other

Page 132

1    T. Levy - Direct - Mr. Josem
2    ways to calculate withdrawal liability that
3    have been recognized as reasonable,
4    including the Segal Blend, including the use
5    the PBGC rate. Different actuaries have
6    those points of view.
7    So we're talking about here is a
8    question of not what is the most
9    "reasonable" manner of calculating
10   withdrawal liability upon which a host of
11   people and a host of actuaries may disagree,
12   but whether the employer has overcome the
13   presumption here recognized by the statute
14   and by the Supreme Court, the presumption of
15   reasonableness, and whether this form of
16   calculation would have been acceptable to a
17   reasonable actuary.
18   And that's really the issue in this
19   case.
20   THE ARBITRATOR: Okay, thank you.
21   Mr. Levy, I need to place you under
22   oath. I need to ask you to stand.
23   T H O M A S  L E V Y, having been duly sworn by
24   the Notary Public, testified as follows:
25

Page 133

1    T. Levy - Direct - Mr. Josem
2    DIRECT EXAMINATION
3    BY MR. JOSEM:
4    Q. Mr. Levy, why don't you briefly
5    describe for the Arbitrator your background as an
6    actuary.
7    A. I have been an actuary at the Segal
8    Company for nearly 49 years and the chief actuary
9    of the firm for nearly 30 years. I have been
10   certainly involved in the development of the Segal
11   Blend on behalf of the company back in 1980 and
12   1981, when we developed the policy.
13   I have been the chair of the pension
14   committee of the Actuary Standards Board. I have
15   been a member until the end of last year of the
16   Actuary Standards Board. So I've been intimately
17   involved in the preparation and have had to vote
18   on actuarial standards of practice.
19   I have been secretary treasurer of the
20   American Academy of Actuaries, obviously, a
21   leadership business, a member of the executive
22   committee of that body.
23   I currently live in Canada, but I'm
24   fully engaged in both the United States and Canada
25   in actuarial work, and certainly over the 35 years

Page 134

T. Levy - Direct - Mr. Josem

since the Segal Blend was developed, I have been
more often than not the witness defending it.
That's been successfully defended many times.

And I've been always part of the team
that considered, as economic and other
circumstances changed, whether the blend still
remained the primary best estimate for actuaries
at Segal or whether change in circumstances called
on us to change the Segal Blend from our
primary -- primary policies as the best estimate
for actuaries.

As Ms. Gleave said, in the last few
years, we have for the first time permitted a few
actuaries who previously were not permitted to do
withdrawal liability actuarial work because they
did not accept the Segal Blend as their best
estimate. We have now permitted a handful of
actuaries to take that position with regard to
withdrawal liability and, apparently, and I'm
learning it for the first time, there are two such
situations that involved Ms. Gleave.

Q.   Now, withdrawal liability was adopted
or became part of the law through the
Multiemployer Pension Plan Amendments Act in 1980.

Page 135

T. Levy - Direct - Mr. Josem

How did the Segal Blend come about as
a result of the passage enactment of MEPA?

A.   At the time that -- this was the
period when interest rates were at double digits,
far higher than funding rates, which were perhaps
in the 5-and-a-half to 6 percent range at the
time, and our starting position was that, if
withdrawal liability were payable in a single
payment, as it is for the windup of a single
employer pension plan, we would simply say this is
a final settlement.

The settlement should be at market
value, that's how we settle things in the United
States, and the market value meant the market
value of the assets, which we get from a plan's
audit, and the market value of the obligations,
which we get by what it would cost you to have an
insurance company take over those obligations from
the plan to settle the obligations. That's what
the market says you have to pay to have the --
have somebody else take the obligation over from
you.

And we then said, but this is
different from the single-employer situation and

Page 136

T. Levy - Direct - Mr. Josem

that the withdrawal liability payments on the
unfunded portion could be paid over as much as 20
years, and we were not prepared to assume that
what you could do at market value today was going
to be what you could do at market value for up to
20 years in the future, particularly the time of
record-high interest rates.

So we looked at the option of having
the entire obligation valued at funding rates,
which some other actuaries did at the time, and we
said, why would we charge an employer based on
6 percent discount rate, say, when we could go out
in the market and settle that obligation at 11 or
12 percent discount rate at a much lower number?

So -- so, again, we said, to the
extent that it's funded, we could treat this as a
settlement and what it would cost you to settle
with regard to the assets that were already there,
because you can only settle what you can -- what
you have assets to settle with. You can't settle
the liabilities that are going to be paid off over
15 or 20 years into the future.

So under the circumstances,
admittedly, we came to the conclusion that we

Page 137

T. Levy - Direct - Mr. Josem

ought to use a market settlement, which is the
PBGC rates and market value of assets, to the
extent funded, and we could use the funding
assumption as of long-term proxy over the next 20
years for what you could do when the money came in
that wasn't coming in immediately, that was being
paid by the employer over quarterly payments for
up to 15 or 20 years.

So that was how the blend was
originally developed, and, again, we saw no
reason, if the plan was fully funded on a market
value basis, to charge the employer withdrawal
liability because, on a long-term basis, using the
long-term 6 percent assumption, it was not fully
funded, so a reverse of today's situation.

Q.   So if I can just make sure we
understand that.

So as you said, the reverse of this
situation. So as we've had -- and maybe we can
take the reverse of the situation with this plan,
with the plan we're talking about today, as a
7-and-a-half percent assumption. When you use the
Segal Blend, the rate is something less -- becomes
something less, if you were to view it as just a

Page 138

T. Levy - Direct - Mr. Josem

1  
2 blend?
3     A.   Correct.
4     Q.   So let's flip it.  Let's assume that
5 the funding rate in this plan was that lower
6 amount but that the PBGC rate was 7-and-a-half
7 percent.
8     A.   Yes.
9     Q.   So if you calculate it in that
10 situation, the withdrawal liability, based on the
11 funding rate, a lower percentage, am I correct
12 that that would increase the withdrawal liability?
13     A.   Yes.  And that was the situation in
14 the early years, and nobody was coming to us and
15 saying, please give us funding assumptions.  They
16 were coming to us in the early arbitrations
17 through all these, please give us PBGC for
18 100 percent, not just the funded percent.
19     Q.   Because the employer's position at
20 that point in time would be -- correct me if I'm
21 wrong -- that the Fund could literally go out in
22 the market and buy annuities based on that higher
23 interest rate, which would then in a sense cost
24 less than if you use the funding rate?
25     A.   Yes.

Page 139

T. Levy - Direct - Mr. Josem

1  
2     Q.   Now, the interest rate environment has
3 obviously changed over the years.  And for many
4 years now the PBGC risk-free rates that we have
5 talked about have been below, oftentimes
6 substantially below, the funding investment return
7 assumption of most plans.  Is that correct?
8     A.   Correct.
9     Q.   Has the Segal Blend changed as a
10 result?  And if not, why not?
11     A.   It has not changed.  We have
12 considered whether the change in economic
13 circumstances would cause us to change the blend
14 and concluded that we had it right the first time
15 and have not elected to change, that the principle
16 was still similar, not identical, the facts and
17 the economic circumstances were different.
18         But still, the basic concept to this
19 is a final settlement to the extent that it can be
20 settled, and it should be valued as a final
21 settlement to the extent it could be settled was
22 still the right way to look at it and that the
23 funding assumption, which now became somewhat
24 generous to the employer for reasons I'll get to
25 in a minute, was still appropriate to use for the

Page 140

T. Levy - Direct - Mr. Josem

1  
2 unfunded portion.
3         I said it's somewhat generous because,
4 as I said in my deposition, one of the concepts we
5 looked at is the withdrawn employer no longer is
6 taking any risk with regard to the plan.  And all
7 the risks, positive or negative, are with the
8 continuing employers and the participants.  And so
9 we felt that the concept still -- still held as we
10 had originally designed it.
11         You can't buy gasoline for your car at
12 a market analyst expectation as to what futures
13 prices are going to be.  You have to buy it at
14 today's prices.  And the same concept held for
15 withdrawal liability, that the employer has to pay
16 at today's market value, not at some long-term
17 estimate of the future market value to the extent
18 that it can be settled, to the extent that the
19 long-term rate today, where investments are much
20 more risky and equitable -- and equities are higher
21 than it was when we developed the policy.
22         In effect, for that piece, for the
23 unfunded piece, we're giving the withdrawing
24 employer the benefit of the risk premium of the
25 expectation that these equities and other

Page 141

T. Levy - Direct - Mr. Josem

1  
2 investments will do well without the employer
3 taking the risk.
4         And the concept is, again, we
5 discussed in the deposition, I'll take the example
6 Mr. French gave you this morning.
7         If you expect to owe somebody $110 in
8 a year, and you have an investment that's expected
9 to earn 10 percent, you can put in $100 and you'll
10 have the $110 in a year, and you might have more,
11 you might have less, but the expectation is that
12 you'll have the 110.
13         If you want to be sure that you have
14 the 110, not take the risk that it might be higher
15 or might be lower, you still have the same
16 expectation at 110, but you have to go outside and
17 buy a one-year treasury that will cost you $108 or
18 $109.
19         That is, risk has a price.  Market's
20 priced to risk.  And in the example that
21 Mr. French gave this morning, if you want to have
22 a $110 expectation with risk, you get away with a
23 lot cheaper price than if you want to have the
24 $110 expectation with no risk, even though both
25 expectations are the same.

Page 142

T. Levy - Direct - Mr. Josem

1
2    Q.   Well, then, how does the Segal Blend
3    take into account the actuary's best estimate of
4    future experience of the plan?
5    A.   In effect, for the unfunded portion,
6    which is the portion the employer -- withdrawing
7    employer is going to pay off over up to 20 years,
8    we use the funding assumption.  That funding
9    assumption has the benefit of expected risk
10   premiums on equities and things like that, but on
11   reflection, we decided not to try to come up with
12   some other number for what we would expect the
13   future markets to be when the future payments are
14   coming in.
15   Q.   Now, Ms. Gleave has testified, and I
16   think you testified in your deposition, that as a
17   practical matter, most multiemployer plans don't
18   buy annuities?
19   A.   Correct.  I don't know that I've
20   ever -- well, I have one example and a very
21   unusual set of circumstances where they bought
22   annuities, and in the normal course, they don't do
23   it.
24   Q.   Okay.  So as I think Ms. Gleave
25   testified, the withdrawal liability payment that's

Page 143

T. Levy - Direct - Mr. Josem

1
2    paid by this employer, those dollars are expected
3    to be anticipated to be invested in the same way
4    as the rest of the assets of the plan?
5    A.   Yes, and that was true in 1980 and
6    it's true today.
7    Q.   Okay.  So why is it that the means or
8    the manner in which the trustees may choose to
9    actually invest the money going forward does not
10   change the approach of the Segal Blend?
11   A.   Because the risk has been assumed by
12   the withdrawing employer when it was an active
13   employer, which has been discussed quite
14   extensively already today.  That risk has now been
15   transferred to the remaining employers and
16   participants, and whether or not they choose to
17   get rid of that risk by buying annuities doesn't
18   affect the fact that the risk has been
19   transferred.
20       And the markets say, when you transfer
21   a risk, there is a price to be paid for doing so.
22   Somebody else is taking the risk for you, then the
23   price is not the same as if you're taking it
24   yourself, the $110 or $108 or $109 example.
25   Q.   Now, Mr. French had testified that

Page 144

T. Levy - Direct - Mr. Josem

1
2    with this interest rate environment, the Segal
3    Blend is actually biased.
4        Can you respond in terms of whether
5    you -- your position on the bias of the Segal
6    Blend?
7    A.   I don't agree, because, again, the
8    withdrawing employer is not taking a risk.  The
9    remaining employers are taking them, and the
10   market says that those are not the identical
11   situations.
12       So the price -- the piece for which
13   there is no risk at a no-risk price, at a
14   risk-free rate, as has been described, the PBGC
15   rate or the annuity rate, and the portion at which
16   there is a risk at a rate that includes the
17   expectation, including the risk.
18   Q.   Now, the -- Mr. Miller and I think
19   Mr. French, certainly Mr. Miller, and the record
20   reflects the version of the ASOP, which was
21   discussed today, I'll call it the "2007/2011
22   version of ASOP 27," and then the fact that there
23   was a revision issued in 2013 to ASOP 27 --
24   A.   Yes.
25   Q.   -- what was your involvement, if any,

Page 145

T. Levy - Direct - Mr. Josem

1
2    with the 2013 revision?
3    A.   I was a member of the actuarial
4    standards board at the time, and, therefore, I was
5    heavily involved both in the drafting and in the
6    adoption of the 2013 revision to ASOP 27.
7    Q.   And the prior version, the one that we
8    actually referred to today in terms of looking at
9    the document, the 2007/2011, Arbitrator Exhibit 2,
10   were you on either the committee that developed
11   that revision or on the actual standards board at
12   the time?
13   A.   No.
14   Q.   Was any Segal actuary on either of
15   those?
16   A.   Yes.  Don Morgan, who's the head of
17   our Boston actuarial department, was a member of
18   the pension committee of the standards board in
19   2007 and was heavily involved in that -- in that
20   document.
21   Q.   And was he also still on the committee
22   for the 2013 version?
23   A.   Yes.
24   Q.   And is -- is Mr. Morgan a
25   multiemployer actuary at Segal?

Page 146

T. Levy - Direct - Mr. Josem

1
2   A.   Yes.
3   Q.   And has he, to your knowledge, issued
4   a withdrawal liability calculations utilizing the
5   Segal Blend over the years?
6   A.   To my knowledge, that is the only way
7   he has issued actuarial valuations for withdrawal
8   liability purposes.
9   Q.   If you know, when was ASOP 27
10  originally issued?
11  A.   I believe 1986, but I'd have to go
12  back and look.  It may be more recent.  Maybe
13  1996.
14  MR. JOSEM:  Mark this as Plan 1.
15  MR. MILLER:  No, just keep Arbitrator.
16  MR. JOSEM:  Well, this is not in the
17  record previously, so I didn't know whether
18  you wanted to do that.
19  MR. MILLER:  Yeah, let's have --
20  MR. JOSEM:  It's up to you.
21  MR. MILLER:  Let's have exhibits that
22  are introduced in the arbitration marked as
23  "Arbitrator."
24  MR. JOSEM:  Fine.  And we can describe
25  it on the record.

Page 147

T. Levy - Direct - Mr. Josem

1
2   THE ARBITRATOR:  A-5.
3   (Arbitrator's Exhibit 5, was marked
4   for identification at this time.)
5   MR. JOSEM:  And let me state, so the
6   record is clear on this, Arbitrator
7   Exhibit 5 was not previously in evidence in
8   the discovery phase or this hearing, so this
9   is essentially a new document, number 1.
10  Number 2, the document I have here
11  marked as Arbitrator 5 is simply an excerpt.
12  I did not photocopy the entire ASOP.  It is
13  available.  We can -- if Mr. Miller wants me
14  to substitute the full one, I certainly can
15  easily do that.  But, perhaps, before we
16  leave today, he can make that decision.
17  BY MR. JOSEM:
18  Q.   Mr. Levy, to your knowledge, what is
19  Arbitrator 5 Exhibit?
20  A.   It is the initial version of ASOP 27
21  selecting -- selection of economic assumptions for
22  measuring pension obligations.
23  Q.   And if you would --
24  MR. JOSEM:  Evan, just for the sake of
25  ease, I essentially photocopied those

Page 148

T. Levy - Direct - Mr. Josem

1
2   sections that have, in a sense, been
3   referred to in the deposition testimony.  As
4   I said, we can certainly add more.
5   MR. MILLER:  Okay.
6   BY MR. JOSEM:
7   Q.   Mr. Levy, were any of the Segal
8   actuaries on the committee or the actuarial
9   standards board at the time?
10  A.   Not at the time of the actual
11  adoption.
12  Q.   If you would turn to page Roman
13  numeral VII of the document.
14  A.   I have it.
15  Q.   And the first full paragraph refers to
16  the pension committee thanking those who have made
17  significant contributions to the work?
18  THE ARBITRATOR:  I'm sorry.  Roman
19  numeral VII?
20  MR. JOSEM:  Roman numeral page VII.
21  THE WITNESS:  It's just before page I.
22  MR. JOSEM:  Right, just before
23  numbered page I of the document.
24  Sorry about that.
25  THE ARBITRATOR:  That's all right.

Page 149

T. Levy - Direct - Mr. Josem

1
2   Got it.
3   MR. JOSEM:  Okay.
4   BY MR. JOSEM:
5   Q.   That first full paragraph says:
6   "The pension committee would like to
7   thank all those who made significant
8   contributions, including the following and former
9   committee members."
10  Are any of those names then listed
11  Segal actuaries?
12  A.   Two of them are.
13  Q.   Again, were they multiemployer
14  actuaries?
15  A.   Yes.
16  Q.   Multiemployer actuaries who utilized
17  the Segal Blend in issuing withdrawal liability
18  calculations?
19  A.   Yes.
20  Q.   Now, with respect to the -- to the
21  selection of a discount, to your understanding,
22  did the 2000 version -- 2013 version of ASOP 27
23  introduce a change or only a clarification of the
24  prior, the 2007/2011 ASOP 27?
25  A.   The primary objective of the 2013 one

Page 150

T. Levy - Direct - Mr. Josem

was to make it clear that the financial economics
model -- I'll spare you a description of what that
is, but it's fundamentally one that does not look
at the actual assets in the plan -- that that --
that that was acceptable.

I think most of us believed that the
2007 version permitted it but there was some
question being raised, and we entered the 2013
version primarily to clarify that that was
acceptable.

MR. JOSEM:  Mark this as Arbitrator 6.

(Arbitrator's Exhibit 6, was marked
for identification at this time.)

Q.    And showing you Arbitrator Exhibit 6,
which as I said off the record is simply an
excerpt of the full 2013 ASOP 27, which is already
part of the record although not marked as an
exhibit -- as an Arbitrator exhibit today, but you
referenced in a sense the clarification, if I call
it that.

And is that found in Section 3.9 on
page 10?

A.    It's one of the places, yes.

Q.    Okay.  Then, will you explain further

Page 151

T. Levy - Direct - Mr. Josem

how that fits with the testimony you just gave
before we went off the record in terms of the --

A.    Well, particularly, 3.9(b) says:

"Defeasance or Settlement.  An actuary
measuring a plan's present value of benefits on a
defeasance or settlement basis may use a discount
rate implicit in annuity prices or other
defeasance or settlement options."

Q.    And these three subsections of 3.9 on
page 10 of that ASOP, the ASOP states that those
are examples of measurement purposes?

A.    Yes.

Q.    And if you would then turn to the last
page of that document, page 24 -- maybe I should
point out that page 24 is a continuation of
page 23 with comment and responses about Section
3.9.

And if you turn to the top comment and
response on page 24, what does that say about the
examples that are listed in the ASOP?

A.    The last sentence says:

"The reviewers note that the list of
examples is not exhaustive and believe that the
current guidance is sufficient, and made no

Page 152

T. Levy - Direct - Mr. Josem

change."

Q.    And the same sentence essentially
appears in the third comment and response on that
page, third response?

A.    Yes.

Q.    Does the Segal Blend assume a
hypothetical portfolio for the plan?

A.    Well, to the extent that the PBGC rate
are a hypothetical portfolio with regard to the
plan, yes, that's what the PBGC portion of the
blend is, in effect.  It's a hypothetical.

Q.    Okay.  So if we go back to
Ms. Gleave's testimony and some of the questions
and answers we've heard today, do you agree with
Ms. Gleave's testimony that the anticipated
experience under the plan for long-term funding
purposes is at the 7-and-a-half percent investment
return assumption?

A.    Yes.

Q.    And, again, can you describe why for
withdrawal liability purposes the anticipated
experience under the plan would be different?

A.    It goes back to what I said about risk
transfer from the withdrawing employer to the

Page 153

T. Levy - Direct - Mr. Josem

continuing employers and continuing employees.  So
it's really a risk adjustment that says, this is a
final settlement with the withdrawing employer,
and to the extent that it is possible because the
assets are there to make a final settlement of the
withdrawing employer's obligation, that should be
done at market value.

Whether or not the trustees choose to,
in fact, buy annuities or set those obligations,
they are still leaving the risks related to those
obligations and the withdrawing employer is not.

Q.    You testified that, at least with
respect to Ms. Gleave, and I think more generally,
that there are now some number of actuaries at
Segal who the firm permits to use other than the
Segal Blend to calculate the unfunded vested
benefits for withdrawal liability purposes?

A.    Yes.

Q.    Being that that is the case, is it
your opinion that the Segal Blend is the only
reasonable method of calculating -- I shouldn't
say, "method" -- only reasonable way to calculate
the withdrawal liability?

A.    We have never felt that the Segal

Page 154

T. Levy - Direct - Mr. Josem

1  Blend was the only reasonable way.  We simply felt
2  that we had gotten it right as to what the best
3  estimate should be as our policy.
4      Q.   Now, why -- again, taking the
5  situation of the current plan, I know you're not
6  the enrolled actuary, but we've heard and there's
7  no dispute that for long-term funding purposes,
8  the plan is deemed to be 111 percent funded as of
9  this valuation date.
10         Why continue to use the Segal Blend
11  rather than the funding assumption in the
12  circumstances of a plan that is concededly
13  well-funded?
14      A.   I think there are any number of
15  reasons, but the main ones are that our reasoning
16  back in 1980, '81, and as it has continued, has
17  been that -- that this was the best estimate
18  regardless of the funding level of the plan,
19  that -- and just as an example -- but, again, it
20  is in my report and I believe my deposition -- if
21  all employers, including every other one, took the
22  same course of action that Manhattan did, which is
23  to say terminated contributing to the plan, you
24  would have a mass withdrawal and the PBGC rates as

Page 155

T. Levy - Direct - Mr. Josem

1  a matter of law would be applied to 100 percent of
2  the obligation, that is, the blend is actually
3  giving a lower withdrawal liability than if all
4  the employers did exactly the same thing as
5  Manhattan did and stopped contributing to the
6  plan.
7         So our view is the funded level of the
8  plan is not a particular issue with regard to the
9  weighting of the blend, that is, the blend is
10  applicable regardless of the funded level of the
11  plan for the reasons I've discussed.
12      Q.   And if the approach of the Segal
13  plan -- or if a determination not to use the Segal
14  Blend to place because the plan was well-funded,
15  what actuarial bias in that situation does the
16  firm leave itself open to?
17      A.   Well, clearly, somebody can try to
18  have our actuaries testify against their
19  colleagues.  That's why we had a policy in the
20  first place.
21         After 30-plus years of our competitors
22  not having a single policy by and large, and that
23  has not turned out to be a problem for any of
24  them, we felt that for the handful of people who

Page 156

T. Levy - Cross - Mr. Roth

1  were not in agreement with the blend, that we
2  didn't have to restrict their ability to work as
3  withdrawal liability actuaries for our clients.
4         MR. JOSEM:  I have no further
5  questions.
6         THE ARBITRATOR:  Would you like to
7  question the witness?
8         MR. MILLER:  Can we take a 5-minute
9  break?
10         THE ARBITRATOR:  Sure.  Let's go ahead
11  and take a break.
12         (Recess taken from 12:46 p.m. until
13  12:59 p.m.)
14         THE ARBITRATOR:  Are you ready to pass
15  the witness?
16         MR. JOSEM:  Yes, absolutely.
17         THE ARBITRATOR:  You may question the
18  witness.
19  CROSS-EXAMINATION
20      BY MR. ROTH:
21      Q.   Mr. Levy, I just want to start by
22  going back to your discussion about the risk
23  transfer and that justification for the Segal
24  Blend that you were talking about.

Page 157

T. Levy - Cross - Mr. Roth

1         So if I understand correctly, the
2  multiemployer plan has a pool of assets and
3  investments, right?
4      A.   Yes.
5      Q.   And that plan, those assets and
6  investments, entail risk?
7      A.   Yes.
8      Q.   And that's why the expected return on
9  that pool of assets is 7.5 percent rather than a
10  lower risk-free type rate?
11      A.   Yes, certainly the principal reason.
12      Q.   And those are the assets that the plan
13  is expecting to use to pay the liabilities in the
14  future.
15         You do agree with that, right?
16      A.   I agree.
17      Q.   And your point is -- tell me if this
18  is correct:  When the employer -- after the
19  employer withdraws and pays its withdrawal
20  liability, the employer no longer stands to gain
21  or lose from that risk that the investments
22  entail.  Is that right?
23      A.   That's certainly one of the main
24  reasons that we continue it today, yes.

Page 158

T. Levy - Cross - Mr. Roth

Q. And so just building on what your explanation was, you view the appropriate rate for the -- for the valuation of the future liabilities in the context of a withdrawing employer to be a risk-free rate, at least to the extent that there are sufficient assets on hand to fund those liabilities?

A. Yes.

Q. You're essentially saying, I think, the anticipated experience on the pool of assets that the Fund actually owns is not -- is not the apposite measure in the context of a withdrawal. Is that right?

A. Again, we do not think that you can settle something at a long-term expectation when it's a final settlement because we do final settlements at market value.

Q. Right. So because you're viewing this as a settlement -- and I'll return to that in a minute, but because you're viewing the withdrawal as a type of settlement, your judgment is that the anticipated experience associated with the multiemployer plan's actual assets is inapposite?

A. Yes.

Page 159

T. Levy - Cross - Mr. Roth

Q. And instead, it would be more appropriate to look at I think you called it a hypothetical set of assets that would be a conservative, risk-free group of assets that could be used to guarantee -- essentially guarantee the share of both liabilities in the future?

A. We would simply describe it as the market value of those liabilities. That is what a transfer of those liabilities from somebody to somebody else would entail as a cost.

Q. Right. And the way you would be measuring that cost would be looking at the -- a hypothetical asset pool that could be used to essentially guarantee those future payments. Is that right?

A. Well, again, it is looking at what the market in the form of annuity purchase rates would charge you to transfer that obligation. It isn't looking at a portfolio as such. It's looking at what it would take to have somebody else take over the responsibility. That is what -- what the market would charge for transferring that liability from the plan to an insurance company.

Q. So you're looking to the market cost,

Page 160

T. Levy - Cross - Mr. Roth

the market price, as opposed to the anticipated experience of the plan's actual assets?

A. Again, we would probably call it the "risk-adjusted expected experience" as I think a better description. I haven't given that a lot of thought.

But, yes, we are taking a hypothetical portfolio, not what we expect the actual portfolio to be.

Q. So put another way, and just building on that, your description, you're imposing an adjustment on the anticipated experience under the plan to account for this risk?

A. Right, to reflect the fact that the risk has been transferred.

Q. I want to go back to your use of the settlement concept.

In a typical settlement of pension obligations, the pension plan would purchase annuities. Is that right?

A. In the multiemployer environment, that's right.

There are really only two ways to settle a pension obligation. One is a lump-sum

Page 161

T. Levy - Cross - Mr. Roth

transfer usually to the participant and now the participant is taking all the risks, or a transfer to an insurance company and the insurance company is taking all the risks.

Q. In the case of a withdrawal from an otherwise ongoing multiemployer plan, the plan bears the same obligations to the participants after the withdrawal as before the withdrawal. Is that correct?

A. By and large, yes.

Q. And the plan is not transferring that risk to the participants or to an insurance company?

A. It is not doing that -- well, to some extent, the risk is being transferred to the continuing employers, because the withdrawn employer's employees are going to get their benefit but the consequences, positive or negative, of variations from that are on the remaining employers and the remaining employees.

Q. Right. So the -- prior to withdrawal, the -- it's the pension plan that bears the risk and bears the obligation to the participants. Is that right?

Page 162

T. Levy - Cross - Mr. Roth

1
2    A.   The pension plan is an organizational
3    tool, if you will, but the pension plan has no
4    existence other than it's holding the assets and
5    paying the benefits.  Ultimately, the
6    contributions and the investment income have to
7    pay for the benefits.
8    Q.   As a practical matter, the employers
9    are the ones funding the trusts?
10   A.   That is true.
11   Q.   But the trust is the entity that bears
12   the obligation under the law to pay the pension
13   benefits?
14   A.   The actual payment obligation is the
15   fund's obligation.
16   Q.   Right.  And that's not affected by the
17   withdrawal?
18   A.   No.
19   Q.   You -- you gave the hypothetical in
20   your testimony about buying gas and you can't by
21   gas today based on a future expectation of what it
22   would cost in the future.
23        Do you remember that testimony?
24   A.   Yes.
25   Q.   So if the -- if the pension benefits

Page 163

T. Levy - Cross - Mr. Roth

1
2    in that hypothetical are the gas, in the case of a
3    withdrawal, the multiemployer plan is not buying
4    the gas today in the sense that the multiemployer
5    plan is not paying the pension benefits today.  Is
6    that right?
7    A.   Right.
8    Q.   It's intending to pay them in the
9    future?
10   A.   Yes.
11   Q.   You also mentioned the mass withdrawal
12   rules and that concept.  I think you said this in
13   your testimony, but just to confirm, in the case
14   of a mass withdrawal, the law requires the use of
15   PBGC rates?
16   A.   It does, and it does that regardless
17   of whether the employer or whether the trustees
18   invest the money entirely in high-grade,
19   fixed-income securities or continue to invest
20   exactly as they've been doing.
21   Q.   Right.  Either way, the law says
22   that's the rate you have to use?
23   A.   Yes.
24   Q.   There's no analogous rule in the case
25   of an ordinary withdrawal.  Is that right?

Page 164

T. Levy - Cross - Mr. Roth

1
2    A.   There is not.
3    Q.   And you don't have any reason to
4    believe that a mass withdrawal is anticipated for
5    this Fund?
6    A.   No.
7    Q.   I want to just go back to the ASOP 27.
8    That was the version we looked at earlier, which
9    was --
10        MR. JOSEM:  The 2007?
11        MR. ROTH:  Yes.
12        MR. JOSEM:  Arbitrator 2.
13        MR. ROTH:  Two, Arbitrator 2.
14   Q.   And if we could just look back at
15   Section 3.6, which is where we were focused
16   earlier, which is on page 5?
17   A.   I have it.
18   Q.   Thank you.
19        And looking at the -- that middle
20   paragraph 3.6, do you see the sentence where
21   it says, "Generally, the appropriate discount rate
22   is the same as the investment return assumption"?
23   A.   Yes.
24   Q.   And do you agree with that principle
25   generally?

Page 165

T. Levy - Cross - Mr. Roth

1
2    A.   As a general rule, yes.  Again, with
3    the 2013 amendments to ASOP 27, we felt that that
4    needed some expansion.
5    Q.   That sentence doesn't change in the
6    subsequent?
7    A.   No, that sentence as such doesn't
8    change.
9    Q.   And you agree that this is the version
10   that applied for purposes of calculating the
11   withdrawal liability in this case, right?
12   A.   Yes.
13   Q.   And then the next sentence talks
14   about, for some purposes, such as SFAS No. 87, or
15   unfunded plan valuations, discount rates may be
16   selected independently of the plan's investment
17   return assumption, if any.
18        I just want to make sure you agreed
19   with the testimony that -- from earlier that the
20   SFAS No. 87 situation is not applicable in the
21   case of withdrawal liability?
22   A.   I agree.  That's -- these are
23   examples --
24   Q.   Yeah, yeah.  And that example is
25   not --

Page 166

T. Levy - Cross - Mr. Roth

1    A.   That example is not one where you
2  would use the -- is not applicable to withdrawal
3  liability.
4    Q.   And you agree the same as to unfunded
5  plan valuations, that example is not applicable in
6  the case of a multiemployer plan that has a
7  dedicated pool of assets?
8    A.   I agree.
9    MR. ROTH:   Just one more set of
10  questions.
11    Q.   As we were discussing earlier, the
12  PBGC rates don't represent the anticipated
13  experience of the actual assets of a multiemployer
14  plan, right?
15    A.   As we discussed, they do not except
16  for the concept of a risk adjusted rate.
17    Q.   Without the risk adjustment --
18    A.   Right.
19    Q.   -- they don't represent --
20    A.   Right.
21    Q.   -- anticipated best estimate of
22  anticipated return experience?
23    And, in fact, the PBGC rates really
24  have nothing to do with the anticipated experience

*(lines numbered 1–25)*

Page 167

T. Levy - Cross - Mr. Roth

1  of the multiemployer plan's actual assets or
2  investments?
3    A.   I don't expect that any of the funds
4  will be used to buy annuities or to transfer
5  obligations to the PBGC, which fundamentally a
6  multiemployer plan can't do anyway.
7    Q.   I understand what you're saying, that
8  you're not -- if the multiemployer plan is not
9  buying annuities, or otherwise altering its
10  investment mix so that it exclusively consists of
11  high-grade corporate bonds, then the PBGC rates do
12  not represent or have anything to do with the
13  anticipated experience of the plan -- of that
14  plan's assets?
15    A.   The actual plan expectation is an
16  ongoing plan, that is right.
17    But, again, the concept of buying
18  those annuities is not one I've seen except in one
19  highly unusual circumstance.
20    Q.   Right, right.  Okay.
21    So with respect to the Segal Blend,
22  which incorporates the PBGC rates into the
23  measurement of the -- of the liabilities -- the
24  future liabilities, the Segal Blend then is not

*(lines numbered 1–25)*

Page 168

T. Levy - Redirect - Mr. Josem

1  the best estimate of anticipated experience of the
2  plan's actual assets?
3    A.   Except subject to the concept of a
4  risk adjustment.
5    Q.   Right.  But putting aside adjusting
6  the experience, so I understand the risk and why
7  you're suggesting that the anticipated experience
8  needs to be modified to account for that transfer
9  of risk, putting aside the adjustment that you
10  want to make, the Segal Blend does not represent
11  the best estimate of anticipated experience under
12  the plan?
13    A.   Under the ongoing plan as one would
14  expect it to actually operate, that is correct.
15    MR. ROTH:   Okay.  No further
16  questions.
17    THE ARBITRATOR:   Would you like to ask
18  any more questions?
19    MR. JOSEM:   Yes, just briefly.
20    THE ARBITRATOR:   Go ahead.
21  REDIRECT EXAMINATION
22  BY MR. JOSEM:
23    Q.   You indicated -- or accepted that the
24  payment obligation -- the payment of benefits is

*(lines numbered 1–25)*

Page 169

T. Levy - Redirect - Mr. Josem

1  the Fund's obligation?
2    A.   Yes.
3    Q.   But if the Fund can't meet that
4  obligation, what happens?  What are some of the
5  possibilities?
6    A.   Well, one possibility is the plan
7  winds up, in effect, with no assets and PBGC, to
8  the extent of its assets, takes over funding the
9  benefit.  The plan continues to operate.
10    One is that the employer's increased
11  contributions.
12    One is the benefits, at least for new
13  accruals, are cut.
14    And another one is the trustees decide
15  to take more risk with the assets in hopes of
16  getting a higher return so that they get more
17  investment income and don't have to change
18  contributions or benefits.
19    Q.   Or the trustees might trigger a mass
20  withdrawal?
21    A.   Well, theoretically, a mass withdrawal
22  has to be triggered by the employers, not by the
23  trustee.  That is one of the things that could
24  happen.

*(lines numbered 1–25)*

---

Page 170

1     Proceedings
2         MR. JOSEM:  I have no further
3     questions.
4     RECROSS EXAMINATION
5     BY MR. ROTH:
6         Q.   The question was about what happens if
7     the Fund can't meet its payment obligations.
8             Just to confirm, the expectation based
9     on the actuary's best estimate as to this Fund is
10    that the Fund will be able to meet its payment
11    obligations?
12        A.   Yeah, I'm not the actuary for this
13    plan.  My understanding from Ms. Gleave's
14    testimony is that that's the case.
15        MR. ROTH:  Thank you.
16        MR. MILLER:  Thank you.  No further
17    questions.
18        THE ARBITRATOR:  All right.  Thank
19    you, sir.
20        (Witness excused.)
21        MR. JOSEM:  I have nothing further,
22    Mr. Arbitrator.
23            Let me make this suggestion.  We may
24    want to put Mr. French on for a brief
25    rebuttal, and I would suggest why don't we

---

Page 171

1     D. French - Redirect - Mr. Miller
2     break for lunch and come back and have that,
3     what I anticipate to be brief testimony, and
4     we would then have nothing further.
5         (Discussion off the record.)
6         MR. JOSEM:  If you just have a few
7     questions, why don't we do it now.
8         THE ARBITRATOR:  Do you want to have a
9     5- or 10-minute break?
10        MR. MILLER:  We can have a 5- or
11    10-minute break and we can come back and
12    finish him up.  I'm fine with that.
13        (Recess.)
14    D A R R E N   F R E N C H, resumed.
15        THE ARBITRATOR:  You are still under
16    oath, sir.
17        THE WITNESS:  Okay.
18    REDIRECT EXAMINATION
19    BY MR. MILLER:
20        Q.   So, Mr. French, thank you.  You're
21    still under oath, and I have a brief series of
22    questions for you.
23            Do employers that participate in a
24    multiemployer pension plan have an obligation to
25    pay the benefit liabilities of the plan?

---

Page 172

1     D. French - Redirect - Mr. Miller
2         A.   On a multiemployer plan, no.
3         Q.   Who does?
4         A.   Basically, the plan and the trust
5     itself.
6         Q.   What is your understanding of what
7     constitutes an employer withdrawal?
8         A.   An "employer withdrawal" is defined --
9     "withdrawal" is defined as a permanent cessation
10    of an obligation to contribute to the plan.
11        Q.   When an employer permanently ceases
12    its obligation to contribute to a multiemployer
13    plan, is the employer settling any benefit plan
14    liability?
15        A.   No.
16        Q.   Why is that, sir?
17        A.   The employer never had an obligation
18    to pay plan liabilities in the first place, so the
19    event of a control can't possibly change that.  He
20    can't settle something that he never had an
21    obligation for.
22        Q.   In your opinion, is there -- strike
23    that.
24            In your opinion, can an actuarial have
25    a settlement of plan liabilities occur in

---

Page 173

1     D. French - Recross - Mr. Josem
2     connection with a cessation of merely an
3     obligation to contribute?
4         A.   No.
5         Q.   And why is that?
6         A.   There's only two ways to settle the
7     obligation, as I think Mr. Levy himself testified,
8     pay a lump sum or you buy an annuity.  Those are
9     the two ways you settle.
10        MR. MILLER:  Thank you.
11            No further questions.
12    RECROSS EXAMINATION
13    BY MR. JOSEM:
14        Q.   That's assuming that you're talking
15    about a settlement in the financial definitional
16    sense?
17        A.   In the sense we've been talking about
18    the whole time, yes.
19        Q.   Well, the pension plan -- Pension Fund
20    has the obligation to pay the benefits?
21        A.   Correct.
22        Q.   The trustees of the plan have an
23    obligation to at least attempt to appropriately
24    fund those benefits so that they can be paid?
25        A.   It's a legal issue, but I would agree

---

D. French - Recross - Mr. Josem

1 with that, yeah.
2      Q.   When that employer withdraws, that
3 employer will no longer be making ongoing
4 contributions?
5      A.   Correct, regular contributions.
6      Q.   I understand may make withdrawal
7 liability payments, and I want to distinguish
8 between those.
9      A.   Yes.
10     Q.   In the ongoing plan situation with
11 ongoing employers, if as time goes on the plan
12 does not meet its investment return assumption,
13 here 7-and-a-half percent, something's going to
14 have to give, either contribution increases,
15 future benefit accruals, or the plan is going to
16 have a problem?
17     A.   Correct.
18     Q.   And if withdrawal liability is -- or
19 the present value of vested benefits for
20 withdrawal liability purposes is calculated using,
21 for this plan, the investment return assumption of
22 7-and-a-half percent, then that withdrawing
23 employer is essentially guaranteed that rate of
24 return on its monies, is it not?

D. French - Recross - Mr. Josem

1      A.   The employer never had an obligation
2 to pay the benefit.
3      Q.   That's not my question.
4           Would you answer my question?
5      A.   I can't answer that because it's not a
6 logical -- it's not a --
7      Q.   All right.  Let's kind of step back
8 for a moment.  Okay?
9           If the plan -- if the ongoing plan, as
10 you said, doesn't meet 7-and-a-half percent, then
11 there may be consequences, including increased
12 contributions, reduced future benefit accruals,
13 and the like?
14     A.   Or the participants don't get the
15 benefit.
16     Q.   If the plan goes insolvent, that's the
17 issue?
18     A.   Or the plan goes insolvent, yeah.
19     Q.   And in that situation, the plan -- the
20 plan -- the actuary has selected an investment
21 return assumption -- again, here, 7-and-a-half
22 percent, that's the assumption -- and if it's not
23 met, something is going to have to happen?
24     A.   Correct.

D. French - Recross - Mr. Josem

1      Q.   Okay.  All right --
2      A.   And if it's more than met, something
3 else is going to happen.
4      Q.   Absolutely.  Absolutely.
5           And as you said, there is both a --
6 it's a 50-50.  There's a 50 percent chance it will
7 be met, but there's also a 50 percent chance that
8 there won't be enough money to pay the pension
9 benefits that these members -- the employees have
10 been promised?
11     A.   If the plan was, in fact, 100 percent
12 funds.  Remember, this plan is 110 percent funded,
13 and it's also got a very healthy contribution
14 rate.
15     Q.   I understand.
16     A.   I'm just saying the way you were
17 wording it, yes, but because this plan is so
18 well-funded and has such a good contribution rate,
19 so much money coming into benefits, that's not
20 really a true statement.
21     Q.   As of the snapshot today -- well, as
22 of the snapshot at the time, it was 111 percent
23 funded?
24     A.   And they're contributing about three

D. French - Recross - Mr. Josem

1 times the rate of --
2      Q.   I understand.  And depending on any
3 number of things that might happen in the future,
4 they could become better funded or worse funded?
5      A.   Right.  My point is, it's not
6 necessarily 50-50, it's probably less than 50-50,
7 less than 50 percent chance.
8      Q.   You testified earlier that it was
9 50-50?
10     A.   No, no, no, I didn't.  That, I did
11 not.
12          I testified that if the plan is
13 exactly 100 percent funded, then it's a 50 percent
14 chance yes and a 50 percent chance no.
15          The plan is well over 50 percent
16 funded and, very importantly, an awful lot of
17 money is coming in.  So at this point in time,
18 today, it's probably better than that.
19     Q.   Okay.  And, again, that can change?
20     A.   Absolutely.  But it's not 50-50 now.
21     Q.   Understood.
22          Now, the employer in this case
23 withdraws.  It leaves behind for the pension plan
24 the obligation to pay the benefits.

Page 178

D. French - Recross - Mr. Josem

1
2     It's the pension plan's obligation to
3  pay the benefits?
4     A.   The pension plan has always had the
5  obligation to pay the benefits.
6     Q.   So the pension plan has the obligation
7  to pay these benefits to the Manhattan Ford folks
8  who qualify for benefits, and whatever share of
9  other vested benefits, if any, Manhattan Ford is
10  liable for under the methods of allocating
11  withdrawal liability?
12     A.   To the extent the plan has the money,
13  yes.
14     Q.   But you've testified, obviously, the
15  trustees have a fiduciary obligation to pay those
16  benefits.  You can't just ignore its obligation
17  and say, we're just going to run out of money,
18  we're not doing anything?
19     A.   I didn't say they would.
20     Q.   So the ongoing plan has an assumption
21  of 7-and-a-half percent, as you say, if it's
22  achieved, and assuming the other assumptions
23  obviously achieved, everything should be
24  hunky-dory?
25     A.   Right.

Page 179

D. French - Recross - Mr. Josem

1
2     Q.   And if the employer is assessed
3  withdrawal liability at less than that investment
4  return assumption and the plan's results exceed
5  the assumptions, that employer is effectively paid
6  more than it should?
7     A.   And everyone else would probably have
8  to pay less than that return.
9     Q.   But the opposite is also true?
10     A.   Yes, 50-50 there.
11     Q.   Understood.  Okay.
12     But if we start with the vested
13  benefit obligation that has to be paid, if we --
14  when the actuary calculates the present value
15  vested benefits using the 7-and-a-half expected
16  return, right?
17     A.   Yes.
18     Q.   The number that they come up with
19  assumes that return, that the plan will get that
20  return?
21     A.   Each and every year, as a matter of
22  fact.
23     Q.   Okay.  So because the withdrawal
24  liability is assessed only once as a practical
25  matter, that withdrawing employer is getting the

Page 180

D. French - Recross - Mr. Josem

1
2  benefit of that 7-and-a-half percent return
3  whether the plan beats it, doesn't make it, or
4  meets it equally?
5     A.   And so might all the other employers.
6     Q.   I understand.
7     A.   I'm just saying it's not something
8  different.
9     Q.   Is the answer "Yes" or "No"?
10     A.   Yes, the answer is yes.
11     Q.   Okay.  And so if the plan does not
12  meet those -- if the plan's results don't meet the
13  assumptions, then, as you said, it may be the
14  employers have to contribute more --
15     A.   Well, it substantially doesn't.
16  Remember, it's 110 percent funded.
17     Q.   Over time, if the plan becomes less
18  than fully funded --
19     A.   Yes.
20     Q.   -- if there are significant employer
21  withdrawals, for example, that might average the
22  contributions, right?
23     A.   Okay.
24     Q.   As you said, at this stage,
25  contributions exceed benefit payments?

Page 181

D. French - Recross - Mr. Josem

1
2     A.   No, contributions exceed the cost of
3  benefit --
4     Q.   I'm sorry.  Cost accruals --
5     A.   -- by a healthy margin.
6     Q.   Right.  Normal costs plus expenses?
7     A.   Healthy -- healthy margin.
8     Q.   Understood.
9     And as you say, you've dealt with a
10  lot of multiemployer plans over the years, and
11  you've certainly seen plans over the years that at
12  one time were in that same situation and as a
13  result of changes, the benefit contributions have
14  been reduced substantially because less employers,
15  etc.?
16     A.   I don't think I testified to that, but
17  certainly have seen situations where that happened
18  if the trustees start to not be careful and bad
19  things happen and, yeah, that could happen.
20     Q.   Okay.  And it has happened, and you're
21  aware of plans --
22     A.   Absolutely.
23     Q.   Okay.
24     A.   But not this plan hasn't so far,
25  right --

## Page 182

D. French - Recross - Mr. Josem

1  Q.   So far --
2  A.   -- even after some pretty terrible
3  years of results.
4  Q.   So far, it hasn't, but, again, we're
5  talking about --
6  A.   Agreed.  It's certainly possible.
7  Q.   Okay.  So we're talking about a
8  snapshot of a valuation?
9  A.   Correct.
10  Q.   And it can change from year to year
11  better or for worse?  It could be better.
12  A.   Better or worse --
13  Q.   The plan might be 118 percent funded.
14  A.   -- I'm agreeing with you.
15  Q.   But that employer, once it has
16  withdrawn, no longer has further -- again,
17  assuming no mass withdrawal, etc., that employer
18  has no further obligation other than to pay that
19  withdrawal liability, and then it's the plan's
20  problem going forward?
21  A.   That's correct.  And as you also
22  pointed out, if it does better than everyone
23  else's benefits.  So it's -- you know, and the
24  trustees have an option.  They could annuitize it.

## Page 183

D. French - Recross - Mr. Josem

1  They could go and put a separate fund and
2  guarantee that this isn't a problem.
3  But they've chosen not to do that.
4  They want the benefit of that extra return.
5  Q.   Let's just talk very briefly about
6  that.
7  I assume you are old enough to
8  remember situations where in a different
9  investment -- interest rate environment, some
10  multiemployer plans immunized some portion of
11  their portfolios?
12  A.   I am old enough to remember a time
13  when interest rates were like that.  I wasn't
14  working on multiemployer plans.
15  But, sure, I remember where you could
16  have 13, 14 percnet interest rates --
17  Q.   Okay.
18  A.   -- and lots of single employer funds
19  did, and I'm sure multiemployer funds did as well.
20  Q.   When we talk about a multi -- if it
21  was a multiemployer plan, for example, immunizing
22  its portfolio, it would be taking a certain
23  portion of the liabilities and matching them up
24  with high-grade bonds with a --

## Page 184

D. French - Recross - Mr. Josem

1  A.   That are actually paid in their
2  portfolio.
3  Q.   Yes.  I'm not talking immunized.
4  You're immunizing --
5  A.   I just want to clarify that it's not
6  just matching up hypothetically, it's matching up
7  with real bonds that you own.
8  Q.   Understood.  Understood.
9  So while the multiemployer plan might
10  not purchase annuities in that kind of
11  high-interest-rate environment, they may be able
12  to immunize a portion of the portfolio, which kind
13  of gives you a result?
14  A.   Except for the mortality experience,
15  but yes.  Other than that, yes.
16  Q.   Assuming everything else is equal?
17  A.   Yes.
18  Q.   All right.  And so regardless of what
19  happens to the assets in the future, whether an
20  environment arises where a plan may be able to
21  immunize, whether a plan decides to go the other
22  way and take even greater risk, and, again, absent
23  a mass withdrawal, that withdrawn employer doesn't
24  have anything to do with it, it's not affected by

## Page 185

Proceedings

1  it, its payments don't change?
2  A.   Correct.
3  Q.   Okay.  So if I -- if you owe me a
4  debt, once you pay me that debt, what I choose to
5  do with the money is mine?
6  A.   Correct.
7  Q.   So whether I choose to buy annuities
8  or whether I choose to put it into an investment
9  portfolio that has a mix of stocks and bonds with
10  some risk is on me, not on you anymore?
11  A.   Right.
12  MR. JOSEM:  No further questions.
13  MR. MILLER:  No questions.
14  THE ARBITRATOR:  All right.  Thank
15  you, sir.
16  (Witness excused.)
17  THE ARBITRATOR:  Any further rebuttal?
18  MR. MILLER:  No.
19  THE ARBITRATOR:  The parties have
20  anything additional besides the submittal to
21  me of the MB 5500 for 2013?  Do the parties
22  have anything else they'd like to submit or
23  as evidence in this proceeding?
24  MR. MILLER:  We do not.

Page 186

```
1              Proceedings
2         MR. JOSEM:  No, sir.
3         THE ARBITRATOR:  Okay.  How would you
4    like to conclude?
5         MR. MILLER:  I don't see a need for
6    closing statements.  We'll be providing
7    briefing, which will be tantamount to same,
8    and so let's talk about briefing schedule.
9         THE ARBITRATOR:  Okay.
10        MR. MILLER:  Bill, what do you have in
11   mind?  And the holidays coming up.
12        THE ARBITRATOR:  Let me tell you this
13   about briefing schedules for me, I don't
14   care.  You guys can put it together.  The
15   time I do care is when my deadline starts,
16   and that -- the trouble with that is, if
17   I've got a ton of writing and things like
18   that, I may need additional time.
19        But as far as I'm concerned, what you
20   can agree to is fine with me, so...
21        MR. JOSEM:  And Evan knows and Jacob
22   knows that whatever we agree to today may
23   change anyway.
24        No, listen, we have a relationship, if
25   either of us -- as a practical matter, we're
```

Page 187

```
1              Proceedings
2    not, you know --
3         MR. MILLER:  Mr. Arbitrator, let me
4    make this suggestion.  Rather than discuss
5    it now, I will reach out to Bill promptly.
6    I have every reason to believe we'll agree
7    to a schedule and we'll report back to you
8    promptly.
9         THE ARBITRATOR:  Okay.
10        MR. MILLER:  That's fine.
11        THE ARBITRATOR:  That makes sense to
12   me.
13        I assume you'll need to factor in
14   whenever the transcript arrives so you can
15   do that as well.  That's fine with me.
16        Then, I think that's really all we
17   need to do today formally.  Thank you very
18   much for your presentations.  I've enjoyed
19   them.  I look forward to your briefs, oh,
20   my.
21        MR. JOSEM:  Oh, my.
22        (Whereupon the proceedings were
23   excluded at 1:42 p.m.)
24
25
```

Page 188

```
1
2              CERTIFICATE
3         I, AMY A. RIVERA, a Certified Shorthand
4    Reporter, Registered Professional Reporter,
5    Certified LiveNote Reporter, and Notary Public of
6    the State of New York, do hereby certify that the
7    foregoing is a true and accurate transcript of the
8    testimony as taken stenographically and before me
9    at the time, place and on the date hereinbefore set
10   forth.
11        I DO FURTHER CERTIFY that I am neither a
12   relative nor employee nor attorney nor counsel of
13   any of the parties to this action, and that I am
14   neither a relative nor employee of such attorney or
15   counsel, and that I am not financially interested in
16   the action.
17   _____
18        Notary Public of the State of New York
19        My commission expires August 28, 2017
20        License No. XI00939
21   Dated:  December 16, 2016
22
23
24
25
```

Page 189

```
1
2                  INDEX
3    Opening Statement by Mr. Miller        12
4    Opening Statement by Mr. Josem        130
5
6    WITNESS       DIRECT  CROSS  REDIRECT  RECROSS
7    DARREN FRENCH
8    By Mr. Miller     19      171
9    By Mr. Josem      58              173
10   DIANE GLEAVE
11   By Mr. Miller     76      122
12   By Mr. Josem      115
13   THOMAS LEVY
14   By Mr. Josem      133     168
15   By Mr. Roth       156     170
16
17                 EXHIBITS
18   EXHIBIT NUMBER          FOR IDENT.  IN EVID.
19   Arbitrator's Exhibit 1               8
20   Arbitrator's Exhibit 2      34
21   Arbitrator's Exhibit 3      79
22   Arbitrator's Exhibit 4      98
23   Arbitrator's Exhibit 5      147
24   Arbitrator's Exhibit 6      150
25
```

**A**

**$100 (2)**
29:23 141:9
**$108 (2)**
141:17 143:24
**$109 (2)**
141:18 143:24
**$110 (6)**
29:21 141:7,10,22,24
143:24
**$117 (1)**
101:13
**$117.8 (2)**
100:18 103:2
**$2.55 (2)**
15:24 17:18
**$23 (1)**
127:17
**$27 (1)**
127:18
**$31.7 (1)**
15:21
**$32.6 (1)**
127:19
**$86.1 (1)**
100:21
**A-3 (1)**
127:7
**A-5 (1)**
147:2
**A-S-O-P (1)**
34:4
**a.m (5)**
2:3 57:17,18 115:12
115:13
**AAA (2)**
9:24 129:13
**ability (5)**
120:9,13 122:21,24
156:3
**able (6)**
44:25 63:20 130:2
170:10 184:12,21
**absence (2)**
39:5 66:17
**absent (5)**
61:18,19,20 123:4
184:23
**absolutely (14)**
7:20 32:18 33:6 46:4
50:8 61:22 66:7,10
129:2 156:17 176:5
176:5 177:21
181:22
**Academic (1)**
76:22

**Academy (8)**
20:2,9 22:4 34:9,13
76:23 116:3 133:20
**accept (1)**
134:17
**acceptable (4)**
49:20 132:16 150:6
150:11
**accepted (1)**
168:24
**account (5)**
64:4,5 142:3 160:14
168:9
**accountant's (1)**
25:15
**accounting (3)**
37:16,17,20
**accruals (8)**
52:24 62:4 119:4
121:17 169:14
174:16 175:13
181:4
**accrued (7)**
25:19,20 50:24 58:7
112:25 113:12,18
**accurate (4)**
32:10 82:3 129:14
188:7
**accurately (1)**
81:25
**achieve (5)**
27:14 30:7,16 60:7
118:9
**achieved (2)**
178:22,23
**achieves (2)**
27:13 30:16
**acknowledge (1)**
37:20
**acronym (1)**
34:2
**act (2)**
6:16 134:25
**action (3)**
154:23 188:13,16
**active (4)**
53:3,10,11 143:12
**actual (21)**
13:5,19 14:18 84:10
87:4,21 88:4 93:15
94:20 131:12
145:11 148:10
150:5 158:24 160:3
160:9 162:14
166:14 167:2,16
168:3

**actuarial (75)**
5:3 17:25 19:9,18,24
20:22 21:3 22:7,13
23:23 31:13,13,15
31:17,19 32:7 33:4
33:7,10,10,12,19,21
33:24 34:5,7,25
35:2,5,13 40:2,14
50:13,14 53:24 54:8
55:25 57:4,6 58:7
70:17 76:19 78:4
79:7 84:22 86:24
87:13 88:6,14 89:10
89:16 92:23 100:10
106:4 108:19,21
109:11 110:6,16
112:20 113:6,9,20
122:22 123:7,15
133:18,25 134:16
145:3,17 146:7
148:8 155:16
172:24
**actuarially (2)**
16:3 54:24
**actuaries (37)**
16:15 20:2,4,10 22:2
22:3,24 28:12 32:24
33:14 34:9 35:12
42:12 69:5,11 71:23
72:3,7 76:22,23,25
116:4 132:5,11
133:20 134:8,12,15
134:19 136:11
148:8 149:11,14,16
153:15 155:19
156:4
**actuary (75)**
5:12 13:10,12 14:4,15
17:22 18:4 19:12,16
20:24 21:3,5,9,19
22:10,25 23:11,17
26:4 28:15 29:17
30:9 32:17 34:10
35:10 40:7 48:25
53:25 59:13,18 63:9
68:17,18,19 71:10
72:17 74:2 76:16
77:4,13,15 78:18
85:18 116:11,14,19
116:23 117:7
123:25 124:9,20,22
125:2,5,8,14,17,18
126:2,3,5,5 132:17
133:6,7,8,14,16
145:14,25 151:5
154:7 170:12

175:21 179:14
**actuary's (15)**
13:4 25:14,17 30:11
32:13 39:24 40:25
50:25 52:9 73:18
83:19 88:7 111:12
142:3 170:9
**add (3)**
114:10 129:11 148:4
**added (1)**
65:9
**addition (3)**
8:5 21:24 46:5
**additional (10)**
57:9 120:10 121:17
122:8 130:7,9,13,14
185:21 186:18
**address (1)**
25:3
**adds (1)**
52:21
**adequate (2)**
46:20 51:2
**adjust (1)**
118:25
**adjusted (3)**
72:24 119:5 166:17
**adjusting (3)**
118:20,23 168:6
**adjustment (5)**
153:3 160:13 166:18
168:5,10
**administrative (2)**
109:8,22
**admitted (4)**
8:12 9:6 12:6 131:12
**admittedly (1)**
136:25
**adopted (2)**
35:21 134:23
**adoption (2)**
145:6 148:11
**advised (1)**
86:15
**advising (2)**
13:24 14:2
**affect (4)**
54:13 62:23 119:6
143:18
**affiliation (1)**
4:12
**agencies (1)**
111:9
**aggregate (6)**
18:2 56:3,11,24 57:7
77:10

**ago (1)**
122:13
**agree (20)**
62:8 107:8 114:25,25
118:11 120:17
129:25 144:7
152:15 157:16,17
164:24 165:9,22
166:5,9 173:25
186:20,22 187:6
**agreed (2)**
165:18 182:7
**agreed-upon (1)**
12:6
**agreeing (1)**
182:15
**agreement (5)**
7:16 9:3 10:8 55:6
156:2
**agreements (1)**
12:13
**ahead (9)**
37:14 75:19 93:11
103:21 110:24
126:22 127:13
156:11 168:21
**aid (2)**
7:6,22
**allegations (1)**
8:9
**allocable (1)**
53:20
**allocating (1)**
178:10
**allocation (6)**
69:14 82:13,14 84:11
106:14,15
**allocations (5)**
68:25 82:15,21,25
96:19
**allow (4)**
43:23 44:4 52:22
89:12
**altering (1)**
167:10
**amendments (2)**
134:25 165:3
**American (8)**
1:2 2:6 20:2,9 22:4
76:22 116:3 133:20
**amortization (1)**
64:13
**amount (5)**
20:18 27:14 67:16
103:2 138:6
**amounts (1)**

124:21

**Amy (3)**
1:21 2:8 188:3

**analogous (1)**
163:24

**analyst (1)**
140:12

**and/or (1)**
62:3

**annual (9)**
13:22 21:22 22:7,13
78:4 110:18,25
118:16,17

**annuities (19)**
16:21 44:17,23 46:9
49:14 95:12 96:4,12
138:22 142:18,22
143:17 153:10
160:21 167:5,10,19
184:11 185:8

**annuitize (2)**
95:25 182:25

**annuity (14)**
42:21 43:6,10 44:7
45:7,25 46:7,11
47:12 68:11 144:15
151:8 159:18 173:8

**answer (15)**
33:9 43:20 62:21
63:20,23 75:4,9
89:10 98:20 103:20
104:12 175:5,6
180:9,10

**answered (1)**
120:21

**answers (3)**
97:17 100:7 152:15

**anticipate (6)**
64:15 90:4,15 91:9,20
171:3

**anticipated (59)**
13:13 14:5,12 16:16
16:19,25 17:9 28:17
28:20 29:2 30:12
32:14 39:16 40:8
41:2 49:11,23 58:25
66:2 69:21 71:2,5
87:20 88:3 89:23
91:2,25 98:25 99:3
99:9,22 100:2 102:8
102:11,14,20 103:8
104:4,20 105:8,15
113:10,16 143:3
152:16,22 158:11
158:23 160:2,13
164:4 166:13,22,23

166:25 167:14
168:2,8,12

**anticipates (1)**
29:17

**anticipating (1)**
69:13

**anticipation (1)**
113:8

**anybody (1)**
49:22

**anymore (1)**
185:11

**anyway (3)**
38:10 167:7 186:23

**apologize (2)**
55:21 126:15

**apparently (2)**
75:2 134:20

**appears (1)**
152:4

**applicable (5)**
51:13 155:11 165:20
166:3,6

**application (3)**
15:13 24:13 99:8

**applied (6)**
13:8 14:23 50:16
53:16 155:2 165:10

**apply (2)**
83:9,25

**applying (1)**
93:15

**apposite (1)**
158:13

**appreciate (3)**
6:18 9:22 66:22

**approach (6)**
15:7,14 81:9 123:22
143:10 155:13

**appropriate (8)**
39:7 43:25 68:5 85:3
139:25 158:3 159:3
164:21

**appropriately (1)**
173:23

**approximate (1)**
95:11

**approximately (5)**
40:13 77:11 116:10
116:13,15

**arbitration (7)**
1:2 2:5,6 6:2 12:23
73:22 146:22

**arbitrations (1)**
138:16

**arbitrator (131)**

4:2,6,22,25 5:5,13 6:3
7:20 8:14,19 9:11
9:14 10:13 11:7,14
11:19 12:10,16,21
14:4 18:12,13,17,21
19:15 21:8 22:19
23:23 29:13 34:16
34:23 35:19 36:5,16
44:2 46:17 47:6
54:7 55:5,9,12,20
55:23 57:10,14,19
57:22 70:11 72:23
73:3 74:15 75:3,8
75:11,14,19 79:6
82:4 85:16 93:5,6,8
93:10 97:22 98:4,6
103:24 104:10,13
104:23,25 110:19
110:22,23 114:16
114:21 115:6,14,17
115:20 122:3
126:14,21 127:6,12
127:21 128:2,5
129:2,5,23 130:5,10
130:15,18,21
132:20 133:5 145:9
146:15,23 147:2,6
147:11,19 148:18
148:25 150:12,15
150:19 156:7,11,15
156:18 164:12,13
168:18,21 170:18
170:22 171:8,15
185:15,18,20 186:3
186:9,12 187:3,9,11

**Arbitrator's (13)**
8:15,17 34:19 79:2
98:2 147:3 150:13
189:19,20,21,22,23
189:24

**argument (1)**
131:6

**arguments (1)**
12:8

**arises (1)**
184:21

**arrangement (1)**
38:14

**arrives (1)**
187:14

**articulated (1)**
84:20

**articulates (1)**
43:22

**artificial (1)**
16:2

**aside (10)**
54:11 63:13,15,19
85:4,13 118:24
119:9 168:6,10

**asked (6)**
86:14 100:6 103:10
120:22 128:11
129:7

**asked-and-answere...**
103:13

**asking (4)**
47:4 97:16 102:16
104:6

**ASOP (24)**
34:2 35:8,10,18 36:2
36:5,7,12 39:6
144:20,22,23 145:6
146:9 147:12,20
149:22,24 150:17
151:11,11,21 164:7
165:3

**ASOPs (4)**
34:4,5 85:17,20

**aspect (1)**
129:25

**assess (1)**
120:5

**assessed (5)**
66:16 67:2 78:13
179:2,24

**assessing (1)**
92:2

**assessment (7)**
18:10 54:3 67:20
72:20 73:8 120:14
124:12

**assessments (2)**
78:10 117:15

**asset (24)**
25:25 26:2 68:25 69:8
81:4,11,15,17 82:13
82:14,15,21,25
83:11,15 84:11 85:7
85:10 96:19 106:13
106:15 109:20
128:14 159:14

**assets (96)**
13:5,15 14:10,17,25
15:4 16:10,11,20,20
17:2,6 25:13 27:3,6
27:20 29:4,9,18
30:7,13,23 32:14
38:8,10,15,16,20
39:2,3,12 51:2,9
61:17 78:20 85:5,9
85:24 87:22 88:4

89:24 90:3,4,7,7,8
90:12,13,15,19,21
90:25 91:7,10,22
94:5,8,15 95:25
96:18 97:8 100:20
100:23 101:23
109:5 112:10
117:22 126:24
127:2 135:16
136:19,21 137:3
143:4 150:5 153:6
157:3,6,10,13 158:7
158:11,24 159:4,5
160:3 162:4 166:8
166:14 167:2,15
168:3 169:8,9,16
184:20

**associate (1)**
76:21

**associated (2)**
16:10 158:23

**ASSOCIATION (2)**
1:2 2:6

**assume (10)**
28:3 70:14,20,24
83:13 136:4 138:4
152:7 183:8 187:13

**assumed (2)**
14:16 143:11

**assumes (3)**
32:15 58:22 179:19

**assuming (10)**
17:21 67:12 86:18
109:8 113:15 114:8
173:14 178:22
182:18 184:17

**assumption (105)**
13:20 18:5 27:6 29:8
29:17 31:2,4,20
32:8,8 33:2 37:2
38:18,23 39:9,20,25
40:7,24 41:9 50:21
51:10 56:7,11,16,17
56:19 59:10,14
64:25 66:13 68:4,20
69:18,20,23 70:2,4
70:8,10,20 71:11,18
73:10,17 78:20
80:14,18,23 83:16
83:18,20 84:23 85:3
86:4,17,21 87:2,6
87:12,19,25 88:16
88:19,22 89:20 92:4
92:11 95:8 98:24
107:13 108:11,14
108:17 110:2,5

111:22 112:8,9
117:20 118:2,7,13
118:14 121:8,22
131:9,15 137:5,15
137:23 139:7,23
142:8,9 152:19
154:12 164:22
165:17 174:13,22
175:22,23 178:20
179:4
**assumptions (66)**
16:15 17:14,21,25
21:16 22:12 25:22
26:11 51:3 52:9
53:24 54:8,12,21,23
55:25 56:11 57:4,6
58:23 59:3 61:13,24
63:2,4 70:25 81:3
83:4,7,10 85:19,23
86:2 88:7 106:4
107:9,10,15,18
109:9,12,18 111:10
111:13 112:2,20
113:9 114:9,13
119:19,24,25
121:10,12,18
122:22 123:7,15
125:13,19,21
138:15 147:21
178:22 179:5
180:13
**attached (1)**
8:8
**attempt (1)**
173:23
**attempting (1)**
59:19
**attention (2)**
98:11 110:17
**attest (1)**
34:13
**attorney (7)**
8:6,7 12:17 50:2,8
188:12,14
**Attorneys (2)**
3:5,14
**audit (1)**
135:17
**auditing (1)**
22:23
**auditor (1)**
25:15
**August (2)**
23:10 188:19
**authenticity (2)**
9:7 128:24

**author (1)**
9:7
**auto (13)**
4:16,19 11:12 12:19
50:23 52:4,20 53:6
53:19 78:14 96:16
113:18 114:8
**Auto's (2)**
15:22 96:11
**available (3)**
128:16,22 147:13
**Avenue (1)**
3:6
**average (2)**
92:16 180:21
**averaging (1)**
42:7
**award (5)**
6:7 7:13 8:10,20 9:15
**aware (12)**
8:20 71:22 72:2,5,6
72:10,10,12 73:5
96:6 124:17 181:21
**awful (1)**
177:17

———————

**B**
**B-R-O-F-S-K-Y (1)**
4:24
**back (32)**
26:20,20 27:11 28:7
29:25 30:6 40:18
92:22 104:14,16,18
108:19 120:9 121:7
122:21,24 133:11
146:12 152:13,24
154:17 156:23
160:17 164:7,14
171:2,11 175:8
187:7
**background (1)**
133:5
**backs (1)**
42:25
**bad (1)**
181:18
**badly (1)**
62:23
**bag (1)**
24:24
**balance (2)**
64:4,8
**balances (1)**
63:13
**bargain (1)**

52:23
**bargaining (2)**
52:23 118:21
**base (1)**
69:6
**based (32)**
14:20 15:7 25:20,21
26:10 29:16 30:6
45:3 47:14,21 48:15
51:2,22 53:7 63:3
66:13 70:16,16
72:18 73:13 85:10
109:24 110:4
121:21,22 128:10
130:8 136:12
138:10,22 162:21
170:8
**bases (1)**
58:9
**basic (2)**
25:10 139:18
**basically (7)**
23:25 36:24 42:6 44:8
45:11 81:4 172:4
**basis (9)**
43:21,22 49:8 58:8
101:9 111:13
137:13,14 151:7
**Bates (2)**
79:20 92:24
**bear (1)**
131:22
**bears (5)**
16:9 161:8,23,24
162:11
**beats (1)**
180:3
**beginning (2)**
40:16 131:4
**begins (4)**
36:14,15 98:13,18
**behalf (8)**
5:9 11:5,12 12:18
18:14 22:24 64:17
133:11
**belief (1)**
114:6
**believe (19)**
12:14 13:20 18:3 23:3
35:17 39:7 47:14
50:15 51:13 68:5
69:11 77:5 79:18
105:5 146:11
151:24 154:21
164:4 187:6
**believed (2)**

46:14 150:7
**benchmarks (1)**
46:23
**benefit (42)**
15:2 20:17 23:11 26:3
26:6,24 31:6 38:14
39:8 41:15 45:14
50:17,24 52:13,14
53:14 54:18 62:4
74:11 109:7,22
118:24 119:4 121:5
121:6 124:16
140:24 142:9
161:19 169:10
171:25 172:13
174:16 175:3,13,16
179:13 180:2,25
181:3,13 183:5
**benefits (75)**
13:17 14:12 15:22,23
25:4,5,9,19,19
26:14 28:13 29:15
54:2,16 56:2 57:5
60:20,22,24,25 61:5
61:8,9,15 69:17
70:5 71:16 80:20
90:5,16,22 91:3,11
93:19,20 94:7,25,25
95:25 96:5 112:22
112:25 113:12,19
118:20,23,25 119:4
151:6 153:18 162:5
162:7,13,25 163:5
168:25 169:13,19
173:20,24 174:20
176:10,20 177:25
178:3,5,7,8,9,16
179:15 182:24
**best (49)**
13:4,7,12 16:16,25
28:16,19,21,25
29:19 30:11 31:24
32:11,13 40:8,25
41:6 42:19 51:3,9
52:9 59:25 69:21
73:19 74:7 87:14
88:8 89:22 90:2
105:3 111:12,21
112:7,9,19,19 113:8
117:21 119:24
134:8,11,17 142:3
154:3,18 166:22
168:2,12 170:9
**best-estimate (1)**
60:6

**better (8)**
59:7 160:6 177:5,19
182:12,12,13,23
**beyond (5)**
21:2 83:21 93:18,20
94:24
**bias (10)**
18:8 31:13,16 32:2,6
32:7,17,20 144:5
155:16
**biased (3)**
18:6 88:10 144:3
**big (1)**
26:17
**Bill (3)**
93:2 186:10 187:5
**bit (5)**
28:2 29:13 33:20
44:13 59:10
**blend (64)**
41:25 42:4 48:23 49:5
50:15 52:5 72:8
73:6,23 92:8,13
93:16,24 95:4 98:25
99:9 101:2 106:18
108:10 116:17,17
116:22,25 117:11
117:16 119:24
120:7 122:9 123:22
125:8 126:6 132:4
133:11 134:2,7,10
134:17 135:2
137:10,24 138:2
139:9,13 142:2
143:10 144:3,6
146:5 149:17 152:7
152:12 153:17,21
154:2,11 155:3,10
155:10,15 156:2,25
167:22,25 168:11
**blended (7)**
15:6,14 72:7,8,24
73:23 92:10
**blending (4)**
15:5 92:17,19 99:16
**blocks (1)**
80:25
**board (9)**
34:8 35:3,13 133:14
133:16 145:4,11,18
148:9
**boast (1)**
28:22
**body (3)**
116:6,8 133:22
**bogged (1)**

81:23
**bond (9)**
45:9,10,21,23 47:15
47:15 48:4,7 65:13
**bonds (22)**
14:22 44:9,9 46:15,15
47:20 48:6,18 49:17
65:8,18,18,25 95:21
106:15,23 127:2,23
167:12 183:25
184:8 185:10
**Boston (1)**
145:17
**bottom (1)**
18:3
**bought (1)**
142:21
**break (10)**
57:13,15 74:18 115:8
122:2 156:10,12
171:2,9,11
**breaks (3)**
5:16,20,21
**brief (3)**
170:24 171:3,21
**briefing (3)**
186:7,8,13
**briefly (11)**
19:14 20:12 21:7
22:18 78:25 83:24
93:23 130:20 133:4
168:20 183:6
**briefs (1)**
187:19
**bring (2)**
26:20 27:11
**brings (1)**
4:7
**Brofsky (5)**
3:10 4:20,20,24,24
**buck (7)**
19:17 20:12,21,23
21:13 23:5 74:6
**building (3)**
80:25 158:2 160:11
**business (1)**
133:21
**buy (11)**
96:4,12 138:22
140:11,13 141:17
142:18 153:10
167:5 173:8 185:8
**buying (6)**
95:12 143:17 162:20
163:3 167:10,18

**C**

**C (3)**
3:2 19:2 171:14
**calculate (17)**
13:2 17:23 69:19 70:5
72:3,9 78:7 86:16
117:12 121:6
123:23 124:21
131:23 132:2 138:9
153:17,23
**calculated (10)**
36:8 71:17 72:17 86:7
91:15 100:17 101:4
101:4,20 174:21
**calculates (2)**
63:9 179:14
**calculating (19)**
14:8 16:5 29:14 33:3
41:16,21 48:23 52:3
68:4 107:10 116:18
119:14,15 124:5,11
124:23 132:9
153:22 165:10
**calculation (33)**
15:10 25:13 29:16
50:18 51:6 54:10
58:18 60:19,19
69:16,16 70:16 78:8
78:13 91:19 94:21
101:16 102:3,7,10
102:19 103:2,7,17
104:4,8,19 107:23
112:6 125:16
126:20,23 132:16
**calculations (5)**
22:22 28:8 45:2 146:4
149:18
**call (10)**
18:23 75:17 97:15
114:17,24 115:2,3
144:21 150:20
160:4
**called (4)**
67:3 79:20 134:9
159:3
**Canada (2)**
133:23,24
**capital (9)**
81:3,14 82:24 83:3,4
83:5,7,9 84:5
**car (1)**
140:11
**care (4)**
11:14 115:4 186:14
186:15
**career (2)**

20:11 77:11
**careful (1)**
181:18
**carrier (1)**
16:22
**carriers (1)**
44:22
**carve (1)**
63:23
**case (55)**
1:4 7:6,8 10:20 13:9
17:16,18 18:20,22
39:10,21,23 42:8,9
48:11 49:19 50:19
56:21 58:16 59:11
64:22 66:25 67:22
71:14 72:17 77:7
78:14 79:9 84:19
85:8 86:8,23 91:16
91:19 94:3,21 97:21
100:17 102:9 103:7
104:7 108:11
124:21 130:17
132:19 153:20
161:6 163:2,13,24
165:11,21 166:7
170:14 177:23
**cases (5)**
6:2,24 7:3 73:22
125:23
**Cash (1)**
108:22
**cause (1)**
139:13
**caused (1)**
56:22
**causes (1)**
17:25
**causing (1)**
17:18
**ceases (1)**
172:11
**central (1)**
24:12
**CENTRE (1)**
1:3
**certain (7)**
12:9 22:5 33:13 37:4
37:20 67:4 183:23
**certainly (23)**
12:2 40:2 48:20 52:14
53:8 57:14 58:11
64:21 65:22 69:3
72:2,6 131:22
133:10,25 144:19
147:14 148:4

157:12,24 181:11
181:17 182:7
**CERTIFICATE (1)**
188:2
**certification (2)**
16:24 22:12
**certified (8)**
2:8,10 13:10 39:24
40:8 41:6 188:3,5
**certify (3)**
22:5 188:6,11
**cessation (2)**
172:9 173:2
**chair (1)**
133:13
**chance (7)**
4:3 66:6 176:7,8
177:8,15,15
**change (25)**
28:6 68:7,10,13 69:13
71:7,10 96:22
121:20 134:9,10
139:12,13,15
143:10 149:23
152:2 165:5,8
169:18 172:19
177:20 182:11
185:2 186:23
**changed (7)**
70:2,9 114:3 134:7
139:3,9,11
**changes (4)**
109:10 121:18,19
181:13
**characterize (2)**
51:23,25
**charge (6)**
43:5 45:13 136:12
137:13 159:19,23
**charged (1)**
125:17
**charging (1)**
10:2
**chatting (1)**
6:3
**cheaper (1)**
141:23
**check (2)**
45:2,8
**checking (2)**
22:23 45:6
**Chestnut (1)**
3:15
**chief (1)**
133:8
**choose (8)**

54:17,20 143:8,16
153:9 185:5,8,9
**choosing (1)**
21:15
**chosen (1)**
183:4
**circular (1)**
70:7
**circumstance (3)**
13:18 38:17 167:20
**circumstances (11)**
12:24 13:9 49:21
53:19 134:7,9
136:24 139:13,17
142:21 154:13
**claim (1)**
16:4
**Claimant (2)**
1:7 3:5
**claimed (1)**
131:20
**clarification (4)**
102:13 113:4 149:23
150:20
**clarify (8)**
39:19 40:4 89:2,12
94:19 108:8 150:10
184:6
**class (3)**
81:11 85:7,10
**classes (6)**
69:8 81:4,15,17 83:11
83:15
**clear (4)**
28:15 74:18 147:6
150:2
**clearest (1)**
26:7
**clearly (3)**
31:25 39:13 155:18
**CLEARY (1)**
3:13
**clients (2)**
44:23 156:4
**close (4)**
10:23 45:4 48:9 95:15
**closing (1)**
186:6
**CLR (1)**
1:21
**coin (1)**
27:23
**colleagues (3)**
78:3,8 155:20
**collect (1)**
54:15

collecting (2)
42:24 54:17
combination (1)
62:2
come (12)
24:6,10 80:20 83:6,18
83:19 91:10 135:2
142:11 171:2,11
179:18
comes (1)
81:4
comfort (1)
50:5
comfortable (2)
49:25 50:7
coming (10)
43:12 55:19 92:18
137:7 138:14,16
142:14 176:20
177:18 186:11
comment (3)
151:17,19 152:4
commercial (7)
16:22 43:4,9 44:16,21
45:7 46:6
commission (1)
188:19
committee (9)
133:14,22 145:10,18
145:21 148:8,16
149:6,9
common (3)
31:17 41:13 127:19
companies (4)
43:4,9 45:8 46:21
company (15)
5:9 43:14 45:12 46:11
47:12 76:11 78:4
83:10 133:8,11
135:19 159:24
161:4,4,14
compare (2)
81:16 94:6
Compared (2)
65:12,13
competitors (1)
155:22
complaining (1)
10:2
complete (1)
66:21
completed (2)
89:9,15
completeness (1)
57:2
compliance (1)

84:9
complicated (1)
26:17
comport (1)
5:15
compound (1)
81:20
compute (2)
55:25 57:5
conceded (1)
103:25
concededly (1)
154:13
concedes (1)
104:2
conceivably (2)
52:16,25
concept (16)
27:16 31:11,12 33:9
59:25 60:9,12
139:18 140:9,14
141:4 160:18
163:12 166:17
167:18 168:4
concepts (1)
140:4
concerned (2)
6:9 186:19
conclude (1)
186:4
concluded (6)
13:12 14:6 84:21 85:2
85:9 139:14
conclusion (1)
136:25
conditions (1)
120:8
conduct (1)
17:12
Conference (1)
76:24
confirm (2)
163:13 170:8
conflicts (1)
17:12
confused (1)
55:12
conjure (1)
17:10
connection (24)
19:23 20:13 21:20
35:8,14 44:19 46:7
46:24 48:10 84:18
84:21 86:23 87:12
88:14 94:20 106:12
106:16,21 107:22

111:17 123:23
124:16 125:15
173:2
consequence (1)
113:3
consequences (2)
161:19 175:12
conservatism (1)
31:22
conservative (5)
14:22 28:23 32:5,21
159:5
consider (3)
11:15 49:20 50:11
considered (2)
134:6 139:12
consist (1)
65:7
consistent (8)
28:9 33:4,6 97:8
109:9 112:18 113:7
126:9
consists (1)
167:11
constitutes (1)
172:7
consultant (4)
5:3 19:9 23:9 24:2
Consultants (1)
19:18
consulted (2)
20:16,17
consulting (3)
23:5 76:24,24
contained (4)
22:12 82:16 85:6
128:14
contend (1)
16:8
contentions (1)
8:23
context (10)
15:16,18 16:14 17:8
30:20 38:24 52:18
55:18 158:5,13
contexts (1)
19:21
continuation (1)
151:16
continue (4)
47:7 154:11 157:25
163:19
continued (3)
75:4 89:18 154:17
continues (1)
169:10

continuing (5)
52:15 140:8 153:2,2
161:17
contribute (4)
172:10,12 173:3
180:14
contributing (9)
18:7 22:24 52:15 53:4
53:17 74:19 154:24
155:6 176:25
contribution (7)
52:16 64:14,16 109:6
174:15 176:14,19
contributions (23)
13:23 62:3 65:2,5
90:9,10,14,17 96:20
109:20 118:21
148:17 149:8 162:6
169:12,19 174:5,6
175:13 180:22,25
181:2,13
control (1)
172:19
controversy (1)
67:12
copy (2)
79:7 98:5
corporate (18)
37:15 44:9 45:9,10,21
45:23 46:14,15
47:15,19 48:6,7,18
49:17 65:8,13,17
167:12
Corporation (1)
23:12
corporations (1)
37:18
correct (156)
9:10 11:18,21 12:4
33:22 34:3 35:24
36:3 37:3,9,10 39:2
39:20,23 43:7 44:14
44:18 51:16,17 56:7
56:8 58:15 59:2
60:23 61:3 64:6
66:18 67:5,7,9,14
67:18,20,24 68:21
68:23 73:14 75:21
76:14,17 78:12,19
78:21 79:13,15
80:15 82:10 83:11
84:24 85:12 87:2,9
87:10,15,22 88:4,6
88:11,17,20 90:6,9
90:23 91:4,11,16,22
92:5,6,8,12 93:14

95:3 96:13,15 97:24
100:5,7,18,21,24
101:3,5,17,18,23,25
102:4,12 103:3,5
105:25 106:2,6,10
106:18,19,23,24
107:6,11,18,23
108:2,7,15,16 110:2
110:3,7,13 111:15
111:19,23 112:4,11
112:15,22 113:13
113:14,20,25 114:4
114:5,12 118:4,23
119:2,8 122:11
123:6,11,19,25
124:6 126:10
129:14,20 130:4
138:3,11,20 139:7,8
142:19 157:19
161:10 168:15
173:21 174:6,18
175:25 182:10,22
185:3,7
corrections (1)
8:11
correctly (1)
157:2
correlated (2)
46:3,4
correlation (1)
45:22
cost (13)
64:12 95:11 118:16
135:18 136:18
138:23 141:17
159:11,13,25
162:22 181:2,4
costs (2)
118:17 181:6
counsel (4)
5:6 129:12 188:12,15
count (2)
68:12 117:10
couple (3)
5:13 97:17 122:7
course (9)
6:17,23 8:19 61:11
74:12 77:11 78:17
142:22 154:23
court (8)
6:23,25 7:17 34:15,22
79:5 97:20 132:14
cover (2)
94:8 109:21
crazy (1)
129:6

**create (1)**
13:15
**credit (4)**
63:13 64:4,8 105:5
**critical (1)**
21:21
**cross (39)**
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 115:1,2
116:1 117:1 118:1
119:1 120:1 121:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
189:6
**cross-examination (...**
10:19,22 58:2 115:21
156:20
**cross-examine (2)**
57:11,23
**CSR (1)**
1:21
**current (18)**
15:3 30:22 64:14 89:7
89:9 90:12,13,14,17
90:18,19 101:22
109:5,17 112:24
120:8 151:25 154:6
**currently (7)**
23:4,10,24 76:10 77:3
77:6 133:23
**cushion (3)**
13:16 17:6 51:9 52:21
114:10
**cut (1)**
169:14

**D**

**D (129)**
18:1 19:1,2 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1

70:1 71:1 72:1 73:1
74:1 75:1,22 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
171:1,14 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
**D-I-A-N-E (1)**
76:9
**D.C (4)**
3:7 4:15,18,21
**Darren (5)**
3:20 5:2 18:24 121:4
189:7
**data (11)**
80:24 81:18 83:17,21
83:22,25 84:12,15
84:20 85:8 121:22
**date (7)**
25:21 35:18 113:12
120:19 126:16
154:10 188:9
**dated (2)**
8:5 188:21
**day (5)**
3:4 4:14,18,21 131:2
**days (3)**
23:7,15 62:13
**deadline (1)**
186:15
**dealt (1)**
181:9
**debate (1)**
62:15
**debt (3)**
127:17 185:5,5
**December (8)**
1:15 2:2 51:15 58:16
78:15 126:18,20
188:21

**decide (1)**
169:15
**decided (1)**
142:11
**decides (1)**
184:22
**decision (3)**
96:24,25 147:16
**decisions (2)**
24:7 44:6
**decreased (1)**
62:4
**dedicated (5)**
38:8,16 39:13,13
166:8
**deem (2)**
12:3 43:25
**deemed (6)**
9:6 14:11 15:15,24
48:8 154:9
**default (1)**
48:5
**defeasance (3)**
151:5,7,9
**defended (1)**
134:4
**defending (1)**
134:3
**defer (3)**
10:11,17 18:16
**deferred (2)**
10:21 130:19
**define (1)**
91:6
**defined (2)**
172:8,9
**defining (2)**
65:23 66:9
**definition (4)**
32:5,20 56:25 69:22
**definitional (1)**
173:15
**Delaware (1)**
2:12
**demonstrate (1)**
46:19
**demonstrated (1)**
84:6
**denying (1)**
8:21
**department (2)**
24:16 145:17
**depending (4)**
63:3 83:14 118:18
177:3
**depends (2)**

65:16,22
**deposition (17)**
11:23 58:12 68:3
97:18,20 98:5,11
100:6 102:17
103:11 104:2
131:21 140:4 141:5
142:16 148:3
154:21
**Depositions (1)**
12:5
**derive (3)**
46:22 83:13,15
**derived (5)**
41:4 46:7,12 47:13,14
**deriving (2)**
43:10 49:23
**describe (8)**
19:14 21:8 26:8 95:14
133:5 146:24
152:21 159:8
**described (7)**
23:17 31:19 86:20
87:19 88:2 95:5
144:14
**description (3)**
150:3 160:6,12
**design (1)**
20:18
**designations (1)**
76:20
**designed (2)**
95:11 140:10
**destroy (1)**
7:2
**destroyed (1)**
7:12
**detail (1)**
127:10
**detailed (1)**
128:13
**determination (4)**
43:23 105:4 131:3
155:14
**determine (11)**
4:7 17:11 25:17,22
44:10 50:16 60:21
86:21 92:15 93:21
121:10
**determined (3)**
86:25 92:14 112:2
**determining (3)**
13:22 69:7 112:13
**develop (2)**
44:22 78:19
**developed (8)**

46:6 83:10 99:15
133:12 134:2
137:11 140:21
145:10
**development (2)**
116:16 133:10
**deviation (1)**
35:22
**Diane (4)**
3:22 5:11 76:7 189:10
**dictate (2)**
33:14,17
**dictates (2)**
111:10 119:18
**difference (1)**
108:4
**different (22)**
14:10 25:21 32:15
37:21 69:8 85:23
86:2 104:21 121:11
121:12,23 123:14
124:22 125:2,5,17
132:5 135:25
139:17 152:23
180:8 183:9
**differently (1)**
70:14
**digital (1)**
6:20
**digits (1)**
135:5
**direct (108)**
18:1 19:1,4 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1,17 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
75:1 76:1,2 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 132:1
133:1,2 134:1 135:1
136:1 137:1 138:1

139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 189:6

**directing (1)**
39:17
**directly (1)**
17:12
**directs (1)**
28:11
**disagree (2)**
71:23 132:11
**disagreement (2)**
55:16 103:14
**discount (46)**
13:3 18:4 26:20,24
27:18 28:12 29:3,14
29:25 30:6,9 31:5
33:2,15 35:15 36:23
36:24 37:21 39:8
41:15,20,22 42:25
43:3 44:22 45:6,17
45:21,22 46:22 48:3
54:11 56:6 69:18
71:17 80:19 92:12
99:7 121:7,7 136:13
136:15 149:21
151:7 164:21
165:15
**discounted (1)**
101:15
**discounting (3)**
33:16 35:15 95:7
**discovery (1)**
147:8
**discuss (2)**
129:21 187:4
**discussed (7)**
46:12 112:14 141:5
143:13 144:21
155:12 166:16
**discussing (1)**
166:12
**discussion (6)**
97:25 108:22 110:25
111:5 156:23 171:5
**dispute (3)**
1:3 4:7 154:8
**distinction (1)**
119:17
**distinguish (1)**
174:8
**distinguished (1)**
119:13

**divide (1)**
28:7
**divisions (1)**
24:3
**divorce (1)**
86:3
**document (16)**
34:24 78:24 79:10,13
79:19 128:16,22
129:14 130:3 145:9
145:20 147:9,10
148:13,23 151:15
**documents (6)**
9:4 11:16,20 12:3,6,9
**doing (5)**
71:8 84:6 143:21
161:15 163:20
178:18
**DOL (2)**
24:9,14
**dollars (4)**
26:14 28:5 63:10
143:2
**Don (1)**
145:16
**door (1)**
6:10
**double (1)**
135:5
**doubt (1)**
7:7
**downside (1)**
59:4
**drafting (1)**
145:5
**drive (1)**
68:10
**due (2)**
25:20 104:22
**duly (3)**
19:2 75:22 132:23
**duties (1)**
23:23
**duty (1)**
64:17

――――――――
**E**
**E (10)**
3:2,2 19:2,2 75:22,22
75:22 132:23
171:14,14
**earlier (7)**
121:4 123:21 164:8
164:16 165:19
166:12 177:9
**early (2)**

138:14,16
**earn (8)**
13:6,14 14:19 29:9,10
29:22 30:5 141:9
**earned (1)**
61:2
**earnings (3)**
90:18 109:6,21
**ease (1)**
147:25
**easiest (1)**
42:5
**easily (1)**
147:15
**East (1)**
2:7
**economic (4)**
134:6 139:12,17
147:21
**economics (1)**
150:2
**effect (11)**
17:18 30:13,15 40:10
56:20 94:14 95:6
140:22 142:5
152:12 169:8
**effective (6)**
35:22 41:20,22 99:7
99:15 126:16
**effectively (2)**
62:14 179:5
**egregious (1)**
17:24
**egregiously (1)**
13:21
**either (19)**
18:6 32:8 48:17,18
59:4,5 65:9 66:7
67:10 71:14 73:22
78:7 95:15 96:13
145:10,14 163:21
174:15 186:25
**elaborate (7)**
26:23 27:25 29:12
44:12 45:5 50:4
54:7
**elected (2)**
139:15
**eligible (1)**
61:6
**else's (1)**
182:24
**embedded (1)**
54:9
**embodied (1)**
33:13

**employ (3)**
86:19 106:17 123:22
**employed (5)**
53:6,25 76:10 93:15
125:2
**employee (3)**
23:25 188:12,14
**employees (10)**
18:8 53:3,10,16 61:9
61:10 153:2 161:18
161:21 176:10
**employer (73)**
10:4 11:5 13:23 16:8
24:22 26:13 32:16
52:7,10 53:17 62:8
63:24,25 66:19,25
67:15 71:14 96:19
119:23 120:4,6,9,15
122:15,17,21,25
123:2,9,18 131:6
132:12 135:11
136:12 137:8,13
139:24 140:5,15,24
141:2 142:6,7 143:2
143:12,13 144:8
152:25 153:4,12
157:19,20,21 158:5
163:17 172:7,8,11
172:13,17 174:3,4
174:24 175:2
177:23 179:2,5,25
180:20 182:16,18
183:19 184:24
**employer's (6)**
61:9 123:10 138:19
153:7 161:18
169:11
**employers (36)**
14:2 18:7 20:17 22:25
24:23 52:15,22 53:4
53:11 62:2 64:11,16
65:3 73:8,8 74:20
111:8 117:8,13,13
123:19 140:8
143:15 144:9 153:2
154:22 155:5
161:17,21 162:8
169:23 171:23
174:12 180:5,14
181:14
**employing (8)**
84:20 85:8 94:22 95:4
101:2 103:3 111:25
112:7
**employment (2)**
15:19 61:4

**employs (1)**
30:9
**enactment (1)**
135:3
**engage (1)**
17:11
**engaged (2)**
14:14 133:24
**engaging (1)**
32:17
**enjoyed (1)**
187:18
**enormous (1)**
20:18
**enrolled (22)**
19:11 20:24 21:3,5,9
21:19 22:10 48:25
68:18 74:2 76:16
77:4,13,15 78:18
116:19 117:7
123:24 124:9,20
125:14 154:7
**entail (3)**
157:7,23 159:11
**entered (1)**
150:9
**entire (2)**
136:10 147:12
**entirely (2)**
65:7 163:18
**entirety (1)**
128:17
**entitled (2)**
61:2,14
**entitlement (1)**
61:5
**entity (1)**
162:11
**environment (7)**
72:15 139:2 144:2
160:22 183:10
184:12,21
**equal (5)**
59:7,8,21 71:17
184:17
**equally (1)**
180:4
**equitable (1)**
140:20
**equities (3)**
140:20,25 142:10
**equity (1)**
65:21
**equivalent (1)**
101:22
**ERISA (7)**

16:13 22:17 28:11
62:10,12 89:25
126:2
**error (3)**
51:10 123:7,12
**ESQ (5)**
1:14 3:8,9,10,17
**essentially (17)**
55:6 59:15,19,24
93:24 95:20 114:10
118:8 120:18 131:7
147:9,25 152:3
158:10 159:6,15
174:24
**establish (2)**
44:4 119:19
**estimate (49)**
13:5,7,12 16:16,25
28:16,19,21,22
30:11 31:25 32:11
32:13,16 40:8,25
41:6 51:3,10 52:9
59:25 69:21 73:19
87:14 88:8,10 89:23
90:2 111:13,22
112:7,9,19,19 113:8
117:8,21 119:25
134:8,11,18 140:17
142:3 154:4,18
166:22 168:2,12
170:9
**estimates (1)**
78:9
**estimating (2)**
48:23 53:25
**Evan (7)**
3:8 4:14 74:22 80:2
110:20 147:24
186:21
**event (3)**
7:8 10:4 172:19
**everybody (3)**
4:4 34:10 129:6
**EVID (1)**
189:18
**evidence (6)**
8:18 10:19,21 15:11
147:7 185:24
**exact (1)**
58:5
**exactly (5)**
27:14 101:6 155:5
163:20 177:14
**examination (10)**
19:4 54:22 76:2 77:20
122:5 133:2 168:22

170:4 171:18
173:12
**examine (2)**
40:14 82:11
**examined (1)**
14:5
**example (15)**
24:12 28:4 29:20
106:12 119:3 141:5
141:20 142:20
143:24 154:20
165:24 166:2,6
180:21 183:22
**examples (4)**
151:12,21,24 165:23
**exceed (8)**
60:8 64:21 65:20
67:21 109:7 179:4
180:25 181:2
**exceeded (1)**
59:21
**exceeds (2)**
25:25 64:25
**exception (5)**
5:23 37:11,12,25 38:3
**exceptions (3)**
37:4,8 39:5
**excerpt (2)**
147:11 150:17
**excess (4)**
15:2 17:6 65:9 77:14
**excluded (1)**
187:23
**exclusively (2)**
48:17 167:11
**excuse (1)**
8:25
**excused (4)**
75:16 130:12 170:20
185:17
**excusing (1)**
108:12
**executive (1)**
133:21
**exercise (1)**
16:2
**exhaustive (1)**
151:24
**exhibit (25)**
8:15,17 34:17,19,23
35:20 36:6 79:2,7
98:2 145:9 147:3,7
147:19 150:13,15
150:19,19 189:18
189:19,20,21,22,23
189:24

**exhibits (4)**
9:16 11:24 146:21
189:17
**exist (3)**
15:8,11 17:19
**existed (1)**
113:19
**existence (1)**
162:4
**expansion (1)**
165:4
**expect (7)**
54:15 118:7 141:7
142:12 160:9 167:4
168:15
**expectation (20)**
68:7,9,11 86:10 91:13
91:14 96:23 97:5,10
140:12,25 141:11
141:16,22,24
144:17 158:16
162:21 167:16
170:8
**expectations (1)**
141:25
**expected (20)**
64:20 65:18 69:9 81:5
82:13,15,20,25 85:7
85:10,11 109:22
114:10,14 141:8
142:9 143:2 157:9
160:5 179:15
**expecting (2)**
69:13 157:14
**expenses (3)**
109:8,23 181:6
**experience (67)**
13:13 14:5 16:16,19
16:20 17:2,9 20:13
22:16,19 28:17,20
29:2,5,9,10 39:16
41:8 44:15,20 49:12
51:19,22 53:8 69:21
81:6 87:20 88:3
89:23 91:20 99:2,4
99:10,22 100:3
102:8,11,14,20
103:8 104:5,20
105:9,15 109:8
112:17 113:7,16
114:9 124:8 142:4
152:17,23 158:11
158:23 160:3,5,13
166:14,23,25
167:14 168:2,7,8,12
184:15

**expert (6)**
5:3,9 23:18 48:11
57:3 131:12
**expertise (1)**
24:11
**expires (1)**
188:19
**explain (5)**
25:8 85:15 121:2,16
150:25
**explained (1)**
121:4
**explanation (1)**
158:3
**explore (1)**
92:20
**extensively (1)**
143:14
**extent (17)**
54:19 94:8,10 99:14
119:3 136:17 137:4
139:19,21 140:17
140:18 152:9 153:5
158:6 161:16 169:9
178:12
**extra (1)**
183:5
**extraordinary (1)**
52:2
**extreme (1)**
123:5

**F**

**F (2)**
19:2 171:14
**face (1)**
49:22
**fact (22)**
11:15 24:25 30:15
31:18 33:12 39:15
41:13 49:13,14 62:7
85:17 96:15 108:4
115:25 127:10
143:18 144:22
153:10 160:15
166:24 176:12
179:22
**factor (1)**
187:13
**facts (3)**
8:11 105:3 139:16
**factual (1)**
8:4,8,25 9:22 55:5
**failure (2)**
13:18 61:19
**fair (14)**

22:9,14 24:24 31:3
47:17,21 64:22,23
81:8 82:23 87:18,24
95:19,23
**fairly (1)**
55:2
**fall (1)**
122:22
**falling (1)**
64:9
**falls (1)**
61:24
**familiar (8)**
31:10,12 35:4 41:24
47:23 74:10 79:12
116:6
**far (7)**
14:19 56:16 135:6
181:24 182:2,5
186:19
**fashion (1)**
22:5
**fast (1)**
79:25
**favor (2)**
18:6 123:8
**favorable (1)**
123:16
**favoritism (1)**
6:6
**favors (1)**
53:3
**feel (1)**
84:4
**fellow (1)**
76:23
**felt (5)**
140:9 153:25 154:2
155:25 165:3
**fiction (3)**
14:15 15:7,19
**fiduciary (1)**
178:15
**figure (6)**
10:23 59:16,20
101:13,14,15
**figuring (1)**
26:13
**filing (3)**
21:23 77:24 88:24
**final (7)**
135:12 139:19,20
153:4,6 158:17,17
**financial (2)**
150:2 173:15
**financially (1)**

188:15
**find (3)**
5:22 54:5,23
**fine (12)**
11:6 62:9 63:22 77:21
97:2 115:7 129:3
146:24 171:12
186:20 187:10,15
**finish (1)**
171:12
**firm (4)**
23:9 133:9 153:16
155:17
**firms (1)**
19:19
**first (23)**
4:9 8:3 10:6,7 18:24
36:18 37:11,12 63:7
73:6 79:18 82:10
92:22 107:14 121:5
128:9 134:14,21
139:14 148:15
149:5 155:21
172:14
**fit (1)**
12:3
**fits (1)**
151:2
**Five (2)**
40:15 115:11
**fixed (2)**
61:6 67:9
**fixed-income (1)**
163:19
**flaw (1)**
17:24
**flip (1)**
138:4
**Floor (1)**
2:7
**Flow (1)**
108:23
**focused (1)**
164:15
**focuses (1)**
76:13
**focusing (1)**
85:5
**folks (1)**
178:7
**follow (5)**
33:18 34:14 73:16,17
105:13
**follow-ups (1)**
128:7
**following (2)**

43:19 149:8
**follows (3)**
19:3 75:23 132:24
**footnotes (1)**
37:17
**force (1)**
36:7
**forced (1)**
52:11
**Ford (6)**
1:6 52:11 119:5,6
178:7,9
**Ford's (1)**
72:18
**foregoing (1)**
188:7
**forgetting (1)**
10:3
**form (15)**
21:22 54:18,19 72:7
73:23 77:23 88:24
119:6 128:15,17,21
129:18,20 132:15
159:18
**formal (5)**
21:2,5 23:14,16 78:9
**formally (1)**
187:17
**former (2)**
61:10 149:8
**forms (3)**
21:14,18 54:19
**forth (1)**
188:10
**forward (6)**
30:8 61:13 66:12
143:9 182:21
187:19
**found (1)**
150:22
**foundation (9)**
44:4,12 46:19 54:6
55:8,11,18 97:15
109:4
**Four (1)**
97:22
**free (1)**
48:9
**French (89)**
3:20 5:2,2 18:1,24
19:1,6 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1,15,21 35:1
36:1,17 37:1 38:1

39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1,3
58:1,4 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 126:9
141:6,21 143:25
144:19 170:24
171:1,20 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
189:7
**French's (2)**
115:24 118:5
**full (6)**
75:9 128:20 147:14
148:15 149:5
150:17
**fully (12)**
14:7 51:5 110:7
120:23,23 121:13
121:13,14 133:14
137:12,15 180:18
**function (2)**
80:17,25
**fund (99)**
1:9 5:12 12:25 13:2,6
13:10,14,25 14:10
14:14,17 15:9,12,14
15:24 16:7 17:2,22
18:15 21:10 24:22
24:23 25:14 27:2,2
27:4,9,12 30:3,14
30:15 32:14 36:8
38:10,15,25 39:2,3
39:21 41:14,19
48:13,16 50:19,22
52:6 53:21,24 57:4
61:19 67:17,23
77:16,19,19 78:5,10
78:15 79:9 80:14
81:12 82:12,21 83:2
84:16,19,23 85:6
86:8,16 90:5 91:11
95:24 96:4,4,8,10
106:13,21 110:5
112:20,24 113:10
114:11 123:16,24
125:25 126:25
138:21 158:7,12

164:5 169:4 170:7,9
170:10 173:19,24
183:2
**fund's (26)**
13:9,19 14:15,25 15:3
16:10 18:4 26:16
30:13 40:7 50:20
54:2 77:23 85:9
88:24 89:24 90:22
96:18 97:8 112:10
112:17 113:6,15
114:6 162:15 169:2
**fund-invested (1)**
69:17
**fundamental (1)**
12:22
**fundamentally (2)**
150:4 167:6
**funded (46)**
13:11 14:7 15:15,16
51:5,8,18 56:23,24
58:7,21 59:6,7
69:25,25 70:15,22
110:7 111:9 112:3
117:2,2 120:23,23
121:13,14 131:12
131:17,17 136:17
137:4,12,16 138:18
154:9 155:8,11
176:13,24 177:5,5
177:14,17 180:16
180:18 182:14
**funding (55)**
14:3 42:7 51:12,23
62:11,19 63:2,6,10
64:3,5,10 84:25
85:5 87:16 88:5
89:25 94:16 99:5
101:10 102:15,16
104:21 108:17
109:18 110:18
111:2,14,18,22
112:12,14 118:18
119:15,20 125:13
126:2 131:23 135:6
136:10 137:4 138:5
138:11,15,24 139:6
139:23 142:8,8
152:17 154:8,12,19
162:9 169:9
**funds (20)**
19:10 20:14,17,21,25
22:2,22,24,25 23:3
44:15,24 48:24 71:4
73:10 127:19 167:4
176:13 183:19,20

**funned (1)**
70:21
**further (18)**
70:24 74:14 114:15
121:24 126:12
150:25 156:5
168:16 170:2,16,21
171:4 173:11
182:17,19 185:13
185:18 188:11
**future (46)**
15:2 17:7 26:14,24,25
27:7 31:5 33:2
40:25 50:24 61:5
62:4 67:23 83:2
90:6,7,8,17,18,23
91:4,10,20 109:6,10
109:20,20 119:4
136:7,23 140:17
142:4,13,13 157:15
158:4 159:7,15
162:21,22 163:9
167:25 174:16
175:13 177:4
184:20
**futures (1)**
140:12

---

**G**

**G (1)**
75:22
**G-L-E-A-V-E (1)**
76:9
**gain (1)**
157:21
**gains (1)**
121:18
**gas (4)**
162:20,21 163:2,4
**gasoline (1)**
140:11
**gather (1)**
84:18
**general (7)**
19:15 24:17 36:22
37:5 62:18,19 165:2
**generally (7)**
9:15 32:25 36:25
82:19 153:14
164:21,25
**generous (2)**
139:24 140:3
**getting (4)**
103:25 104:9 169:17
179:25
**give (11)**

12:2 34:8 43:20,24
55:18 121:25
127:10 129:22
138:15,17 174:15
**given (5)**
12:8 17:16 74:11
102:6 160:6
**gives (2)**
45:12 184:14
**giving (2)**
140:23 155:4
**Gleave (77)**
3:22 5:11,11 14:15
75:1,20 76:1,4,7
77:1 78:1 79:1,5,20
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1,14 94:1
95:1 96:1 97:1,12
98:1,10 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1,3 112:1
113:1 114:1,23
115:1,23 116:1
117:1 118:1 119:1
120:1 121:1 122:1,7
123:1 124:1 125:1
126:1 127:1 128:1
129:1 134:13,22
142:15,24 153:14
189:10
**Gleave's (4)**
16:24 152:14,16
170:13
**gloss (1)**
103:18
**go (42)**
4:10 5:14 10:5 26:4
33:14 35:14 37:14
42:12,23 44:15
45:19 75:19 80:22
83:4 89:2 91:25
93:11 98:7 103:19
103:21 104:18
107:14 110:24
118:17,19 120:9
122:21,24 127:13
128:9 129:6 136:13
138:21 141:16
146:11 152:13
156:11 160:17
164:7 168:21 183:2
184:22

**goes (5)**
42:23 152:24 174:12
175:17,19
**going (70)**
5:20,22 6:6,10 7:7,9
7:10,12,13 10:14
11:15 26:12,12 27:6
27:13 28:5 29:22
30:5,7,8,16,17,17
31:24 32:3,22 34:12
34:15 43:15 47:2
49:14,15 54:17,20
55:13 56:20 61:13
62:15 63:19 65:20
66:6,12 81:19 96:8
96:21 97:12,14,15
97:19 103:9,12,20
103:22 107:3
126:23 127:10
128:6 136:5,22
140:13 142:7 143:9
156:23 161:18
174:14,16 175:24
176:4 178:17
182:21
**good (12)**
4:2 19:6,7 52:2 53:9
76:4 80:5,5 93:4,4
98:8 176:19
**gotten (2)**
7:4 154:3
**government (7)**
21:23 44:9 46:15
47:15 65:18 77:23
111:9
**governs (1)**
37:16
**grade (1)**
127:15
**great (4)**
17:20 49:8 79:24
93:12
**greater (1)**
184:23
**group (2)**
42:24 159:5
**grow (3)**
27:7 28:5 30:23
**grows (1)**
29:24
**guarantee (5)**
23:12 159:6,6,15
183:3
**guaranteed (1)**
174:24
**guess (6)**

10:8 26:7 28:25 65:21
126:18 129:11
**guidance (3)**
34:8 35:12 151:25
**guide (1)**
33:18
**guidelines (6)**
48:13,16 69:2 81:10
82:12 97:9
**guiding (2)**
85:20,21
**guys (1)**
186:14

### H

**H (3)**
19:2 132:23 171:14
**half (3)**
31:24 32:3,23
**hall (1)**
6:13
**hand (2)**
94:8 158:7
**handed (3)**
34:21 35:19 79:6
**handful (2)**
134:18 155:25
**hands (1)**
4:4
**Hang (2)**
82:4,4
**happen (14)**
6:8 7:7,9 32:10 49:19
53:15 61:6 121:20
169:25 175:24
176:4 177:4 181:19
181:19
**happened (2)**
181:17,20
**happens (7)**
7:7,14 61:21 118:15
169:5 170:6 184:20
**happy (2)**
53:12,13
**hard (1)**
74:21
**head (1)**
145:16
**heading (3)**
80:9 108:22 110:18
**healthy (4)**
176:14 181:5,7,7
**hear (4)**
4:7 15:25 47:7 75:20
**heard (7)**
25:5 33:21 73:11

74:23 118:5 152:15
154:7
**hearing (3)**
7:19 131:2 147:8
**hearings (1)**
6:21
**heavily (2)**
145:5,19
**held (3)**
2:5 140:9,14
**hello (4)**
4:4,4,5 6:13
**help (1)**
24:10
**helping (2)**
24:3,7
**helps (1)**
23:18
**hereinbefore (1)**
188:9
**high (2)**
28:22 52:24
**high-grade (8)**
47:19 48:6,7,18 65:7
163:18 167:12
183:25
**high-interest-rate (1)**
184:12
**high-quality (3)**
44:9 46:15 47:15
**higher (1)**
41:19 52:23 66:7
72:20 87:5 118:21
135:6 138:22
140:20 141:14
169:17
**highly (3)**
17:17 18:6 167:20
**historical (3)**
81:6,18 84:16
**hit (1)**
45:3
**hold (2)**
34:12 79:25
**holding (2)**
24:24 162:4
**holidays (1)**
186:11
**hopes (1)**
169:16
**horizontal (1)**
100:11
**host (2)**
132:10,11
**huge (1)**
130:3

**hundred (1)**
28:4
**hundreds (1)**
22:21
**hunky-dory (1)**
178:24
**hypothetical (11)**
14:16 17:10 29:23
152:8,10,12 159:4
159:14 160:8
162:19 163:2
**hypothetically (1)**
184:7

### I

**IDENT (1)**
189:18
**identical (2)**
139:16 144:10
**identification (5)**
34:20 79:3 98:3 147:4
150:14
**identified (5)**
17:13 39:6 85:9 90:21
94:22
**identify (2)**
4:11 34:23
**ignore (1)**
178:16
**immediately (1)**
137:7
**immunize (2)**
184:13,22
**immunized (2)**
183:11 184:4
**immunizing (2)**
183:22 184:5
**impact (4)**
52:6 97:13 107:25
108:11
**implementation (1)**
24:3
**implications (1)**
24:7
**implicit (1)**
151:8
**important (5)**
56:16 103:17 104:15
107:9,21
**importantly (2)**
21:13 177:17
**imposed (1)**
36:9
**imposing (1)**
160:12
**inactive (1)**

20:3
**inapposite (1)**
158:24
**include (2)**
22:6 61:8
**included (3)**
8:5,9 12:5
**includes (2)**
9:2 144:16
**including (8)**
11:22 58:23 132:4,4
144:17 149:8
154:22 175:12
**income (5)**
90:10,13 109:6 162:6
169:18
**incorporate (1)**
106:3
**incorporates (1)**
167:23
**increase (4)**
62:3 64:16 74:11
138:12
**increased (2)**
169:11 175:12
**increases (2)**
53:14 174:15
**incur (1)**
120:10
**incurs (1)**
118:17
**independent (2)**
5:3 23:8
**independently (1)**
165:16
**INDEX (1)**
189:2
**indicated (2)**
23:4 168:24
**indicates (2)**
80:11 100:15
**information (3)**
42:24 44:20 128:13
**inherent (1)**
66:3
**initial (1)**
147:20
**insolvency (1)**
61:20
**insolvent (4)**
91:25 109:17 175:17
175:19
**instance (1)**
124:9
**instances (2)**
124:15,19

**instruments (1)**
95:22
**insufficient (2)**
14:11 65:10
**insurance (16)**
16:22 43:4,9,14 44:21
45:7,12 46:7,11,21
47:12 135:19
159:24 161:4,4,13
**insurers (1)**
42:24
**intend (2)**
96:4 130:25
**intended (4)**
81:11 83:14 91:2
95:17
**intending (2)**
105:20 163:8
**interchangeably (1)**
107:19
**interest (29)**
29:4 30:21 42:17
70:18 72:14 73:23
92:4,17 93:22 94:7
94:16,16 95:6 98:23
99:5,15,17 107:9,14
108:11 111:19
135:5 136:8 138:23
139:2 144:2 183:10
183:14,17
**interested (2)**
130:6 188:15
**interim (3)**
8:10,20 9:15
**internally (1)**
28:9
**INTERNATIONA...**
1:3
**intimately (1)**
133:16
**introduce (1)**
149:23
**introduced (1)**
146:22
**invest (4)**
65:25 143:9 163:18
163:19
**invested (10)**
14:17 41:11 48:17
49:17 87:21 88:4
96:18,20 97:8 143:3
**investing (1)**
65:6
**investment (129)**
13:19 15:8 27:7,9,12
27:20 29:16 30:12

30:25 31:4 32:25
36:25 37:22 38:17
38:21,22 39:9,18,20
40:6,24 41:8 46:23
48:12,16 49:16,23
50:21 54:12 58:23
59:10,14,20 60:8
64:19,24 65:10,10
65:20 66:14 68:3,7
68:13,19,25 69:2,14
69:18,23 70:2,3,10
70:20,25 71:10,18
73:9,17,19 78:19
80:9,12,13,18,23
81:2,10 82:11,17
83:16,18 84:4,22
85:3,23 86:17,21,25
87:4,11,18,25 88:13
88:16,19 89:19
90:10,13,18 92:3,11
95:8 97:9 107:2,12
107:17 108:13,16
109:6,21,25 110:4
112:17 113:7,16
114:8 117:20,25
118:9 121:8 125:18
125:20 127:15
131:8,14 139:6
141:8 152:18 162:6
164:22 165:16
167:11 169:18
174:13,22 175:21
179:3 183:10 185:9
**investment-grade (6)**
45:10 95:21 106:15
106:23 127:2,23
**investments (21)**
30:23 48:21 61:25
69:14 71:8 81:11
83:15 85:7,10
106:10,22 127:16
127:18,23 128:14
140:19 141:2 157:4
157:7,22 167:3
**involved (8)**
20:15 22:23 44:7
133:10,17 134:22
145:5,19
**involvement (1)**
144:25
**involving (2)**
12:24 73:22
**irrelevant (1)**
131:13
**issue (9)**
7:13 12:22 84:19

103:13 123:12
132:18 155:9
173:25 175:18
**issued (6)**
16:21 35:2 144:23
146:3,7,10
**issues (5)**
24:5,10 43:5 118:24
128:24
**issuing (1)**
149:17
**iteration (2)**
35:25,25

**— J —**
**Jacob (3)**
3:9 4:17 186:21
**January (3)**
79:8 88:15 109:9
**Jenna (3)**
3:10 4:20,22
**Jersey (1)**
2:11
**job (4)**
1:22 25:14,15,17
**joint (2)**
8:4,25
**Jones (4)**
3:4 4:14,17,20
**Josem (149)**
3:13,17 5:6,6 7:16 8:7
8:13 9:13 10:11
11:6,13,22 12:15
15:25 18:16,18
43:15 46:25 57:1,12
57:16,24 58:1,3
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1,2,4
74:1,14,22 79:25
80:5 81:19 91:5,24
92:25 93:4 96:21
103:9,22 107:12
114:19,22 115:1,3
115:11,22 116:1
117:1 118:1 119:1
120:1 121:1,24
126:13 128:23
129:3,17,21 130:1,2
130:9,20,24 131:1
132:1 133:1,3 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1

146:14,16,20,24
147:1,5,17,24 148:1
148:6,20,22 149:1,3
149:4 150:1,12
151:1 152:1 153:1
154:1 155:1 156:5
156:17 164:10,12
168:1,20,23 169:1
170:2,21 171:6
173:1,13 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:13 186:2
186:21 187:21
189:4,9,12,14
**judgment (16)**
8:10,22 9:5 11:17
18:9 27:17 32:17
36:21 42:16 50:21
52:21 53:18 83:19
85:2,14 158:22
**justification (2)**
72:11 156:24
**justified (1)**
16:3

**— K —**
**keep (7)**
10:3 25:10 53:12,13
103:12,18 146:15
**key (3)**
54:12,21 56:17
**kind (13)**
21:13 24:11 27:7
42:24,25 43:3 44:25
45:16 68:10 70:18
175:8 184:11,13
**kinds (2)**
26:10 45:25
**know (31)**
5:19 7:9 21:11,13
24:20 27:3 43:10
45:14,15 49:22
56:22 61:21 75:6
81:22 85:19 93:3
103:10 114:16
115:9 117:10
120:12 127:3 128:3
128:5 130:22
142:19 146:9,17
154:6 182:24 187:2
**knowledge (14)**
43:17 46:5,20 86:12
96:2,3,7,10,14
105:22,24 146:3,6

147:18
**known (5)**
23:12 25:18 26:2
33:25 92:7
**knows (2)**
186:21,22

─────────── **L** ───────────

**L (2)**
75:22 132:23
**labeled (3)**
78:24 79:19,21
**labels (1)**
79:20
**Labor (1)**
24:16
**language (2)**
28:14 35:22
**large (4)**
19:18 68:9 155:23
161:11
**law (18)**
24:4 39:3 50:2,8
62:23 64:10,15 67:6
67:9 68:22 73:16
109:11 121:19
134:24 155:2
162:12 163:14,21
**lawyers (1)**
97:14
**lay (3)**
44:11 54:6 109:3
**laying (2)**
55:7,11 97:15
**lead (1)**
71:9
**leadership (2)**
20:6 133:21
**learning (2)**
42:12 134:21
**leave (7)**
24:23 63:13,15,19
105:2 147:16
155:17
**leaves (2)**
24:23 177:24
**leaving (1)**
118:23
**left (1)**
74:6
**legal (3)**
50:14 61:16 173:25
**legally (2)**
38:10 65:4
**legitimate (2)**
68:15 71:20

**lengthy (1)**
20:11
**lent (1)**
24:9
**lesser (1)**
59:6
**let's (26)**
28:4 33:20 43:20
57:15 58:18 59:9
63:13 64:7 70:19,24
78:23 79:18 92:20
92:22 100:9 107:14
108:19 110:15
138:4,4 146:19,21
156:11 175:8 183:6
186:8
**level (6)**
50:5 51:12 111:9
154:19 155:8,11
**Levy (48)**
3:21 5:8,8 132:1,21
133:1,4 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
147:18 148:1,7
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1,22
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 173:7 189:13
**liabilities (51)**
14:24 15:2 16:12 17:7
24:25 26:6 27:19,21
33:2,16 39:8 41:15
50:17 56:17 64:13
80:21 91:22 92:5,13
92:15,18,19 93:17
93:18,25 94:9,12,23
94:24 99:16 100:18
100:24 101:3,20
102:19 106:16
107:5 119:14
136:22 157:14
158:4,8 159:7,9,10
167:24,25 171:25
172:18,25 183:24
**liability (134)**
13:3 14:9,14 15:17,19
16:6,14 17:11,15,19
17:23 18:5 20:19
22:16 23:21 24:5,19

24:21 25:3,24,25
26:25 28:10 30:10
31:6 33:3 35:16
36:9 41:16,21 48:24
49:15 50:18,23 51:6
51:14 52:4,19 54:3
54:9 58:8 60:19,22
64:15 66:16 67:3
68:5 69:16,19 70:6
71:16 72:4,19 73:7
78:9,13 86:7 91:15
91:19 92:2 93:21
96:12,16 97:6 99:5
100:12,16 101:13
101:16 102:2,10
103:2,6 104:3,20
105:24 106:4
107:10,22 108:5,6
108:13,15 113:17
114:7 116:18
117:12 119:16,22
119:25 122:10,14
123:19,23 124:6,12
124:21,24 125:16
126:4 131:24 132:2
132:10 134:16,20
134:23 135:9 136:2
137:14 138:10,12
140:15 142:25
146:4,8 149:17
152:22 153:18,24
155:4 156:4 157:21
159:24 165:11,21
166:4 172:14 174:8
174:19,21 178:11
179:3,24 182:20
**liable (1)**
178:10
**License (1)**
188:20
**light (3)**
43:22 50:20 114:6
**likelihood (3)**
59:8,20,21
**Likewise (1)**
120:12
**limit (1)**
130:3
**limitation (1)**
10:9
**limited (1)**
9:19
**LINCOLN (1)**
1:6
**line (6)**
98:14,14,19,20

100:10,11
**list (1)**
151:23
**listed (3)**
9:15 149:10 151:21
**listen (1)**
186:24
**literally (1)**
138:21
**litigated (1)**
67:10
**little (11)**
26:23 28:2 29:13
33:20 42:9 44:13
48:5 59:9 70:13
74:9 92:21
**live (4)**
26:12 54:15 72:15
133:23
**lived (1)**
72:15
**LiveNote (2)**
2:10 188:5
**Local (9)**
1:9 13:2,24 39:21
64:20 66:14 77:16
116:11 117:6
**logical (1)**
175:7
**long (14)**
5:17,18 26:11,12
54:13,14 55:21
67:19 69:12 74:13
116:10,13 117:22
118:15
**long-term (28)**
13:6,14,17 16:25 66:2
81:15,17 84:22
85:11,24,25 86:17
87:4 94:16 112:10
118:13 125:20
137:5,14,15 140:16
140:19 152:17
154:8 158:16
**longer (7)**
5:19 16:9 69:9 140:5
157:21 174:4
182:17
**look (27)**
10:16 17:8 25:3,13
27:10 38:9,19 44:8
56:23 65:17,17 81:9
82:14,19,20,24
84:10,15 85:18 94:5
97:16 139:22
146:12 150:4 159:3

164:14 187:19
**looked (5)**
40:12 84:13 136:9
140:5 164:8
**looking (13)**
29:6 59:15 68:24 71:7
81:6 86:25 145:8
159:13,17,20,20,25
164:19
**looks (3)**
8:6 81:2,3
**lose (1)**
157:22
**losses (3)**
118:17 120:11 121:18
**lot (5)**
121:19 141:23 160:6
177:17 181:10
**lots (1)**
183:19
**Louisiana (1)**
3:6
**low (2)**
28:23 72:14
**lower (19)**
13:4 14:19,23 30:10
32:21 41:20,22
52:16 65:2,4 66:7
73:7 87:9 136:15
138:5,11 141:15
155:4 157:11
**lump (1)**
173:8
**lump-sum (1)**
160:25
**lunch (1)**
171:2

─────────── **M** ───────────

**M (1)**
132:23
**main (3)**
49:10 154:16 157:24
**mainstream (1)**
55:2
**majority (7)**
48:20 69:4 102:2,9,25
103:6 104:8
**making (3)**
52:10 112:6 174:4
**managers (1)**
84:4
**mandatory (1)**
34:8
**Manhattan (25)**
1:6 4:15,19 11:12

12:19 15:22 36:9
50:23 52:4,11,20
53:6,19 72:17 78:14
96:11,16 113:18
114:8 119:5,6
154:23 155:6 178:7
178:9
**manner (6)**
14:18,19 53:2 82:9
132:9 143:8
**margin (2)**
181:5,7
**mark (4)**
34:16 97:20 146:14
150:12
**marked (12)**
34:19,22 35:19 36:5
79:2,6 98:2 146:22
147:3,11 150:13,18
**market (37)**
14:24 15:3 44:16 46:2
48:8 81:3,14 82:24
83:4,7,10 94:5,14
120:8 135:13,15,15
135:17,21 136:5,6
136:14 137:2,3,12
138:22 140:12,16
140:17 144:10
153:8 158:18 159:9
159:18,23,25 160:2
**Market's (1)**
141:19
**markets (6)**
43:4 46:2 83:5 84:5
142:13 143:20
**mass (11)**
61:18 66:17 123:4
154:25 163:11,14
164:4 169:20,22
182:18 184:24
**matching (3)**
183:24 184:7,7
**material (1)**
107:25
**materially (1)**
13:4
**matter (15)**
6:21 8:3 38:25 50:13
50:15 59:12 72:13
107:2 131:16
142:17 155:2 162:8
179:21,25 186:25
**matters (3)**
8:3 11:10 17:15
**MB (6)**
21:22,24 39:25 77:23

88:23 185:22
**McDOWELL (2)**
1:14 4:5
**mean (18)**
24:14 38:5,7 42:4
45:6 48:2 50:3,9
53:10 66:5 91:6
99:12 107:12
109:15 114:22
120:4 121:14
129:24
**Meaning (1)**
43:3
**means (11)**
26:24 28:19,22 31:20
48:3 50:9 103:15
109:16 116:21
120:5 143:7
**meant (4)**
25:9 72:23 123:2
135:15
**measure (4)**
38:23 58:20 92:4
158:13
**measured (1)**
61:8
**measurement (10)**
85:19 86:5 111:14,18
111:23 112:23
121:10,21 151:12
167:24
**measuring (5)**
26:5 29:7 147:22
151:6 159:13
**meet (15)**
13:16 50:24 61:12,23
62:11 63:10 64:2
118:8 169:4 170:7
170:10 174:13
175:11 180:12,12
**meeting (2)**
62:24 64:12
**meets (1)**
180:4
**member (11)**
19:22,25 20:3,8 33:19
34:13 76:22 133:15
133:21 145:3,17
**members (5)**
22:3 34:9 35:13 149:9
176:10
**mention (1)**
10:14
**mentioned (5)**
22:15 33:8 46:9 84:14
163:11

**MEPA (1)**
135:3
**MEPRA (2)**
24:4 118:24
**merely (2)**
40:10 173:2
**met (5)**
59:4 118:14 175:24
176:3,8
**method (10)**
9:25 49:21,23 106:18
125:8,11 126:8,9
153:22,23
**methodology (1)**
94:22
**methods (1)**
178:10
**MetLife (1)**
16:23
**Michael (2)**
1:14 4:5
**middle (1)**
164:19
**migrating (1)**
110:10
**Miller (188)**
3:8 4:14,14 8:7 9:10
11:4,11,18,21 12:1
12:4,14,17,20 13:1
14:1 15:1 16:1 17:1
18:1,19,23 19:1,5,7
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1,18
35:1 36:1,15 37:1
38:1 39:1 40:1 41:1
42:1 43:1,18 44:1,5
44:11 45:1 46:1,17
47:1,9,10 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1,7,10,14
55:17,21 56:1 57:8
57:21 74:24 75:1,13
75:17,20 76:1,3
77:1 78:1 79:1,4
80:1,3,7 81:1,22
82:1,2,7 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1,2,6,9,12,13
94:1 95:1 96:1 97:1
97:2,4,19,23 98:1,4
98:8,9 99:1 100:1
101:1 102:1 103:1
103:22 104:1,11,22

105:1,7 106:1 107:1
108:1 109:1 110:1
110:21 111:1 112:1
113:1 114:1,15,25
115:16,19 121:25
122:1,6 123:1 124:1
125:1 126:12
128:12 129:16,19
130:4,7,13,16
131:10 144:18,19
146:15,19,21
147:13 148:5 156:9
170:16 171:1,10,19
172:1 173:10
185:14,19,25 186:5
186:10 187:3,10
189:3,8,11
**Miller's (3)**
117:19 119:13 120:22
**million (10)**
15:21,24 17:19
100:18,21 101:13
103:2 127:17,18,19
**mind (2)**
55:24 186:11
**mine (1)**
185:6
**minimal (1)**
62:19
**minimum (7)**
62:11 63:2,6,10 64:2
64:9 65:4
**minute (2)**
139:25 158:21
**minutes (2)**
114:19 115:11
**missed (1)**
126:15
**mix (6)**
68:7,13 90:20,21
167:11 185:10
**model (1)**
150:3
**modified (1)**
168:9
**moment (7)**
41:19 63:14 85:5,15
121:25 122:13
175:9
**money (19)**
27:15 30:18 52:8
112:21,24 113:11
120:10 122:16,22
122:25 137:6 143:9
163:18 176:9,20
177:18 178:12,17

185:6
**monies (2)**
123:18 174:25
**month (1)**
42:14
**monthly (1)**
42:17
**Morgan (2)**
145:16,24
**morning (8)**
4:2 19:6,7 76:4
115:24 118:6 141:6
141:21
**mortality (5)**
45:16 54:14 58:24
61:25 184:15
**motions (3)**
8:21 9:5 11:17
**move (1)**
128:20
**multi (1)**
183:21
**multi-million-dolla...**
108:6,14
**multiemployer (58)**
9:24 12:25 19:10,20
20:9,13,21 21:4,9
21:20 22:10 23:18
23:21 41:9 48:24
51:20 68:18 74:3
76:14 77:2,12 78:18
79:9 87:21 88:3
106:5,9 107:3 116:2
123:8,24 124:4,10
134:25 142:17
145:25 149:13,16
157:3 158:24
160:22 161:7 163:3
163:4 166:7,14
167:2,7,9 171:24
172:2,12 181:10
183:11,15,20,22
184:10
**mutual (1)**
127:19

_____

N

**N (6)**
3:2 19:2,2 75:22
171:14,14
**N.W (1)**
3:6
**name (3)**
4:5,23 76:5
**names (1)**
149:10

**nature (1)**
81:20
**nearly (2)**
133:8,9
**necessarily (2)**
40:24 177:7
**need (25)**
9:20 24:12 26:14 27:4
27:5 28:7 29:21,23
30:19 50:22 53:11
62:3,4,17 63:14
113:17 115:9 119:4
122:2 132:21,22
186:5,18 187:13,17
**needed (3)**
13:16 17:6 165:4
**needs (5)**
28:16 69:17 70:4
85:18 168:9
**negative (2)**
140:7 161:20
**neglected (1)**
11:10
**negotiate (3)**
62:7 64:16,17
**negotiates (1)**
24:22
**neither (2)**
188:11,14
**net (2)**
80:9,11
**never (11)**
7:21 43:13 49:18,25
50:11 65:20 131:20
153:25 172:17,20
175:2
**new (9)**
2:7,7,11,11 24:4
147:9 169:13 188:6
188:18
**no-risk (1)**
144:13
**non-actuaries (1)**
42:6
**non-funded (1)**
38:12
**non-retired (1)**
54:16
**normal (3)**
64:12 142:22 181:6
**normally (2)**
9:23 10:24
**Notary (5)**
2:10 75:23 132:24
188:5,18
**note (1)**

151:23
**noted (1)**
37:8
**Notes (1)**
110:18
**notice (7)**
2:8 111:2,7,14,18,23
112:14
**noticed (1)**
9:14
**November (2)**
8:6,7
**number (26)**
25:16 28:8,24 30:2
40:9 41:3,4,7 64:3
67:4,13 72:16,16
80:24 84:12 88:17
119:12 136:15
142:12 147:9,10
153:15 154:15
177:4 179:18
189:18
**numbered (1)**
148:23
**numbers (3)**
26:20 56:20 58:5
**numeral (3)**
148:13,19,20

———————————
**O**

**O (1)**
132:23
**oath (3)**
132:22 171:16,21
**object (5)**
11:25 43:15 81:19
96:21 103:9
**objecting (1)**
47:5
**objection (7)**
44:3 47:7 82:5 91:5
104:10 128:23
129:4
**objective (1)**
149:25
**obligated (3)**
63:24,25 64:2
**obligation (46)**
13:17 26:3 61:16
62:10,12,20 63:6,11
64:3,10 95:12 123:9
123:13,17 135:22
136:10,14 153:7
155:3 159:19
160:25 161:24
162:12,14,15

168:25 169:2,5
171:24 172:10,12
172:17,21 173:3,7
173:20,23 175:2
177:25 178:2,5,6,15
178:16 179:13
182:19
**obligations (16)**
27:5 31:6 50:24
105:21 120:16
135:17,19,20
147:22 153:10,12
160:20 161:8 167:6
170:7,11
**obtain (1)**
122:16
**obtained (1)**
44:20
**obtaining (1)**
52:19
**obviously (13)**
11:25 43:16 58:5,19
71:22 72:13 96:24
103:14 128:24
133:20 139:3
178:14,23
**occur (3)**
58:25 124:16 172:25
**occurred (2)**
14:13 129:8
**offended (1)**
6:12
**offer (1)**
16:15
**offered (2)**
45:8 75:5
**offhand (1)**
68:15
**office (1)**
2:6
**official (2)**
7:18,21
**oftentimes (1)**
139:5
**oh (9)**
20:23 22:20 35:6 55:9
79:24 80:3 89:6
187:19,21
**okay (147)**
7:25 12:10,16 20:5,11
21:18 23:20 24:17
25:2,8,10 26:7 27:2
28:14,21 29:19 31:3
31:9,15 32:24 33:24
35:4,7,24 36:4,20
36:21 37:3,7,11,19

37:25 39:19 40:16
40:18,20 44:5,11,19
46:5 47:9 48:15
52:3,18 53:23 54:22
55:4,9,20 57:2,22
59:3,18 60:13 61:7
61:18,19 62:9 63:17
63:21 64:24 65:6
66:11,12 67:15,22
67:25 68:17 69:6,12
69:24 70:23,24
71:12,13,22 72:12
72:12,22 73:3,13,21
74:5 76:10 77:2,10
77:20,22 79:12,18
80:3,11,17 81:8
82:7,20 83:24 85:4
90:20,25 92:20 93:8
95:24 97:11,18 98:8
98:22 100:5,9,15
101:19,25 102:24
107:15 110:12,15
110:24 114:3
115:20 118:4 120:3
121:13 132:20
142:24 143:7 148:5
149:3 150:25
152:13 167:21
168:16 171:17
175:9 176:2 177:20
179:11,23 180:11
180:23 181:20,23
182:8 183:18 185:4
186:3,9 187:9
**old (2)**
183:8,13
**once (5)**
66:17 67:10 179:24
182:16 185:5
**one-year (1)**
141:17
**ones (4)**
53:11 54:13 154:16
162:9
**ongoing (14)**
62:2 86:18 108:17
113:21,25 119:20
161:7 167:17
168:14 174:4,11,12
175:10 178:20
**open (6)**
10:18 12:18 18:14
130:19,22 155:17
**opening (14)**
10:6,9,15,20 12:1
13:1 14:1 15:1 16:1

17:1 130:1 131:1
189:3,4
**operate (2)**
168:15 169:10
**opinion (13)**
31:4 32:24 33:3 50:14
56:6 57:3,7 71:15
71:21 73:14 153:21
172:22,24
**opportunity (4)**
10:5 75:5 103:23
114:18
**opposed (3)**
52:5 88:10 160:2
**opposite (2)**
27:22 179:9
**optimism (1)**
31:21
**optimistic (1)**
28:24
**option (2)**
136:9 182:25
**optional (1)**
54:19
**options (1)**
151:9
**order (5)**
27:4 28:8 30:4 50:23
113:18
**ordered (1)**
18:10
**ordinary (1)**
163:25
**organization (2)**
33:19 116:4
**organizational (1)**
162:2
**originally (3)**
137:11 140:10 146:10
**ought (3)**
12:11 83:7 137:2
**outcomes (1)**
87:15
**outperform (1)**
84:5
**outperforms (1)**
84:3
**outside (1)**
141:16
**overall (1)**
95:6
**overcome (1)**
132:12
**overestimate (1)**
32:9
**overfund (1)**

30:17
**overfunded (6)**
17:5 52:8,10,12,19
59:5
**overfunding (2)**
17:17 52:21
**overruled (1)**
104:10
**oversaw (1)**
79:16
**owe (2)**
141:7 185:4
**owns (1)**
158:12

---
**P**

**P (2)**
3:2,2
**p.m (3)**
156:13,14 187:23
**page (27)**
36:16 79:19 80:8
92:23 98:11,14,15
98:21 100:9 108:21
110:15,20,21
127:11 148:12,20
148:21,23 150:23
151:11,15,15,16,17
151:20 152:5
164:16
**paid (12)**
26:15 114:7 123:19
136:3,22 137:8
143:2,21 173:24
179:5,13 184:2
**paragraph (2)**
148:15 149:5 164:20
**paragraphs (1)**
36:18
**part (12)**
9:11 11:15 28:21 58:6
99:11,13 103:11
106:18 109:25
134:5,24 150:18
**part-time (2)**
23:6,8
**participant (3)**
54:20 161:2,3
**participants (13)**
53:5 54:15 61:2,13,14
111:8 119:7 140:8
143:16 161:8,13,24
175:15
**participate (1)**
171:23
**participation (1)**

46:10
**particular (18)**
11:2 17:16 30:21 36:4
56:15 58:14 66:19
84:19 87:15 90:3
98:24 106:9 117:3,5
120:19 125:25
129:11 155:9
**particularly (4)**
45:9 95:4 136:7 151:4
**parties (11)**
4:6 8:21,22 9:3 10:10
11:19,24 118:21
185:20,22 188:13
**party (3)**
10:2,2 12:7
**pass (3)**
57:19 115:17 156:15
**passage (1)**
135:3
**pattern (1)**
127:10
**patterns (1)**
58:24
**Pause (1)**
122:4
**pay (40)**
13:17 14:11 17:7
24:24 26:16 27:4,20
30:19 38:11 90:5,16
90:22 91:2,11,21
112:21,24 113:11
113:18 135:21
140:15 142:7
157:14 162:7,12
163:8 171:25
172:18 173:8,20
175:3 176:9 177:25
178:3,5,7,15 179:8
182:19 185:5
**payable (1)**
135:9
**paying (3)**
53:19 162:5 163:5
**payment (11)**
25:3 26:25 54:18,20
135:10 142:25
162:14 168:25,25
170:7,10
**payments (25)**
27:11 45:15 49:15
50:23 52:20 64:15
67:4,8,17 96:12,16
97:6 109:7,22
113:17 121:5,6
123:10 136:2 137:8

142:13 159:15
174:8 180:25 185:2
**pays (2)**
67:16 157:20
**PBGC (69)**
14:20 15:5 23:12,14
23:24 42:8,11,12,14
42:17,23 43:11
47:22 65:14 72:3,18
72:25 90:25 91:7,8
91:9,21 92:11,14
93:15,21 94:2,7,10
94:15,23 95:5,10,14
95:19 97:13 99:25
101:4,5,9,15,20
102:4,7,18 103:3
104:3 105:8,14,17
106:3,17 107:4
132:5 137:3 138:6
138:17 139:4
144:14 152:9,11
154:25 163:15
166:13,24 167:6,12
167:23 169:8
**PBGC's (2)**
16:18 47:18
**PDA (1)**
119:9
**Pennsylvania (1)**
3:16
**pension (91)**
1:9 5:7,12 13:2,13
14:6 15:12,20 16:7
16:10 17:4,22 18:15
19:10 20:14 21:20
23:11 24:4 26:5
30:12,14,20,22
35:16 36:8 37:16,17
38:25 39:21 40:7
41:9,14 43:5 44:15
44:24 46:8 48:13,16
50:22 52:6,24 53:24
54:2 76:13,14 77:3
77:16,19 81:12
82:21 84:23 85:24
86:8,15 90:16,22
95:12,24 96:4,7,10
106:13,17,21 117:6
123:16 125:15
133:13 134:25
135:11 145:18
147:22 148:16
149:6 160:19,20,25
161:23 162:2,3,12
162:25 163:5
171:24 173:19,19

176:9 177:24 178:2
178:4,6
**pensioners (1)**
13:24
**pensions (2)**
13:25 52:24
**people (5)**
6:2 26:11 53:12
132:11 155:25
**percent (115)**
13:7,11,20 15:4,6,15
15:16 17:3 28:5
29:22,24 30:5 32:15
39:22 40:6,9,23
41:7,20 42:8,10
50:20 51:8,8,13,18
52:5 56:23,23 58:7
58:19 59:11 60:7,10
66:3,7 69:25,25
70:15,16,19,21,21
80:12 84:24 85:2,12
87:2,11 88:13,20
89:19,22 92:3,11
93:16,17,19 94:4,13
94:23 95:8 99:19
100:24 101:3,17
106:13,14 109:25
110:4 111:19,25
112:3,7,9,18 117:25
118:8,9,14 119:21
131:15,16,17 135:7
136:13,15 137:15
137:23 138:7,18,18
141:9 152:18 154:9
155:2 157:10
174:14,23 175:11
175:23 176:7,8,12
176:13,23 177:8,14
177:14,15,16
178:21 180:2,16
182:14
**percentage (8)**
58:22 60:14 111:14
111:18 112:3,14
117:3 138:11
**percnet (1)**
183:17
**perfect (1)**
45:24
**perform (5)**
20:22 22:4 32:15
117:22 125:16
**performance (2)**
63:4 67:23
**performed (1)**
78:2

**period (8)**
58:14 65:16,19,23
73:25 115:25
118:15 135:5
**periods (2)**
69:9 100:2
**permanent (1)**
172:9
**permanently (1)**
172:11
**permits (1)**
153:16
**permitted (4)**
134:14,15,18 150:8
**person (1)**
54:17
**personally (2)**
22:21 83:4
**phase (1)**
147:8
**Philadelphia (1)**
3:16
**phone (1)**
70:12
**photocopied (1)**
147:25
**photocopy (1)**
147:12
**phrase (4)**
28:19 31:15,16
123:14
**pick (3)**
28:24 59:16,19
**piece (3)**
140:22,23 144:12
**pieces (1)**
25:12
**place (6)**
7:13 132:21 155:15
155:21 172:18
188:9
**places (1)**
150:24
**plaintiff (1)**
5:4
**plan (236)**
5:7,10 14:3,6,6 15:20
16:17 17:4,8,17
22:10 25:20 28:17
28:20 29:3,18 30:17
30:18,20,22 37:16
37:17 38:4,6,7,12
38:13 39:17 41:9,11
41:12 49:12,13,24
50:6 51:2,5,14,15
51:18,24 52:8,19

53:5,13 56:22 58:6
59:5 60:20 61:12,16
61:23 62:11 63:9,18
64:7,11,20,20 66:12
66:14 67:2 68:4,18
69:12,22,24 70:4,14
70:21,21 74:3 84:2
84:8,25 85:5,22,24
86:18 87:15,17
88:17 89:6,7,9,14
89:15,18 90:16
91:20 99:2,10,23
100:3 102:8,12,14
102:21 103:8 105:9
105:10,12,15,16,18
105:20 106:17
107:3 108:18
109:10,16,19
111:10 112:12
113:21,21,24,25
116:11,23 117:3,6,6
117:21 118:16
120:10,16,18,22,23
123:8 124:10
127:17 128:15,18
128:21 129:19,19
131:11,13,16
134:25 135:11,20
137:12,21,22 138:5
140:6 142:4 143:4
146:14 150:5 152:8
152:11,17,23 154:6
154:9,13,19,24
155:7,9,12,14,15
157:3,6,13 159:24
160:14,20 161:7,7
161:12,23 162:2,3
163:3,5 165:15
166:6,7,15 167:7,9
167:14,16,17
168:13,14 169:7,10
170:13 171:24,25
172:2,4,10,13,13,18
172:25 173:19,22
174:11,12,16,22
175:10,10,17,19,20
175:21 176:12,13
176:18 177:13,16
177:24 178:4,6,12
178:20 179:19
180:3,11,17 181:24
182:14 183:22
184:10,21,22

**plan's (30)**
17:9 26:5 29:17 31:5
63:4,25 78:20 80:21

81:2 87:21 88:3
90:3 91:3,3,22,24
112:3 117:22
135:16 151:6
158:24 160:3
165:16 167:2,15
168:3 178:2 179:4
180:12 182:20

**planning (1)**
114:22

**plans (25)**
19:20 21:4 46:8 51:20
62:15 70:25 74:10
76:14 77:3,12 78:18
106:5,9 116:18
124:4,16 125:15,21
139:7 142:17
181:10,11,21
183:11,15

**please (10)**
4:23 6:12 34:24 75:8
76:5,8 98:13 104:16
138:15,17

**plus (5)**
64:13 90:7 109:5,20
181:6

**point (23)**
5:24 10:18 11:3 26:13
27:15 39:14 40:5
44:3 60:17 65:24
83:17,22 101:25
118:18 119:23
120:6,15 131:7
138:20 151:16
157:18 177:6,18

**pointed (1)**
182:23

**points (8)**
80:24 83:21,25 84:12
84:15,20 85:8 132:6

**policies (1)**
134:11

**policy (17)**
38:21 48:13,16 71:4
81:2,10 82:11,16,17
84:9,10 97:9 133:12
140:21 154:4
155:20,23

**pool (10)**
32:14 38:9,16 39:12
90:15 157:3,10
158:11 159:14
166:8

**pooled (2)**
96:17 97:7

**portfolio (22)**

14:21 15:8 38:8 47:19
65:6,21,25 66:4,14
69:2 81:5 95:21
107:2 152:8,10
159:20 160:9,9
183:23 184:3,13
185:10

**portfolios (1)**
183:12

**portion (26)**
93:25 94:2,9,11 99:4
99:18,21,25 101:16
101:19,21,22 102:7
102:18 104:3,7
107:5 136:3 140:2
142:5,6 144:15
152:11 183:11,24
184:13

**portions (1)**
128:19

**position (6)**
69:15 131:25 134:19
135:8 138:19 144:5

**positive (2)**
140:7 161:19

**possibilities (1)**
169:6

**possibility (3)**
6:11 62:6 169:7

**possible (2)**
153:5 182:7

**possibly (1)**
172:19

**potential (1)**
87:14

**potentially (6)**
38:18 50:5 52:13,23
81:16 83:2

**PPA (3)**
62:13,16 111:7

**practical (5)**
72:13 142:17 162:8
179:24 186:25

**practice (10)**
33:11,22,25 34:6 35:2
35:5,8,11 76:13
133:18

**predict (1)**
30:22

**prediction (2)**
32:10,11

**predominantly (1)**
19:20

**preliminarily (1)**
8:2

**preliminary (3)**

8:2 11:9 12:12
**premature (1)**
44:3
**premium (2)**
84:7 140:24
**premiums (1)**
142:10
**preparation (3)**
22:11 79:16 133:17
**prepared (10)**
21:25 75:17 91:18
105:23 110:6 113:5
113:13,19,23 136:4
**present (23)**
3:19 6:5,25 10:6 15:4
16:12 18:22 25:18
25:22 26:5,21,25
27:19 28:12 29:15
50:17 60:20 80:20
94:6 100:17 151:6
174:20 179:14
**presentations (2)**
46:10 187:18
**pressures (1)**
46:2
**presumption (2)**
132:13,14
**pretty (6)**
20:15 28:15 45:3
46:14 95:15 182:3
**previously (7)**
53:5 73:21 87:25
131:3 134:15
146:17 147:7
**price (8)**
45:13 141:19,23
143:21,23 144:12
144:13 160:2
**priced (1)**
141:20
**prices (4)**
43:2 140:13,14 151:8
**pricing (6)**
42:21 44:10,23 45:4,7
46:16
**primarily (2)**
76:14 150:10
**primary (6)**
21:18 80:25 134:8,11
134:11 149:25
**principal (1)**
157:12
**principle (5)**
37:5 85:20,21 139:15
164:24
**principles (3)**

33:5,7,13
**prior (5)**
40:3,11 145:7 149:24
161:22
**probability (1)**
59:8
**probably (12)**
20:24,24 21:21 22:20
23:2 41:13 66:23
77:9 160:4 177:7,19
179:7
**problem (9)**
49:7 55:13 63:23
129:4,15 155:24
174:17 182:21
183:3
**proceed (4)**
9:19 10:24 98:19
115:15
**proceeding (5)**
8:12,16 9:25 131:21
185:24
**proceedings (15)**
2:5 3:1 4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
170:1 185:1 186:1
187:1,22
**process (4)**
26:9 44:21 81:25
86:20
**produce (1)**
43:2
**product (1)**
43:6
**profession (5)**
19:8,24 31:13,17 34:2
**professional (4)**
2:9 19:23 20:6 188:4
**projected (8)**
17:7 80:19 81:17
91:11 109:7,17
112:21 114:11
**projection (3)**
113:10 121:5,6
**projections (5)**
69:8 81:13,14 122:23
123:17
**promised (4)**
90:5,16,22 176:11
**promptly (2)**
187:5,8
**promulgated (2)**
34:7 83:6
**proposition (1)**
36:22
**proprietary (1)**

83:9
**prove (1)**
9:20
**provide (3)**
21:3 35:11 128:20
**provided (2)**
46:18 47:5
**providing (1)**
186:6
**provisions (1)**
109:11
**proxies (1)**
14:21
**proxy (3)**
47:18 95:20 137:5
**Prudential (1)**
16:23
**Public (5)**
2:11 75:23 132:24
   188:5,18
**publicly (2)**
128:16,22
**published (5)**
14:20 42:17 43:12
   47:18 92:12
**publishes (1)**
42:14
**punished (2)**
62:24,25
**purchase (7)**
44:16 46:8 49:14
   68:12 159:18
   160:20 184:11
**purchased (1)**
44:24
**purchases (1)**
44:7
**pure (1)**
101:9
**purport (1)**
49:11
**purpose (19)**
16:5 24:18,20,21
   32:22 33:15 83:8
   85:14,18 86:4
   103:16 104:18
   105:9,11,14 119:14
   119:19 121:9
   122:11
**purposes (58)**
4:9 8:12 13:22,23
   14:2,4,14 17:5 18:5
   28:10 29:3,14 30:10
   31:7 35:15 37:12,20
   43:11 51:14 60:22
   68:20 70:6 71:16

77:19 84:25 87:16
88:5 89:25 95:7
100:16 102:15,20
104:19,21 107:6
108:17 109:18
111:11,22 112:12
112:13 119:15,16
119:20,21 120:2,24
121:12 122:10
146:8 151:12
152:18,22 153:18
154:8 165:10,14
174:21
**pursuant (1)**
2:8
**put (10)**
12:11 49:16 84:7
85:13 141:9 160:11
170:24 183:2 185:9
186:14
**putting (5)**
52:7 85:4 119:9 168:6
168:10

_____
Q
_____

**qualification (1)**
97:3
**qualifications (1)**
19:15
**qualify (1)**
178:8
**quantifier (1)**
23:3
**quarterly (2)**
67:16 137:8
**question (33)**
9:6,18 33:9 62:21
70:7 74:8 75:4,13
81:20 86:6,13 89:3
97:13 98:14,18
104:12,15,24,24
105:13 108:9 113:2
114:18,23 123:14
129:7 132:8 150:9
156:8,18 170:6
175:4,5
**questions (31)**
57:9 63:16 82:8 97:17
98:19 100:6 114:15
117:19,20 119:13
120:22 121:24
122:8 126:12,13
128:10 130:8,8,9
152:14 156:6
166:11 168:17,19
170:3,17 171:7,22

173:11 185:13,14
**quick (1)**
74:8
**quickly (2)**
89:12 109:3
**quite (6)**
10:13 40:3 58:13
98:17 117:9 143:13
**quoting (1)**
45:23

_____
R
_____

**R (7)**
3:2 19:2,2,2 171:14
171:14,14
**raised (1)**
150:9
**range (2)**
59:15 135:7
**rare (2)**
51:21 53:15
**rarely (1)**
53:14
**rate (91)**
13:3 14:23 18:4 27:18
27:20 28:12 29:3,4
29:14 30:2,9,21
32:21 33:15 35:15
36:23,24 37:21 39:8
39:9 41:15,20,23
42:7,25 43:3 45:7
45:17,21,22 48:2,3
48:3,8 52:5,16
54:11,12 56:6 65:14
69:18 70:18 71:17
72:3,7,8,14,18,24
72:25 73:23 92:4
95:7 98:24 99:6,8
99:15 101:21 107:9
111:19 121:8
131:23 132:5
136:13,15 137:24
138:5,6,11,23,24
139:2 140:19 144:2
144:14,15,15,16
151:8 152:9 157:11
158:3,6 163:22
164:21 166:17
174:24 176:15,19
177:2 183:10
**rates (74)**
14:20,21 15:5 42:9,11
42:12,17,22 43:10
43:12 44:22 45:9,10
45:21 46:7,11,22
47:12,16,18,19,24

48:7 61:25 64:14,21
64:25 92:12,17
93:15,16,22 94:2,7
94:10,16,17,23 95:5
95:11,14,15,16,20
95:20 97:14 99:17
101:4,5,15 102:4
103:3 105:8,14,17
106:3,17 107:4
135:5,6 136:8,10
137:3 139:4 154:25
159:18 163:15
165:15 166:13,24
167:12,23 183:14
183:17
**rating (1)**
94:15
**reach (1)**
187:5
**read (12)**
36:18 50:2 75:8,10
97:16 98:12 102:17
103:11 104:14,16
104:17 109:2
**ready (5)**
57:19 98:7 115:14,17
156:15
**real (1)**
184:8
**real-world (1)**
24:6
**really (13)**
24:2 25:12 54:13
93:19 106:25 121:9
127:14 132:18
153:3 160:24
166:24 176:21
187:16
**reason (12)**
5:25 10:25 11:2 49:9
49:10 53:9 71:21
125:22 137:12
157:12 164:3 187:6
**reasonable (12)**
12:25 16:4 17:24
50:16 56:7 65:21
132:3,9,17 153:22
153:23 154:2
**reasonableness (1)**
132:15
**reasoning (1)**
154:16
**reasons (6)**
49:6 68:15 139:24
154:16 155:12
157:25

**rebuttal (3)**
10:22 170:25 185:18
**recalculated (1)**
18:11
**recall (1)**
55:3
**receive (1)**
7:2
**received (3)**
8:4,17 73:9
**Recess (4)**
57:17 115:12 156:13
171:13
**recognized (2)**
132:3,13
**recollection (2)**
51:7 74:7
**recommending (1)**
118:20
**reconvene (1)**
115:10
**record (37)**
4:9 6:20 7:18,21 8:24
9:2,12,17 11:16
12:12 39:19 40:4
58:6 74:25 75:10
76:6 84:6 89:13
93:24 94:20 97:17
97:25 98:12 102:18
104:7,17 109:3
128:19 129:10
144:19 146:17,25
147:6 150:16,18
151:3 171:5
**record-high (1)**
136:8
**recorder (1)**
6:20
**recording (1)**
7:24
**Recross (15)**
170:4 173:1,12 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 189:6
**redirect (16)**
74:16 75:12 103:23
114:17 122:1,5
123:1 124:1 125:1
168:1,22 169:1
171:1,18 172:1
189:6
**reduced (2)**
175:13 181:14
**reducing (1)**

95:6
**refer (3)**
77:18 127:4 128:7
**referenced (1)**
150:20
**references (1)**
8:23
**referred (5)**
9:8 38:12 115:25
145:8 148:3
**referring (2)**
89:5 127:7
**refers (1)**
148:15
**reflect (14)**
88:7 98:25 99:9,19
100:2 102:8,11,20
103:7 104:4 105:8
105:14,17 160:15
**reflected (2)**
58:21 88:23
**reflection (2)**
6:22 142:11
**reflective (1)**
120:8
**reflects (3)**
99:3,22 144:20
**refund (2)**
123:9,13
**regard (7)**
33:8 78:23 134:19
136:19 140:6
152:10 155:9
**regarding (2)**
36:23 57:3
**regardless (7)**
67:22 106:8 117:2
154:19 155:11
163:16 184:19
**Registered (2)**
2:9 188:4
**regs (1)**
24:7
**regular (2)**
42:7 174:6
**regulations (1)**
109:11
**related (4)**
20:19 23:21 68:8
153:11
**relationship (3)**
27:18 46:21 186:24
**relative (2)**
188:12,14
**relatively (1)**
82:3

**relevance (2)**
11:25 128:25
**relitigate (1)**
131:2
**remain (6)**
71:2,2,5 86:18 90:14
113:24
**remained (1)**
134:8
**remaining (5)**
53:3 143:15 144:9
161:21,21
**remains (3)**
67:8 88:20 113:21
**remarkable (1)**
58:13
**remedies (1)**
119:9
**remember (9)**
104:13 116:3 122:18
162:23 176:13
180:16 183:9,13,16
**repeat (1)**
87:23
**report (22)**
22:7,13 40:2 48:11
50:25 58:9 79:8
86:24 87:13 88:15
92:23 100:10
108:20,21 110:6,16
113:20,24 127:5,25
154:21 187:7
**reported (2)**
1:20 63:7
**reporter (13)**
2:9,10,10 6:23,25
7:18 34:16,22 79:5
97:20 188:4,4,5
**reports (5)**
21:25 22:4,6 34:14
40:14
**represent (10)**
42:18,21 49:11 73:18
87:14 89:22 166:13
166:20 167:13
168:11
**represented (3)**
49:13 100:23 111:21
**representing (4)**
4:15,19 44:15 46:8
**represents (5)**
87:20 88:2 90:2
101:14 117:21
**request (2)**
18:9 128:12
**require (2)**

37:21 64:10
**required (6)**
21:23 22:4 65:2,4
67:19 88:7
**requirements (3)**
35:12 62:11 90:2
**requires (5)**
16:13 60:19 63:10
111:7 163:14
**reserve (1)**
12:7
**reserving (1)**
11:24
**RESOLUTION (1)**
1:3
**respect (8)**
12:13 22:16 98:23
104:22 126:24
149:20 153:14
167:22
**respective (1)**
78:20
**respond (2)**
47:3 144:4
**Respondent (2)**
1:10 3:14
**response (7)**
104:24,25 117:18
119:12 151:20
152:4,5
**responses (1)**
151:17
**responsibilities (3)**
21:8,12 23:24
**responsibility (2)**
124:11 159:22
**responsible (7)**
21:15,16,19 22:11
124:5,23 126:3
**responsive (1)**
104:23
**rest (5)**
96:17 97:8 130:15,16
143:4
**rested (1)**
10:20
**restrict (1)**
156:3
**result (5)**
52:17 135:3 139:10
181:13 184:14
**resulted (2)**
15:14 73:7
**results (7)**
21:17 22:5 65:2 99:8
179:4 180:12 182:4

**resumed (1)**
171:14
**retired (4)**
20:3 23:5 61:14 74:19
**retiree (1)**
54:16
**retirees (2)**
18:8 74:11,19
**retirement (3)**
26:11 58:24 61:25
**return (111)**
13:15,19 14:19 27:8
27:10,12,20 29:4,16
30:12,25 31:4 32:25
36:25 37:22 38:18
38:22 39:9,18,20
40:6,24 41:9 49:24
50:21 54:12 58:23
59:10,14,21 60:8
66:2,6 68:4,19 69:9
69:18,20,23 70:2,3
70:10,20,25 71:10
71:18 73:9,17,19
78:19 80:9,12,13,18
80:23 81:5 83:2,16
83:18 84:23 85:3,11
85:23 86:17,21 87:2
87:5,11,15,19,25
88:13,16,19,22
89:19 92:3,11 95:8
107:13,17 108:13
108:16 109:25
110:5 117:20,25
118:9 121:8 123:17
125:18,21 131:14
139:6 152:19 157:9
158:20 164:22
165:17 166:23
169:17 174:13,22
174:25 175:22
179:4,16,19,20
180:2 183:5
**returns (12)**
40:9 41:2 64:19 65:10
65:11,17,19,20
81:15,17 84:16
112:10
**reverse (3)**
137:16,19,21
**review (4)**
48:12,15 53:23 79:8
**reviewers (1)**
151:23
**revised (1)**
113:3
**revision (4)**

144:23 145:2,6,11
**rid (1)**
143:17
**right (93)**
4:22 7:20 10:12,14
11:7,25 12:7,17
18:17,19,23 21:11
24:17 27:14 30:2
34:18 36:11 37:7
38:17 40:19 44:2,5
46:12 47:6 55:23
56:13,14,19 59:18
60:15 61:7 62:18
65:18,24 66:9 67:15
75:14 84:16 87:6
88:8 90:12 93:10,23
98:17 100:15 115:6
122:7,23 129:2
130:5,10 139:14,22
148:22,25 154:3
157:4,16,23 158:14
158:19 159:12,16
160:15,21,23
161:22,25 162:16
163:6,7,21,25
165:11 166:15,19
166:21 167:17,21
167:21 168:6
170:18 175:8 176:2
177:6 178:25
179:16 180:22
181:6,25 184:19
185:12,15
**risk (46)**
16:9 48:5,9 65:9,14
65:23 66:3,5,10
140:6,24 141:3,14
141:19,20,22,24
142:9 143:11,14,17
143:18,21,22 144:8
144:13,16,17
152:24 153:3
156:23 157:7,22
160:14,16 161:13
161:16,23 166:17
166:18 168:5,7,10
169:16 184:23
185:11
**risk-adjusted (1)**
160:5
**risk-free (14)**
47:24 48:2,3,8 64:21
64:25 65:14 95:15
95:16 139:4 144:14
157:11 158:6 159:5
**risks (4)**

140:7 153:11 161:3
161:5
**risky (1)**
140:20
**Rivera (3)**
1:21 2:8 188:3
**role (1)**
20:6
**Roman (3)**
148:12,18,20
**room (4)**
4:10 34:10,11 51:10
**Roth (24)**
3:9 4:17,17 75:2
156:1,21 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1,11,13 165:1
166:1,10 167:1
168:16 170:5,15
189:15
**rough (1)**
47:18
**roughly (6)**
20:21 58:6 77:7
100:18,21 101:3
**routinely (2)**
21:25 35:7
**RPR (1)**
1:21
**rude (1)**
5:24
**rule (2)**
163:24 165:2
**rules (2)**
9:24 163:12
**run (1)**
178:17
**runway (1)**
55:22

——————————
**S**

**S (2)**
3:2 132:23
**safety (1)**
13:25
**sake (1)**
147:24
**sat (1)**
115:25
**saw (1)**
137:11
**saying (7)**
32:2 37:23 138:15
158:10 167:8
176:17 180:7

**says (19)**
35:21 39:15 47:22
50:9 68:22 109:2,4
110:9 111:12
112:23 127:8
135:21 144:10
149:5 151:4,22
153:3 163:21
164:21
**scenario (1)**
60:6
**schedule (6)**
21:22 39:25 77:23
88:23 186:8 187:7
**schedules (1)**
186:13
**scheme (1)**
25:3
**score (1)**
59:9
**second (3)**
37:25 38:3 126:3
**secondary (1)**
49:8
**secretary (1)**
133:19
**section (9)**
36:12,22 37:4,19 39:6
110:17 150:22
151:17 164:15
**sections (1)**
148:2
**securities (2)**
127:17 163:19
**see (16)**
11:5 45:21 56:21
79:10 80:9 81:10,24
82:7 100:13,20
102:22 108:24
109:13 111:3
164:20 186:5
**seek (1)**
44:16
**seen (8)**
6:3 49:18 53:14 60:16
74:12 167:19
181:11,17
**Segal (76)**
5:8,11 41:24 42:3
48:22 49:5 50:5,15
52:4 72:8 73:6,23
76:11 78:4 83:3,10
92:8 93:16,24 95:4
98:25 99:9 101:2
106:18 108:10
116:14,16,17,22,25

117:11,16 119:24
122:9 123:22 124:5
125:3,5,7,8,17,18
126:5,6 132:4 133:7
133:10 134:2,9,10
134:17 135:2
137:24 139:9 142:2
143:10 144:2,5
145:14,25 146:5
148:7 149:11,17
152:7 153:16,17,21
153:25 154:11
155:13,14 156:24
167:22,25 168:11
**select (4)**
16:15 28:12 39:7
89:19
**selected (11)**
4:6 18:4 54:24 80:14
83:11 87:12 88:14
88:16 117:24
165:16 175:21
**selecting (7)**
17:14 33:15 35:14
36:23 80:22 118:6
147:21
**selection (3)**
86:3 147:21 149:21
**selects (2)**
59:13 68:19
**seminars (1)**
46:13
**sense (8)**
38:22 138:23 148:2
150:20 163:4
173:16,17 187:11
**sent (1)**
111:7
**sentence (7)**
109:15 151:22 152:3
164:20 165:5,7,13
**separate (3)**
49:16 92:18 183:2
**separately (1)**
114:23
**September (1)**
35:21
**series (1)**
171:21
**serve (3)**
20:5 77:3 106:5
**served (2)**
77:12 116:8
**services (1)**
21:4
**serving (1)**

21:2
**set (10)**
64:3 83:3,7 85:23
86:2 142:21 153:10
159:4 166:10 188:9
**sets (1)**
92:15
**settle (14)**
95:12 105:20 135:14
135:20 136:14,18
136:20,21,21
158:16 160:25
172:20 173:6,9
**settled (3)**
139:20,21 140:18
**settlement (22)**
119:22 120:3,14
122:14 135:12,13
136:18 137:2
139:19,21 151:5,7,9
153:4,6 158:17,20
158:22 160:18,19
172:25 173:15
**settlements (2)**
120:6 158:18
**settling (2)**
105:16 172:13
**severe (1)**
56:20
**SFAS (3)**
37:13 165:14,20
**shake (1)**
4:4
**share (5)**
15:23 24:24 53:20
159:7 178:8
**short (6)**
23:13 24:20 61:24
62:21 64:9 122:22
**Shorthand (1)**
2:9 188:3
**shot (2)**
120:5 122:16
**show (4)**
127:7,16 129:24,24
**showing (1)**
150:15
**shows (1)**
50:25
**side (4)**
6:4,5,15 44:8
**sideline (1)**
62:17
**sides (1)**
27:23
**sign (1)**

21:14
**signed (1)**
77:22
**significant (12)**
31:21,21 56:18 83:22
102:2,9,25 103:6
106:22 148:17
149:7 180:20
**significantly (3)**
48:17 84:3,5
**similar (1)**
139:16
**simpler (1)**
115:5
**simplest (1)**
42:5
**simply (6)**
77:19 135:11 147:11
150:16 154:2 159:8
**single (4)**
135:9,10 155:23
183:19
**single-employer (1)**
135:25
**sir (19)**
9:13 11:4,13 19:8
31:10 40:16 44:14
47:24 48:8,13 54:22
57:8 75:15 130:23
170:19 171:16
172:16 185:16
186:2
**situation (20)**
6:22 8:25 14:16 17:10
49:18 50:12 71:13
126:2 135:25
137:16,20,21
138:10,13 154:6
155:16 165:20
174:11 175:20
181:12
**situations (7)**
68:6 125:7,12 134:22
144:11 181:17
183:9
**size (2)**
41:11 64:9
**slam (1)**
6:10
**snapshot (6)**
58:14 120:18 121:21
176:22,23 182:9
**so-called (9)**
15:6,13 19:11 21:9,24
42:11 77:22 81:13
88:23

19:23 20:7
**Society (2)**
20:3 76:21
**somebody (7)**
135:22 141:7 143:22
155:18 159:10,11
159:21
**something's (1)**
174:14
**somewhat (3)**
113:3 139:23 140:3
**sorry (18)**
24:15 34:11 37:15
55:10 63:5,25 70:7
70:11 74:24 75:6
93:7 98:16 110:19
110:21 126:21
148:18,24 181:4
**sort (1)**
27:22
**spare (1)**
150:3
**special (1)**
16:5
**specific (1)**
12:11
**specifically (2)**
16:7,13
**specifics (1)**
41:18
**spell (2)**
4:23 76:8
**spent (1)**
19:17
**spokesman (1)**
5:23
**stage (7)**
47:5,7 60:25 64:22
96:23 131:6 180:24
**stamped (1)**
92:24
**stand (2)**
18:9 132:22
**standard (5)**
35:5,11 37:16 58:10
64:5
**standards (21)**
31:20 33:10,10,13,17
33:22,24 34:5,8,25
35:2,10,13 37:21
133:14,16,18 145:4
145:11,18 148:9
**standoffish (1)**
5:23
**stands (1)**
157:21

**start (5)**
4:13 54:17 156:22
179:12 181:18
**starting (3)**
98:16,18 135:8
**starts (1)**
186:15
**state (6)**
24:12 76:5 104:6
147:5 188:6,18
**stated (1)**
36:22
**statement (22)**
10:6,9,16 12:1 13:1
14:1 15:1 16:1 17:1
22:14 47:21 84:9,10
109:24 110:9,11
113:6 130:1 131:1
176:21 189:3,4
**statements (3)**
82:16,17 186:6
**states (6)**
2:11 24:15 37:4
133:24 135:15
151:11
**status (5)**
14:3 51:23 114:7
117:2 131:13
**statute (4)**
28:15 39:4,17
132:13
**statutory (2)**
17:13 131:7
**stay (1)**
26:12
**stenographically (1)**
188:8
**step (7)**
26:17,18,19 45:20
82:10,24 175:8
**stick (1)**
58:19
**stipulate (1)**
91:24
**stipulated (1)**
56:9
**stipulation (2)**
8:4 9:2
**stipulations (1)**
9:22
**stock (1)**
127:20
**stocks (2)**
65:25 185:10
**stopped (1)**
155:6

**stops (1)**
21:14
**story (1)**
14:9
**straight (1)**
49:22
**stream (3)**
67:3,8 80:20
**Street (2)**
2:7 3:15
**strike (10)**
31:11 54:5 66:15,15
78:2 86:14 91:8
96:9 101:12 172:22
**studies (1)**
69:7
**subcategory (1)**
68:13
**subcommittee (2)**
20:9 116:2
**subject (5)**
10:19,21 46:11 62:16
168:4
**submit (5)**
46:17 129:13 130:14
130:16 185:23
**submittal (1)**
185:21
**submitted (3)**
9:4 11:17 48:12
**subsections (1)**
151:10
**subsequent (1)**
165:6
**substance (1)**
64:8
**substantial (2)**
64:8 104:8
**substantially (3)**
139:6 180:15 181:14
**substitute (1)**
147:14
**successfully (1)**
134:4
**suddenly (1)**
15:20
**sufficient (6)**
13:15 46:18 61:17
109:21 151:25
158:7
**suggest (2)**
43:19 170:25
**suggesting (1)**
168:8
**suggestion (2)**
170:23 187:4

**sum (2)**
54:8 173:8
**summarize (8)**
20:12 22:18 23:22
81:8,24 83:24 93:23
111:6
**summarized (1)**
8:22
**summary (5)**
8:10,21 9:5 11:17
82:3
**supervise (3)**
78:3,8,12
**supervised (2)**
22:21 79:15
**supplement (1)**
129:10
**support (2)**
9:5 16:21
**supposed (3)**
33:18 42:21 59:24
**supposedly (1)**
131:11
**Supreme (1)**
132:14
**sure (15)**
5:17 24:21 46:25
52:5 60:17 63:20
74:22 99:20 127:9
137:17 141:13
156:11 165:18
183:16,20
**surprising (1)**
74:9
**survey (2)**
69:6 83:5
**surveys (2)**
43:11 82:24
**suspension (1)**
118:24
**Sustained (1)**
82:6
**sworn (4)**
19:2 75:22 102:6
132:23

_____
T
_____

**T (39)**
132:1,23 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1

156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1
**table (1)**
54:14
**take (27)**
5:20 11:14 26:19
33:25 45:6,14 49:15
57:15 64:4 68:23
114:19 115:8
116:21 123:12
134:19 135:19,22
137:21 141:5,14
142:3 156:9,12
159:21,21 169:16
184:23
**taken (5)**
57:17 115:12 131:25
156:13 188:8
**takes (1)**
169:9
**talk (10)**
5:15 33:20 59:9 60:24
78:24 117:5 118:19
183:6,21 186:8
**talked (5)**
7:25 58:24 65:15
131:10 139:5
**talking (12)**
29:10 118:22 129:9
129:17 132:7
137:22 156:25
173:14,17 182:6,8
184:4
**talks (1)**
165:13
**tantamount (1)**
186:7
**team (2)**
124:4 134:5
**technical (1)**
49:7
**technically (2)**
115:2 128:17
**teeth (1)**
62:14
**tell (4)**
80:3 127:21 157:18
186:12
**tentative (1)**
83:16
**tenure (1)**
116:23
**term (7)**

25:4,9 30:24 33:21
41:24 47:23 117:22
**terminated (5)**
61:3 86:8,11,19
154:24
**terminating (3)**
85:22 105:17,19
**termination (2)**
86:6 111:11
**terms (9)**
9:9,20 42:5,6 63:16
63:18 144:4 145:8
151:3
**terrible (1)**
182:3
**test (3)**
17:13 45:2,20
**testified (28)**
19:3 58:4,12 60:18
68:2 71:9 72:14
73:21 75:23 101:21
102:24 103:15
105:18 117:18
122:13 123:21
126:10 132:24
142:15,16,25
143:25 153:13
173:7 177:9,13
178:14 181:16
**testify (1)**
155:19
**testimony (22)**
6:15 47:4 73:13 87:20
88:2 102:6,22
115:24 118:6
122:18 131:5 148:3
151:2 152:14,16
162:20,23 163:13
165:19 170:14
171:3 188:8
**thank (31)**
4:25 5:5 11:8 12:20
18:12,13,18 36:16
40:22 57:8,16,24
75:14 79:24 80:6
94:18 98:21 126:23
129:16 130:10,23
132:20 149:7
164:18 170:15,16
170:18 171:20
173:10 185:15
187:17
**thanking (1)**
148:16
**Thanks (1)**
76:8

**then-published (1)**
107:4
**theoretical (1)**
62:6
**theoretically (2)**
59:7 169:22
**theory (1)**
49:8
**thereto (1)**
40:11
**they'd (2)**
61:4 185:23
**thing (8)**
6:19 7:12 27:24 29:19
56:14 71:19 130:6
155:5
**things (11)**
5:14,16 9:19 71:9
121:19 135:14
142:10 169:24
177:4 181:19
186:17
**think (55)**
4:3 11:11 12:15 23:17
27:13,22 28:14
29:22 30:5,7,16
31:18,19,23 32:22
33:8 34:16 37:23
40:17 46:9 50:9
55:15 58:11,12
62:16 63:14 65:16
68:8,14,15 72:13
74:4 85:13 95:23
97:22 101:21
103:24 119:10
122:15 123:21
126:14 142:16,24
144:18 150:7
153:14 154:15
158:10,15 159:3
160:5 163:12 173:7
181:16 187:16
**thinking (1)**
71:20
**third (2)**
152:4,5
**Thirty-seven (1)**
92:25
**Thirty-six (1)**
110:24
**Thomas (3)**
3:21 5:8 189:13
**thought (3)**
6:5 115:4 160:7
**three (3)**
36:18 151:10 176:25

**time (64)**
5:18 7:13 8:18 15:9
26:13 27:15 34:20
36:7 39:22 51:6,20
58:14 60:7,10,17
61:24 65:16 69:9
74:2,13 79:3 80:15
85:6 86:7 91:12
97:10 98:3 105:23
110:6 113:5,19,23
116:2 118:8,10,15
120:15,24 126:16
126:25 134:14,21
135:4,8 136:7,11
138:20 139:14
145:4,12 147:4
148:9,10 150:14
173:18 174:12
176:23 177:18
180:17 181:12
183:13 186:15,18
188:9
**times (4)**
103:19,20 134:4
177:2
**title (2)**
23:14,16
**today (34)**
4:8 9:20 26:21 27:3
29:21,23 30:6 61:4
88:20 89:3 104:2
121:7,14,21,22,23
136:5 137:22
140:19 143:6,14
144:21 145:8
147:16 150:19
152:15 157:25
162:21 163:4,5
176:22 177:19
186:22 187:17
**today's (3)**
137:16 140:14,16
**tomorrow (2)**
121:14,23
**ton (1)**
186:17
**tool (1)**
162:3
**top (1)**
151:19
**track (1)**
84:6
**transcriber (1)**
7:4
**transcript (10)**
6:24 7:2,5,11,17

98:12,13 103:12
187:14 188:7
**transcripts (2)**
11:23 131:21
**transfer (9)**
143:20 152:25 156:24
159:10,19 161:2,3
167:5 168:9
**transferred (4)**
143:15,19 160:16
161:16
**transferring (2)**
159:23 161:12
**treasurer (1)**
133:19
**treasuries (6)**
48:19 95:22 106:14
106:23 127:3,24
**treasury (3)**
24:10 95:22 141:17
**treat (1)**
136:17
**trigger (1)**
169:20
**triggered (1)**
169:23
**TRIGIANI (1)**
3:13
**trouble (1)**
186:16
**true (8)**
70:9 110:8 143:5,6
162:10 176:21
179:9 188:7
**trust (9)**
15:9 27:2 32:14 38:10
38:15 90:4 96:18
162:11 172:4
**trusted (2)**
38:25 39:3
**trustee (2)**
96:24 169:24
**trustees (10)**
118:19 143:8 153:9
163:17 169:15,20
173:22 178:15
181:18 182:25
**trusts (1)**
162:9
**try (5)**
25:10 26:8 38:22
142:11 155:18
**trying (7)**
24:6 60:2,3,4,5 81:24
101:12
**Tuesday (1)**

1:15
**turn (17)**
36:11 79:18 87:5,8
92:22 98:10 100:9
108:19,20 110:15
110:17 114:9 123:7
123:15 148:12
151:14,19
**turned (3)**
113:7,9 155:24
**turning (1)**
80:8
**turns (2)**
112:18 113:16
**two (24)**
25:12 26:8 37:8 39:5
49:6 68:6,8,14
92:15,18 97:13
99:17 124:17,18,19
125:15,21,23
134:21 149:12
160:24 164:13
173:6,9
**two-step (1)**
26:9
**type (3)**
48:8 157:11 158:22
**typical (2)**
51:19 160:19
**typically (4)**
25:14 45:12 48:7
67:16
**typo (1)**
8:11

**U**

**UAW (3)**
1:9 5:7 77:16
**ultimately (7)**
7:18 21:15,16 63:18
83:19 101:7 162:5
**unbundled (1)**
82:8
**unchanged (2)**
71:2,5
**uncommon (1)**
121:11
**underestimate (1)**
32:9
**underfunded (1)**
15:21
**underlying (2)**
16:19 106:9
**understand (26)**
6:17 9:3,23 24:6,18
42:3,6 47:2 56:5

64:18 69:15 71:25
99:21 101:11,12
103:24 126:22
130:24 137:18
157:2 167:8 168:7
174:7 176:16 177:3
180:6
**understanding (24)**
28:11,18 31:17 36:10
42:19,20 43:8,14,21
44:6 45:3 47:11
51:4 59:17,23 69:4
73:12 95:10,13
114:2,4 149:21
170:13 172:6
**understood (9)**
66:24,24 113:24
119:11 177:22
179:11 181:8 184:9
184:9
**undisputed (1)**
72:21
**unfair (1)**
17:17
**unfortunately (1)**
62:13
**unfunded (26)**
15:21,23 24:25 25:4,5
25:9 26:3 38:3,5,12
54:2 56:2 57:5
60:21 64:13 70:5
71:15 92:5 94:11
136:3 140:2,23
142:5 153:17
165:15 166:5
**union (2)**
52:22 53:12 62:7
**United (3)**
24:15 133:24 135:14
**unreasonable (12)**
13:21 18:2 54:25 56:2
56:3,12,24 57:7
73:15,20 131:19,24
**unreasonableness (1)**
56:10
**unusual (5)**
13:8 41:8,12 142:21
167:20
**updated (1)**
35:22
**upside (2)**
59:4 120:13
**use (63)**
13:19 28:16 31:25
32:4,25 35:7 38:18
38:22 39:16 41:14

41:19 43:11 46:14
46:23 49:5 50:10,15
64:24 68:3 69:7,17
69:20 70:9 72:3,7
80:24 83:17 85:20
86:2 91:10 92:3
95:5 96:8,11 107:3
107:19 108:10
117:16 119:20,23
125:8,11 126:6,10
131:8,18,22 132:4
137:2,4,23 138:24
139:25 142:8 151:7
153:16 154:11
155:14 157:14
160:17 163:14,22
166:3
**uses (2)**
30:22 99:5
**usually (2)**
128:7 161:2
**utilized (2)**
73:6 149:16
**utilizing (1)**
146:4

_____
**V**

**v (3)**
1:8 75:22 132:23
**valuation (31)**
21:25 22:7,13 38:6
40:2 58:5,13,21
68:20 79:8 84:22
86:24 87:13 88:15
89:10,16 92:23
100:10 108:20,21
109:19,19 110:6,16
113:6,13 120:17
127:5 154:10 158:4
182:9
**valuations (6)**
20:16 38:4 78:5 146:7
165:15 166:6
**value (39)**
14:24,25 15:3 16:12
25:18,22,25 26:2,5
26:22,25 27:19
28:13 29:15 50:17
60:20 80:20 94:5,6
94:15 100:17
101:23 109:5
135:14,15,16,17
136:5,6 137:3,13
140:16,17 151:6
153:8 158:18 159:9
174:20 179:14

**valued (7)**
15:4 94:2,3,10,12
136:10 139:20
**valuing (4)**
39:8 43:5 53:25 107:4
**variations (2)**
45:25 161:20
**variety (4)**
19:20 21:12 58:20,22
**various (6)**
11:24 24:2 25:21
68:25 81:4 83:5
**vary (4)**
10:25 11:2 63:3 67:17
**vast (1)**
69:4
**vehicle (1)**
49:16
**version (13)**
36:4,6 144:20,22
145:7,22 147:20
149:22,22 150:8,10
164:8 165:9
**versus (1)**
119:15
**vested (26)**
15:22,23 25:4,5,9,18
26:3 28:13 29:15
54:2 56:2 57:5
60:20,21,24 61:7,9
70:5 71:15 94:6
118:25 153:17
174:20 178:9
179:12,15
**view (13)**
33:4 54:24 70:3 72:14
119:22 122:14
131:5,8,14 132:6
137:25 155:8 158:3
**viewed (1)**
95:18
**viewing (2)**
158:19,21
**VII (3)**
148:13,19,20
**viola (1)**
15:22
**virtually (1)**
17:4
**vis-a-vis (1)**
63:4
**visiting (2)**
23:11,16
**voices (1)**
7:15
**vote (1)**

133:17

_____
**W**

**want (27)**
6:8,9 7:9 10:17 27:3
27:10 29:12 32:4
45:19 50:14 74:22
81:22 115:9 129:5
141:13,21,23
156:22 160:17
164:7 165:18
168:11 170:24
171:8 174:8 183:5
184:6
**wanted (3)**
5:14 86:16 146:18
**wanting (1)**
103:18
**wants (2)**
53:13 147:13
**Washington (4)**
3:7 4:15,18,21
**wasn't (3)**
6:5 137:7 183:14
**way (23)**
6:16 26:7 27:11 41:12
41:13 56:18 63:21
74:17 101:6 113:3
115:7 123:15
125:24 139:22
143:3 146:6 153:23
154:2 159:12
160:11 163:21
176:17 184:23
**ways (6)**
58:20 121:4 132:2
160:24 173:6,9
**we'll (11)**
5:17 32:3,4 41:18
44:3 78:24 91:24
115:8 186:6 187:6,7
**we're (22)**
5:16,20,21 8:19 11:6
11:15 32:2 80:5,5
86:24 92:17,18 98:6
129:17 132:7
137:22 140:23
178:17,18 182:5,8
186:25
**we've (5)**
65:14 137:20 152:15
154:7 173:17
**website (3)**
42:15,18 47:22
**weight (3)**
12:2,8 43:24

**weighted (1)**
92:16
**weighting (3)**
83:14 106:22 155:10
**well-funded (4)**
131:11 154:14 155:15
176:19
**went (2)**
122:20 151:3
**weren't (1)**
75:3
**widely (1)**
46:14
**William (2)**
3:17 5:6
**winds (1)**
169:8
**windup (1)**
135:10
**withdrawal (159)**
13:3 14:9,13 15:10,17
15:18 16:6,14 17:11
17:14,23 18:5 20:19
22:16 24:5,18,21
25:2 28:10 29:15
30:10 31:6 33:3
36:8 39:22 40:10
41:16,21 48:23
49:15 50:18,22 51:6
51:14 52:3,19 54:3
54:9 60:18,22 61:18
64:14 66:16,17,21
67:3 68:5,9 69:16
69:19 70:6 71:16
72:4,9,18,19 73:7
78:9,13 86:7 91:15
91:18 92:2 94:21
96:12,16 97:6
100:11,16 102:19
102:25 103:6 104:3
104:19 105:24
106:4,16 107:5,10
107:22 108:5,6,13
108:15 113:17
114:7 116:18
117:12 119:5,15,21
119:23,25 120:7
122:10,14 123:4,10
123:23 124:11,21
124:22,23 125:16
126:4,17,19 131:23
132:2,10 134:16,20
134:23 135:9 136:2
137:13 138:10,12
140:15 142:25
146:4,7 149:17

152:22 153:18,24
154:25 155:4 156:4
157:20 158:13,21
161:6,9,9,22 162:19
163:3,11,14,25
164:4 165:11,21
166:3 169:21,22
172:7,8,9 174:7,19
174:21 178:11
179:3,23 182:18,20
184:24
**withdrawals (1)**
180:21
**withdrawing (14)**
32:16 52:7 117:13
140:23 142:6
143:12 144:8
152:25 153:4,7,12
158:5 174:23
179:25
**withdrawn (13)**
18:11 117:8 122:25
123:3,9,10,18,19
124:5 140:5 161:17
182:17 184:24
**withdraws (4)**
16:9 157:20 174:3
177:24
**withdrew (3)**
67:2 71:14 78:15
**witness (30)**
5:9 6:4 18:24 43:20
46:18 55:15 57:20
74:17 75:6,16,18
115:18 126:19
127:4,9,14,25 128:4
128:6,8 130:12
134:3 148:21 156:8
156:16,19 170:20
171:17 185:17
189:6
**witnesses (3)**
10:7 16:2 130:14
**wording (1)**
176:18
**words (6)**
28:3 31:23 38:9 50:2
59:22 122:15
**work (11)**
9:21 20:18,22 42:20
48:10 78:17 129:12
133:25 134:16
148:17 156:3
**worked (4)**
22:20 43:13 114:13
125:25

**working (3)**
19:19 23:6 183:15
**works (3)**
72:11 93:25 101:6
**worse (3)**
177:5 182:12,13
**wouldn't (4)**
38:21 59:11 73:17
86:19
**wound (1)**
101:7
**writing (1)**
186:17
**wrong (4)**
56:14,19 68:24
138:21
**wrote (1)**
129:8

**X**

**x (3)**
1:5,11 63:10
**XI00939 (1)**
188:20

**Y**

**Y (1)**
132:23
**yeah (11)**
57:12 105:11 129:23
130:2 146:19
165:24,24 170:12
174:2 175:19
181:19
**year (28)**
26:16 28:5,6,7 29:21
40:3,10,12,16 51:14
51:15 63:7 89:6,7
89:14,15,18 128:15
128:18,21 129:19
129:20 133:15
141:8,10 179:21
182:11,11
**year's (1)**
89:10
**years (38)**
19:17,19 20:20,23
26:15 40:3,11,13,15
53:8 64:22 67:4,21
72:16 88:17 93:17
93:20 94:24 116:15
117:7 133:8,9,25
134:14 136:4,7,23
137:6,9 138:14
139:3,4 142:7 146:5
155:22 181:10,11

182:4
**yep (2)**
67:25,25
**yield (1)**
48:4
**York (5)**
2:7,7,11 188:6,18

**Z**

**zero (1)**
18:11

**0**

**0l-15-0004-3027 (1)**
1:4

**1**

**1 (10)**
8:15,17 26:17 35:22
79:8 88:15 109:9
146:14 147:9
189:19
**1:42 (1)**
187:23
**10 (14)**
20:23 22:22 28:5
29:22,24 30:5 32:4
40:17 65:19 77:5
100:9 141:9 150:23
151:11
**10-minute (3)**
10:9 171:9,11
**10:08 (1)**
57:17
**10:22 (1)**
57:18
**100 (11)**
23:2 26:15 56:22
69:25 70:21 103:20
131:16 138:18
155:2 176:12
177:14
**11 (2)**
51:8 136:14
**11:37 (1)**
115:12
**11:51 (1)**
115:13
**110 (9)**
28:6 29:25 30:4,6
141:12,14,16
176:13 180:16
**111 (10)**
13:11 15:16 51:7,13
51:18 58:7,19 70:16
154:9 176:23

**111.7 (1)**
112:3
**112 (1)**
51:8
**115 (1)**
189:12
**116310 (1)**
1:22
**118 (1)**
182:14
**12 (5)**
51:8 55:6 77:5 136:15
189:3
**12:46 (1)**
156:13
**12:59 (1)**
156:14
**120 (1)**
28:6
**122 (1)**
189:11
**13 (3)**
58:16 126:20 183:17
**130 (1)**
189:4
**133 (1)**
189:14
**14 (3)**
40:21 41:10 183:17
**147 (1)**
189:23
**15 (4)**
20:25 22:22 136:23
137:9
**15-year (1)**
65:19
**150 (2)**
2:6 189:24
**156 (1)**
189:15
**16 (1)**
188:21
**168 (1)**
189:14
**17 (1)**
8:6
**170 (1)**
189:15
**171 (1)**
189:8
**173 (1)**
189:9
**17th (1)**
2:7
**18th (1)**
8:7

**19 (1)**
189:8
**19106 (1)**
3:16
**1980 (4)**
133:11 134:25 143:5
154:17
**1980s (1)**
73:6
**1981 (1)**
133:12
**1986 (1)**
146:11
**1987 (1)**
116:12
**1996 (1)**
146:13

**2**

**2 (11)**
26:19 34:17,19,23
35:20 36:6 145:9
147:10 164:12,13
189:20
**20 (13)**
67:6,21 93:17,20
94:23,25 103:19
136:3,7,23 137:5,9
142:7
**2000 (1)**
149:22
**20001 (1)**
3:7
**2006 (2)**
62:13,16
**2007 (4)**
35:21 145:19 150:8
164:10
**2007/2011 (3)**
144:21 145:9 149:24
**2008 (1)**
20:10
**2010 (3)**
40:17,18,20
**2011 (1)**
35:23
**2013 (17)**
41:10 51:15 77:8
109:9 126:18
129:18,19 144:23
145:2,6,22 149:22
149:25 150:9,17
165:3 185:22
**2014 (10)**
20:10 24:5 40:20
51:21,25 77:8 78:15

79:8 88:15 126:20
**2015 (2)**
23:10 89:17
**2016 (3)**
1:15 2:2 188:21
**2017 (1)**
188:19
**23 (1)**
151:17
**24 (3)**
151:15,16,20
**25 (1)**
19:19
**259 (10)**
1:9 5:7 13:2,24 39:21
64:20 66:14 77:16
116:11 117:6
**27 (18)**
35:2,5,11 36:2,5,7,12
39:6 144:22,23
145:6 146:9 147:20
149:22,24 150:17
164:7 165:3
**28 (1)**
188:19
**29 (1)**
117:6

---
**3**
---
**3 (7)**
42:10 79:2,7 93:16,19
94:23 189:21
**3.31 (3)**
93:17,20 94:24
**3.6 (8)**
36:12,19,22 37:4,19
39:6 164:15,20
**3.9 (3)**
150:22 151:10,18
**3.9(b) (1)**
151:4
**30 (2)**
19:17 133:9
**30-plus (1)**
155:22
**31 (3)**
51:15 58:16 126:18
**325 (1)**
3:15
**34 (1)**
189:20
**35 (1)**
133:25
**36 (3)**
110:15,21 116:15
**37 (2)**

92:23 93:9

---
**4**
---
**4 (3)**
97:23 98:2 189:22
**42 (1)**
127:11
**42nd (1)**
2:7
**49 (1)**
133:8

---
**5**
---
**5 (13)**
32:23 36:16 106:13
106:14 114:19
147:3,7,11,19
164:16 171:9,10
189:23
**5-and-a-half (1)**
135:7
**5-minute (3)**
57:13,15 156:9
**50 (16)**
23:2 60:7,10 69:25
70:15,21 77:14
118:8,9 131:17
176:7,8 177:8,14,15
177:16
**50-50 (8)**
59:22 66:8 176:7
177:7,7,10,21
179:10
**51 (1)**
3:6
**5500 (9)**
21:22 77:23 88:24
128:15,18,21
129:18,20 185:22
**57 (2)**
98:11,14
**58 (3)**
98:15,21 189:9

---
**6**
---
**6 (15)**
1:15 2:2 31:25 32:3,4
32:23 98:14,19
135:7 136:13
137:15 150:12,13
150:15 189:24
**64 (2)**
79:19 80:8
**692 (1)**
92:24

---
**7**
---
**7 (3)**
31:24 32:3,22
**7-and-a-half (25)**
59:11 66:2,6,13 70:19
71:3 85:2 92:14
94:12 99:19,21
117:25 118:14
119:21 131:15
137:23 138:6
152:18 174:14,23
175:11,22 178:21
179:15 180:2
**7.5 (38)**
13:7,20 15:4,6 17:3
32:15 39:22 40:6,9
40:23 41:3,7,20
42:8 50:20 52:5
80:12 84:24 85:12
87:2,11 88:13,20
89:19,22 92:3,11
94:4 95:8 101:17
109:25 110:4
111:19,25 112:7,9
112:18 157:10
**70 (1)**
56:23
**719 (1)**
79:21
**73 (3)**
15:15 100:24 101:3
**76 (1)**
189:11
**79 (1)**
189:21

---
**8**
---
**8 (4)**
98:14,20 108:21
189:19
**81 (1)**
154:17
**87 (3)**
37:13 165:14,20

---
**9**
---
**9:04 (1)**
2:3
**98 (1)**
189:22