William T. Josem, Esquire
CLEARY, JOSEM & TRIGIANI LLP
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
Telephone: 215-735-9099

*Attorneys for Defendant,*
*UAW Local 259 Pension Fund*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ———————————————————— : | | |
| MANHATTAN FORD LINCOLN, INC., | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION No. 17-CV-5076** |
| v. | : | |
| | : | |
| UAW LOCAL 259 PENSION FUND, | : | |
| | : | |
| Defendant | : | |
| ———————————————————— : | | |

## MEMORANDUM IN OPPOSITION TO
## MANHATTAN FORD LINCOLN, INC.'S MOTION FOR SUMMARY JUDGMENT
## AND IN SUPPORT OF
## UAW LOCAL 259 PENSION FUND'S CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION                                                                   1

FACTS                                                                          3

    Background                                             3

    The Statutory Scheme                                   5

    Actuarial Standard of Practice No. 27                  6

    The Segal Blend                                        7

    The Plan's Assessment of Withdrawal Liability          9

STANDARD OF REVIEW                                                            10

ARGUMENT                                                                      11

    The Best Estimate of Anticipated Experience
for Withdrawal Liability Purposes and for Long-Term
Funding Purposes Need Not be the Same                                         12

    The Arbitrator Correctly Understood the Supreme Court's
*Concrete Pipe* Decision as *Not* Foreclosing the Use of
More than One Interest Rate When Calculating UVBs
for Withdrawal Liability Purposes                                             17

CONCLUSION                                                                    22

i

# **TABLE OF AUTHORITIES**

**CASES**

*Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427,
52 S.Ct. 607, 76 L.Ed. 1204 (1932)                                    13

*Block Communications, Inc. and Central States SE & SW Areas
Pension Fund*, AAA Case No. 11 621 2637 09 (2013)                     21

*Board of Trustees of Trucking Employees of North Jersey Welfare
Fund, Inc. Pension Fund v. Centra*, 983 F.2d 495 (3d Cir. 1992)       11

*Central States, S.E. & S.W.A. Pension Fund v. Santa Fe Industries*,
22 F.3d 725 (7th Cir. 1994)                                           11

*Chicago Truck Drivers, Helpers and Warehouse Workers Union
(Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d
346 (7th Cir. 2012)                                                   21

*Concrete Pipe & Products v. Construction Laborers Pension Trust,*
508 U.S. 602 (1993)                                                   *passim*

*Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211 (1986)     11, 14

*Crown Cork & Seal Company, Inc. v. Central States Southeast and
Southwest Areas Pension Fund*, 982 F.2d 857 (3d Cir. 1992)            10

*Embassy Industries and Local 365 UAW Pension Trust Fund*,
AAA Case No. 13 621 01504 06 (2008)                                   21

*Environmental Defense v. Duke Energy Corp.,* 549 U.S. 561 (2007)     12

*In re Marcal Paper Mills*, 650 F.3d 311 (3d Cir. 2011)               11

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717 (1984)   5, 11, 14

*Republic Industries, Inc. v. Central Pennsylvania Teamsters
Pension Fund,* 693 F.2d 290 (3d Cir.1982)                             11

*Supervalu, Inc. v. Board of Trustees of Southwestern Pennsylvania and
Western Maryland Area Teamsters and Employers Pension Fund*,
500 F.3d 334 (3d Cir. 2007)                                           10

*Sotheby's Inc. and Local 814, IBT Pension Fund*, AAA Case
No. 13 621 003393 (1994)                                              21

*United Retail & Wholesale Employees Teamsters Union Local No. 115
Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3d Cir. 1986)      18

*Widoff's Modern Bakery & B&C Union & Industry International
Pension Fund*, AAA Case No. 11 621 01198 06 (2007)      21

**STATUTES**

ERISA Section 4211, 29 U.S.C. § 1391      3

ERISA Section 4219, 29 U.S.C. § 1399      3

ERISA Section 4213, 29 U.S.C. § 1393      5, 16

ERISA Section 304, 29 U.S.C. § 1084      5

ERISA Section 4221, 29 U.S.C. § 1401      6

Section 4221(c) of ERISA, 29 U.S.C. § 1401(c)      6, 10, 18

29 U.S.C. § 1001a      11

29 CFR § 4281.13(a)      16

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. 283 (1974),
*reprinted in* [1974] U.S. Code Cong. & Admin. News 503      5

H.R. Rep. No. 869, Part I, 96th Cong., 2d Sess. 1, 51,
*reprinted in* 1980 U.S. Code Cong. & Admin. News 2918      11

**INTRODUCTION**

After the passage of the Employee Retirement Income Security Act (ERISA) in 1974, Congress became concerned that withdrawals by employers from multiemployer pension plans could negatively affect employers who continue to contribute to a plan, as well as the participants who have been promised a pension benefit upon retirement. As a result, in 1980, Congress enacted the Multiemployer Pension Plan Amendments Act (MPPAA) in an effort to assure that withdrawing employers did not escape from a plan without paying their fair share of any unfunded obligations.

Under MPPAA, a withdrawing employer may be assessed withdrawal liability so that it pays that fair share when its contribution obligation to a plan ceases. The calculation of withdrawal liability is based on the methods permitted under MPPAA for allocating the unfunded vested benefits (UVBs) of a plan, as well as the actuarial assumptions used to calculate those UVBs and to determine their present value. Once finally assessed, withdrawal liability is payable over a period not to exceed twenty years and remains fixed regardless of the future experience of the plan.

In this case, Manhattan Ford Lincoln, Inc. ("Employer" or "Manhattan Ford"), withdrew from the UAW Local 259 Pension Fund ("Plan") in 2014. As a result, it was assessed withdrawal liability. Manhattan Ford challenged that assessment in an arbitration proceeding under MPPAA. The only issue raised by Manhattan Ford in that proceeding was the discount rate chosen by the Plan's actuary to determine the present value of the Plan's UVBs in computing Manhattan Ford's withdrawal liability. As explained herein, and because Manhattan Ford was essentially terminating its participation in the Plan and entering into a final "settlement" of its obligations to the Plan, the Plan Actuary valued the UVBs at a market rate to the extent that those vested benefits were matched by Plan assets and at the long-term funding rate assumption

1

for those vested benefits that exceeded those assets, a calculation known as the "Segal Blend." The Segal Blend takes into account that a withdrawn employer's participation in the future experience of the Plan is different than that of the remaining employers who will continue to be subject to the minimum funding obligations of ERISA.

Manhattan Ford objects to the use of the Segal Blend and claims that the Plan Actuary *must* use the Plan's long-term funding assumption, a discount rate required for certain purposes under ERISA and the Internal Revenue Code to compute a plan's minimum funding requirements under those statutes. To that end, Manhattan Ford urges that the actuary's "best estimate" for the long-term funding of the Plan must be used to calculate the withdrawal liability of a withdrawing employer who will not bear any risk that those long-term assumptions may not be achieved. Manhattan Ford makes that argument because, for long-term funding purposes, the Plan is more than 100% "funded." Under Manhattan Ford's analysis, the Plan has no UVBs so there should be no withdrawal liability.

As appealing as Manhattan Ford's argument may seem at first glance, acceptance of its position would be at odds with the entire premise of MPPAA in that it would permit Manhattan Ford to transfer the risk of the Plan's benefit obligations to the non-withdrawing employers and to escape without paying its fair share of the UVBs. Manhattan Ford's position also ignores that, in the more than 35 years since the enactment of MPPAA, courts and arbitrators have uniformly upheld withdrawal liability determinations based on the same assumptions used by this Plan in calculating withdrawal liability. The Arbitrator's affirmance of the Plan's withdrawal liability determination should be upheld in this case as well.

2

**FACTS**

 **Background**

 The Plan is a multi-employer defined benefit pension plan. *See* ECF 6, Compl. Exh. C ("Final Award"), at 5. In 2014, Manhattan Ford's obligation to contribute to the Plan permanently ceased, thereby triggering Manhattan Ford's withdrawal. Final Award at 5. In accordance with ERISA Section 4211(c)(3)(A), 29 U.S.C. § 1391(c)(3)(A), the Plan's actuary determined the Plan's unfunded vested benefits for withdrawal liability purposes as of December 31, 2013, which was the end of the plan year preceding the plan year in which Manhattan Ford withdrew. Final Award at 6. Based on that determination, the Plan determined Manhattan Ford's withdrawal liability to the Plan to be $2,553,692 (payable in 33 quarterly payments over 8+ years). Final Award at 6.

 Manhattan Ford timely requested review of the withdrawal liability determination under ERISA Section 4219, 29 U.S.C. § 1399, and subsequently demanded arbitration of the withdrawal liability determination. Final Award at 6. Arbitrator Michael D. McDowell, Esquire, was selected to hear and determine this case. Final Award at 2.

 After discovery, both parties filed Motions for Summary Judgment and, on July 25, 2016, the Arbitrator issued an Interim Award in which he denied both Motions on the basis that genuine issues of material fact existed as to the reasonableness of the actuarial assumptions and methods used in the calculation of Manhattan Ford's withdrawal liability. ECF 6, Compl. Exh. B ("Interim Award"), at 17-18. Importantly, however, the Arbitrator rejected Manhattan Ford's claim that the statutory text and Supreme Court precedent required the Plan Actuary to use the same discount rate for withdrawal liability purposes that it used for minimum funding purposes. Interim Award at 17. In so doing, the Arbitrator not only analyzed the statutory text, he also

3

noted that the Pension Benefit Guaranty Corporation ("PBGC"), the governmental corporation with jurisdiction over withdrawal liability issues, has recognized that assumptions for purposes of calculating withdrawal liability may be different than those used for minimum funding and that a series of other arbitrators had also upheld the use of the Segal Blend.  Interim Award at 14-16.

An arbitration hearing was then conducted and on June 14, 2017, the Arbitrator issued his final award.  In that Final Award, the Arbitrator determined that the actuary's use of the "Segal Blend" to calculate Manhattan Ford's withdrawal liability was not unreasonable and, accordingly, upheld the Plan's withdrawal liability assessment in full.  Final Award at 16.  In so ruling, the Arbitrator determined that it was not unreasonable for the Segal Blend to consider "anticipated experience" for purposes of withdrawal liability in the context of a risk-adjusted experience rather than the expected experience for employers under long-term funding assumptions.  Final Award at 12-13.  To that end, the Arbitrator pointed out that the actual investment policy of the Plan was irrelevant in light of the reasoning behind the use of PBGC risk-free interest rates as more accurately taking account of the avoidance of future risk by the Employer due to its fixed withdrawal liability payment.  Final Award at 13.  Finally, the Arbitrator referred to the reality that "the fact that the Plan may be more than fully funded now based on the actuary's estimate of future funding of the Plan on a snapshot of the Plan experience does not require abandonment of the Segal Blend in determining withdrawal liability in favor of using exclusively using the 7.5% interest assumption used for funding purposes." Final Award at 14.

This appeal followed.

4

**The Statutory Scheme**

As amended by MPPAA, ERISA contains several statutory provisions that govern the determination and assessment of withdrawal liability. The intent of these statutory provisions, of course, is to allocate to a withdrawing employer its fair share of a plan's UVBs. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 723 n.3 (1984). The UVBs represent the difference between the present value of a plan's vested benefits (nonforfeitable pension benefits already earned by participants in the pension plan) and a plan's current assets. ERISA Section 4213(c), 29 U.S.C. § 1393(c). *Id.* at 725. To calculate the present value of those UVBs (which benefits will be paid to retirees over many years), the Plan actuary must select a discount (or interest) rate in accordance with Section 4213. Specifically, Section 4213 provides that a plan's unfunded vested benefits for "*computing withdrawal liability . . . under this part* shall be determined by each plan on the basis of" actuarial assumptions prescribed by the PBGC [the PBGC has never issued such regulation] or "which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." ERISA Section 4213(a)(1), 29 U.S.C. § 1393(a)(1) (emphasis supplied). In making that calculation, Section 4213(b)(1) further provides that the actuary "*may* rely on the most recent complete actuarial valuation" used for purposes of minimum funding.

ERISA, of course, governs far more than employer withdrawals. Among other things, ERISA contains minimum funding requirements that are designed to ensure that, over the long-term, the funds necessary to pay promised pension benefits will be available at retirement. H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. 283 (1974), *reprinted in* [1974] U.S. Code Cong. & Admin. News 503. The minimum funding provisions of ERISA are found at ERISA Section

5

304, 29 U.S.C. § 1084.  Like the withdrawal liability provisions of ERISA Section 4213, the minimum funding provisions found also require that actuarial assumptions offer the best estimate of anticipated experience under the plan.  In fact, just as Section 4213 provides that the actuarial assumptions for computing withdrawal liability are to conform to that Section, so, too, the statute provides that "for purposes" of minimum funding, the actuarial assumptions must conform to Section 304(c)(3).  Unlike Section 4213, however, Section 304(c)(3)(A) requires that each assumption be reasonable.  Section 4213(a)(1) require only that the assumptions be reasonable in the aggregate.

The determination of a plan's UVBs for withdrawal liability purposes is provided a presumption of reasonableness under Section 4221(a)(3)(B) of ERISA, 29 U.S.C. § 1401(a)(3)(B).  As interpreted by the Supreme Court of the United States in *Concrete Pipe & Products v. Construction Laborers Pension Trust,* 508 U.S. 602 (1993), an employer's burden to overcome that presumption is "a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary." *Id.,* at 634-35.

### Actuarial Standard of Practice No. 27

The reasonableness of the actuary's methods and assumptions is "judge[d] . . . by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation."  *Id.* To that end, actuaries are required to follow the Actuarial Standards of Practice that apply to the profession.  Roth Decl. Exh. A (Exhibit to Manhattan Ford's Motion for Summary Judgment), Hr'g Tr. ("Tr"), at 33-34.  Those actuarial practices and procedures are established by the Actuarial Standards Board.  Tr. 34.  In this case, Actuarial Standard of Practice No. 27 ("ASOP No. 27") is the actuarial standard that

6

governs an actuary's selection of the interest rate and discount rate assumptions for a plan. Tr. 35. ASOP No. 27 states, at Section 3.6, that while "generally" a plan's investment rate and its discount rate should be the same, "[t]he purpose of the measurement is a primary factor" in constructing a best estimate investment return and discount rate assumption. Josem Decl. Ex. 1 ("ASOP No. 27") at 5.

Here, of course, the purpose of the measurement is the settlement of withdrawal liability, occasioned by the withdrawing employer's termination of its ongoing obligations to the Plan. Generally (and as more fully discussed *infra*), to settle a liability, something akin to annuity purchase rates are used. Final Award at 12-13. This process is described in ASOP No. 27. Section 3.6.4 of the ASOP provides that an actuary may assume multiple investment return rates rather than one single rate. ASOP No. 27 at 9. An example of the permitted use of multiple rates can be found at Section 3.6.4(b):

> Obligations Covered by Designated Current Assets – One investment return rate is assumed for obligations covered by designated current plan assets on the measurement date, and a different investment return rate is assumed for the balance of the obligations and assets. *Id.*

In his Arbitration Award, the Arbitrator considered the provisions of ASOP No. 27, as well as the testimony and documentary evidence introduced by the parties. The Arbitrator opined that it did not appear that ASOP No. 27 precluded the use of the Segal Blend and noted that even Manhattan Ford's expert witness had admitted that not all actuaries use only a plan's funding rate in calculating withdrawal liability; rather, some actuaries use PBGC rates while others use some form of a blended rate, such as the Segal Blend. Final Award at 14-15.

### The Segal Blend

The Segal Company represents more multiemployer pension plans than any firm in the country. Josem Decl. Ex. 2 ("Levy Report"), para. 3. When MPPAA was first passed, Segal

sought to develop a principles-based formula for valuing a plan's unfunded vested benefit liabilities for purposes of withdrawal liability.  Josem Decl. Ex. 3 ("Levy Dep.") at 45:5-10. The result has become known as the Segal Blend, which represents an attempt to determine the market value of a plan's vested benefits as of the date of an employer's withdrawal.  Levy Report at para. 10; Tr. 135-137.  It flows from the premise that since withdrawal liability is a final settlement of an employer's obligations to the plan, and since a plan cannot pay to participants the lump sum present value of the vested benefit obligation, those benefits should be valued based, at least in part, using the risk-free rate charged by insurance companies to pension plans that wish to settle some or all of their benefit obligations (such as through the purchase of annuities).  Final Award at 11.  To the extent that there are assets on hand that are attributable to the withdrawing employer, the vested benefit liabilities are valued based on that market-based settlement rate.  Final Award at 8; ECF 6, Compl. Exh. A ("Assessment"), at 2.  Those rates are obtained from the PBGC and represent the rates at which one could purchase annuities to cover those benefits.  Tr. 144.  By using the PBGC rate, Segal is attempting to value the cost to "settle" the obligations of the withdrawing employer, who will not participate in the plan's future experience, at market value as of the date of withdrawal.  Tr. 139-40.

For benefits that cannot be settled immediately because they are not currently funded, Segal uses a rate equal to the interest rate used for long-term plan funding calculations, otherwise known as the funding rate, which is the rate determined in accordance with the minimum funding provisions of ERISA Section 304.  Tr. 136-37; Assessment at 2.  Segal then "blends" those rates because withdrawal liability will be paid in a series of installment payments over a number of years.  Tr. 137; Levy Report, para. 10.  As such, the Segal Blend values at market that portion of the liabilities that are already funded (since that portion could be "settled") and uses the plan's

long-term funding assumptions to value the unfunded portion of those liabilities that will be funded by the employer's withdrawal liability payments over a period of years. *Id*.

The Segal Blend has remained unchanged for more than 30 years (and has been used by this Plan to calculate withdrawal liability for more than 25 years). Final Award at 12. When first adopted, application of the formula typically meant that an employer's withdrawal liability was *less* than it would have been had only the assumptions used for minimum funding purposes under ERISA been used to calculate that withdrawal liability. Final Award at 11-12. That was true because, at the time, plan funding rates were generally lower than the PBGC rates. In fact, for the entire decade of the 1980s, after the passage of MPPAA, this Plan's funding rate of 7.5% was lower than the PBGC rates in 37 out of 40 quarters. *See* www.pbgc.gov/prac/interest/ida. As interest rates have declined, and pension funds have begun to invest in a wider array of investments, however, the Segal Blend now often results in a somewhat higher liability for withdrawing employers compared to the use of the funding assumption as the discount rate. Final Award at 12.

### The Plan's Assessment of Withdrawal Liability

In using the Segal Blend to calculate Manhattan Ford's withdrawal liability, the Plan's actuary, Diane Gleave of The Segal Company, testified that, as provided under ASOP No. 27, the purpose of a calculation dictates the establishment of the assumptions. (Tr. 119:12-120:2). In the withdrawal liability context, and where the withdrawing employer is settling its obligations with the Plan, Gleave testified that the Segal Blend represents her "best estimate" of the unfunded vested benefit liabilities for withdrawal liability purposes. (Tr. 119:20 – 120:16.); *see also* Josem Decl. Ex. 5 ("2014 Valuation") at 38 ("[T]hese actuarial assumptions and methods are reasonable (taking into account the experience of the Plan and reasonable expectations) and,

9

in combination, represent the actuary's best estimate of anticipated experience under the Plan to determine the unfunded value of vested benefits for purposes of withdrawal liability."

Gleave acknowledged that, for purposes of meeting the Plan's minimum funding obligations, the long-term anticipated experience of the Plan is that the Plan's investments will yield an average annualized return of 7.5%. Final Award at 7. She also acknowledged that, based on those long-term funding assumptions, the Actuarial Valuation reflects that the Plan was more than 100% funded as of January 1, 2014. Final Award at 7. Nonetheless, the Segal Blend represents both Segal's and Ms. Gleave's best estimate of the UVBs for withdrawal liability purposes because the withdrawing employer is effectively terminating its relationship with the Plan and, by paying withdrawal liability, is entering into a final settlement of its obligations. Tr. 119-120.

**STANDARD OF REVIEW**

Section 4221(c) of ERISA, 29 U.S.C. § 1401(c), provides that when reviewing an arbitrator's withdrawal liability award, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." An arbitrator's legal conclusions, on the other hand, are reviewed *de novo*. *Supervalu, Inc. v. Board of Trustees of Southwestern Pennsylvania and Western Maryland Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007). Where there is a mixed question of law and fact, the clearly erroneous standard applies to findings of fact, with plenary review of the legal questions. *Crown Cork & Seal Company, Inc. v. Central States Southeast and Southwest Areas Pension Fund*, 982 F.2d 857, 861 (3d Cir. 1992).

**ARGUMENT**

MPPAA was "designed to promote benefit security for multiemployer plan participants through the melioration of the financial condition of multiemployer plans." H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 1, 51, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2919. It was enacted in response to Congress' concern that withdrawals by contributing employers would undermine the multiemployer pension system. "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or [withdrew] from, multiemployer plans." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 722 (1984). The preamble to MPPAA states that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations." 29 U.S.C. § 1001a(a)(4)(A). As the Supreme Court has recognized, Congress provided for employer withdrawal liability so as to provide a disincentive to withdrawals and to mitigate their effect by requiring a withdrawing employer to pay its fair share of a pension plan's unfunded vested benefits liabilities. *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211 (1986); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co., supra,* 467 U.S. at 723 n. 3. The purpose of withdrawal liability in multiemployer pension plans, then, "is to protect other employers in the multiemployer plan from having to pay for those benefits which are properly the responsibility of other employers." *Central States, S.E. & S.W.A. Pension Fund v. Santa Fe Industries*, 22 F.3d 725, 726-727 (7th Cir. 1994). *See also In re Marcal Paper Mills*, 650 F.3d 311 (3d Cir. 2011); *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992); *Republic Industries, Inc. v. Central*

*Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 292 (3d Cir.1982).

### The Best Estimate of Anticipated Experience for Withdrawal Liability Purposes and for Long-Term Funding Purposes Need Not be the Same

Much of Manhattan Ford's argument in this case is based on its contention that the Plan Actuary did not use her best estimate of anticipated plan experience in computing withdrawal liability. In making that argument, Manhattan Ford asserts that "anticipated experience" under the statute must mean the anticipated investment return of a plan's portfolio of assets which, in this case, is 7.5%. That argument, however, is really but the flip side of Manhattan Ford's other argument, to wit, that ERISA requires that a plan's long-term funding assumptions be used both for minimum funding purposes and for withdrawal liability purposes. In either event, the argument is fundamentally flawed in that it fails to recognize the very real differences between the purpose of withdrawal liability and the purposes of long-term funding assumptions.

ERISA Section 4213 provides, in relevant part, that a plan's UVBs for computing withdrawal liability is to be determined on the basis of actuarial assumptions which, in the aggregate, are reasonable and which offer the actuary's best estimate of anticipated experience under the plan. The minimum funding provisions of ERISA, as found at ERISA Section 304, contain quite similar, albeit not identical language. On this basis, Manhattan Ford argues that actuaries *must* use the discount rate required under the minimum funding provisions to calculate UVBs for withdrawal liability purposes.

The Plan readily concedes that the minimum funding language as enacted in 1974 under ERISA and the withdrawal liability language added in 1980 by MPPAA are similar. Manhattan Ford overstates its case, however, when it asserts that they must be interpreted to have the same meaning. As the Supreme Court stated in *Environmental Defense v. Duke Energy Corp.,* 549 U.S. 561, 574 (2007):

> . . . "[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section." *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). Thus, the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning ... is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Ibid.*" [1]

Long-term funding assumptions as required under ERISA's minimum funding provisions contemplate an ongoing plan with ongoing employers that can make up any shortfalls in a plan's actual experience.  Josem Decl. Ex. 4 ("Gleave Dep") at 13-14.  The anticipated experience over the long-term, then, assumes that, if need be, future adjustments in contributions and/or benefit accruals can be made. In the case of withdrawal liability, however, there is no ability to adjust contributions since, once assessed, the withdrawn employer's obligations are fixed.  Thus, in the withdrawal liability context, the withdrawn employer's liabilities are being settled once and for all and, as the Segal Blend (and the PBGC recognize), settlements take place at market, or risk-free, rates.  In that connection, by recognizing that Congress provided for withdrawal liability so as to provide a disincentive to withdrawals and to mitigate their effect by requiring a withdrawing employer to pay its fair share of a pension plan's unfunded vested benefits liabilities, the Supreme Court has effectively acknowledged that a withdrawal is tantamount to a

---

[1]  An example of a situation where the same wording in two different provisions of a statute does not always have the same precise meaning was referenced by the Supreme Court in *Concrete Pipe*.  There, in discussing the term "reasonable" in the context of the presumption attaching to the actuary's calculation of the UVBs, the Court interpreted "reasonable' in two different ways because of the function, or purpose, of the presumptions.  The Supreme Court said "[f]ollowing the usual presumption of statutory interpretation, that the same term carries the same meaning whenever it appeals in the same Act . . . we might expect 'reasonable' in § 1401(a)(3)(B) to function here just as it did in § 1401(a)(3)(A), to denote a certain range of probability that a factual determination is correct.  For several reasons, however, we think it clear that this second presumption of reasonableness functions quite differently."  508 U.S. at 634.

final settlement between the withdrawn employer and the plan. *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211 (1988); *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 723 n. 3 (1984).

The difference in approach, then, is a result of the different purpose of the minimum funding and withdrawal liability calculations. In fact, under the Segal Blend, the actuary is *not* certifying that the discount rate used to calculate the UVBs is the actuary's best estimate of expected long-term experience under the plan (as required for a minimum funding calculation). Rather, it is a best estimate of expected future experience under the plan recognizing the differing risks to withdrawing employers and continuing employers (Levy Dep., 66:5-20). Viewed in that light, the Segal Blend does take into account the anticipated experience of the plan; it just does so with the recognition that the anticipated long-term experience that must be used for minimum funding purposes is different from the anticipated experience in the withdrawal liability context.

It is certainly true that the low interest rate environment of recent times has meant that Manhattan Ford's withdrawal liability is higher than it would be in a higher interest rate environment and higher than it would be if the Plan Actuary used the long-term funding assumption of 7.5% in calculating withdrawal liability. In fact, the Plan does not dispute that it could conceivably achieve its long-term funding assumption. By the same token, the investment return could also fall short of that return, or hit it dead-on (the most unlikely result, of course). Manhattan Ford complains that the Plan will reap a windfall if the 7.5% return is exceeded, but completely ignores that its entire analysis is premised not only on the Plan meeting that assumption, but more importantly on the Plan *guaranteeing* that rate of return to Manhattan Ford across-the-board and over time as to all withdrawing employers.

14

As the Plan's expert testified, if you expect to owe somebody $110 in one year, you can invest that $100 in a mix of stocks and bonds with the *expectation* that those investments will yield an annual return of 10% so that you will have $110 at the end of the year. Tr. 141. Of course, depending on how your investments perform, you might end up with either more or less. If, however, you want to be *guaranteed* that you will have the $110 at the end of the year, then you must transfer the investment risk to someone else by, for example, buying risk-free treasury notes that will cost you $108 or $109, and that are guaranteed to be worth $110 in one year (unless, of course, the government defaults on these notes). Tr. 141.

In the withdrawal liability context, the investment risk rests on the shoulders of the pension fund and the employers who continue to contribute to the fund. Here, if the 7.5% return is not met, which, even according to Manhattan Ford's expert, is anticipated to occur 50% of the time (Tr. 60:6-12), the Plan must still find a way to pay to retirees the vested pension benefits that they have been promised. In other words, the risk to the Plan is that it will not have sufficient assets to pay those promised (and vested) benefits that ERISA requires the Plan to pay. The withdrawn employer, however, no longer bears that risk. Rather, when it withdraws from the pension plan, it transfers that investment risk in its entirety to the plan and the remaining contributing employers. In so doing, that employer arguably gives up its opportunity to "make money" if the investments outperform the assumed return rate of 7.5%. That is a small price to pay, however, for the certainty of a fixed withdrawal liability payment.

The cost of purchasing an investment vehicle providing a *guaranteed* 7.5% return, then, is far different than the cost of purchasing a portfolio that is *expected* to return 7.5%. *See* Levy Report, at para. 9. And that is why the Segal Blend considers "anticipated experience" for purposes of withdrawn employers in the context of a risk-adjusted expected experience rather

15

than the expected experience for contributing employers under long-term funding assumptions. Tr. 160:11-16. The Segal Blend simply attempts to account for that transfer of risk by utilizing current PBGC interest rates to discount liabilities covered by the current assets of a plan which can be settled immediately.  By so doing, the Segal Blend seeks to assure that the withdrawn employer pays its fair share and is not being subsidized by other employers who will have to make up the difference if the long-term funding rate of 7.5% is not achieved.  As we stated at the outset of our argument, that focus on assuring that a withdrawn employer pays its fair share of the UVBs goes to the very essence of MPPAA**.**

Indeed, the fact that the PBGC requires that UVBs be valued based on those same risk-free rates when a multiemployer plan terminates by mass withdrawal (*See* 29 CFR § 4281.13(a)) lends even more credence to the rationale of using a different interest rate for the portion of the liabilities that can be settled with current assets, while using the long-term funding rate for those benefits that are not currently funded.  In fact, since the withdrawn employer is both terminating and settling its obligations on the one hand, and is continuing to make certain ongoing withdrawal liability payments on the other, the Segal Blend's recognition that such an employer essentially has a foot in both camps logically flows from the statutory provisions and fully justifies the use of two different interest rates to calculate the employer's withdrawal liability.

The fact that withdrawal liability represents a final settlement also makes irrelevant any issue as to how the Trustees choose to invest withdrawal liability payments. Tr. 143:7-24.  There is simply no requirement, as Manhattan Ford contends, that the assumptions used for withdrawal liability must reflect a plan's investment portfolio.   Contrary to Manhattan Ford's claims, "anticipated experience under the plan," at least in the withdrawal liability context, does not mean the expected return of a plan's actual investment portfolio.   *See* 29 U.S.C. § 1393(a).

In that connection, it is also important to point out that while the minimum funding provisions of Section 304 and the withdrawal liability provisions of Section 4213 are similar in calling for "reasonable" assumptions, they differ in that Section 304 requires that each assumption be reasonable whereas Section 4213 provides only that the assumptions must be reasonable "in the aggregate." That distinction is not without importance. By providing that the withdrawal liability assumptions need only be reasonable in the aggregate, Congress plainly contemplated that each assumption used to calculate withdrawal liability might not be the same as used for determining a fund's minimum funding obligations.

Finally, it is important to point out that under ERISA Section 4213, the PBGC was given the authority to prescribe actuarial assumptions to be used in the calculation of withdrawal liability. That delegation would have been unnecessary if Section 4213 precluded the use of other than the long-term funding assumptions in determining withdrawal liability. Moreover, Congress could have, but did not, reference the minimum funding provisions of Section 304 in Section 4213(a), nor did it even more simply provide that the same assumptions be used for both purposes. In contrast, Congress explicitly cross-referenced IRC Section 412 in Section 4213(b). When it wanted to be explicit, then, Congress certainly knew how to do so.

### The Arbitrator Correctly Understood the Supreme Court's *Concrete Pipe* Decision as *Not* Foreclosing the Use of More than One Interest Rate When Calculating UVBs for Withdrawal Liability Purposes

Manhattan Ford asserts in its Brief that in *Concrete Pipe*, the Supreme Court flatly precluded the use of other than the funding rate in calculating UVBs for withdrawal liability purposes. Manhattan Ford's reading of *Concrete* Pipe, however, is simply wrong.

The question before the Supreme Court in *Concrete Pipe*, as articulated by the Court at footnote 10 of its opinion, was whether the presumptions favoring multiemployer plans violated

the due process rights of the employer by denying it access to an impartial decisionmaker.  The

Court held that they did not.  With regard to the second of those presumptions[2], i.e. the

presumption under ERISA Section 4221(a)(3)(B), 29 U.S.C. § 1401(a)(3)(B), as to the

correctness of the actuarial assumptions and methods used in calculating an employer's

withdrawal liability in the absence of a showing of unreasonableness, the Supreme Court

interpreted that presumption to "simply" impose on the employer "a burden to show that the

combination of methods and assumptions employed in the calculation would not have been

acceptable to a reasonable actuary."  508 U.S. at 635.   Contrary to Manhattan Ford's

contentions, that holding was not dependent on an actuary's use of only the funding rate in

discounting UVBs for withdrawal liability purposes.  Indeed, as discussed below, the Supreme

Court was not only aware of the fact that actuaries did not exclusively use the funding rate in

calculating withdrawal liability, it knew that the actuary in *Concrete Pipe* had used the Segal

Blend.

     In discussing the presumption, the Supreme Court did quote a dissent from Judge Seitz in

*United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn &*

*McDonnell, Inc.*, 787 F.2d 128, 146-47 (3d Cir. 1986) to the effect that use of different

assumptions for different purposes "could very well be attacked as presumptively unreasonable."

508 U.S. at 632-33.  Contrary to Manhattan Ford's claim, however, the Supreme Court did not

hold, or even state that the use of different assumptions for different purposes "is presumptively

unreasonable," nor did it shift the burden of proof to the fund or its actuary; rather, its explicit

---

[2]  The first of the presumptions considered by the Supreme Court in *Concrete Pipe* concerned an
arbitrator's factual findings.  The Supreme Court upheld that presumption by construing it "to
place the burden on the employer to disprove a challenged factual determination by a
preponderance" of the evidence. *Id.* at 629-630.

holding was that the burden remained with the employer.  In so holding, the Supreme Court clearly did not foreclose the use of different assumptions by an actuary for different purposes. Rather, the Supreme Court made clear that "the reasonableness of a method" should be judged "by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation." *Id.* at 635.  To that end, the Supreme Court focused on the fact that the actuary, and not a fund's trustees, selects the assumptions to be used in calculating withdrawal liability. *Id.* at 632.  The Supreme Court explained that actuaries are "trained professionals subject to regulatory standards" who are "not . . . vulnerable to suggestions of bias or its appearance." *Id.*[3]  The Supreme Court also explicitly recognized that with respect to technical actuarial matters, "there are often several equally 'correct approaches.'" *Id.*  As we have shown elsewhere in this Brief, and as the Arbitrator correctly determined, ASOP No. 27, the governing standard of actuarial practice, fully supports the use of more than one discount rate to calculate withdrawal liability.  Moreover, the simple fact is that Manhattan Ford's claim of unreasonableness here is based solely on its contention that the Segal Blend does not comply with ERISA because of its failure to use only the funding rate in calculating withdrawal liability.[4]

---

[3]  That is certainly true here, inasmuch as The Segal Company has used the Segal Blend since 1980 through a variety of different interest rate environments, and the Segal Blend has been used to calculate withdrawal liability for this Plan since Segal became the Plan actuary in 1987-1988. Moreover, since the Segal Blend produced lower withdrawal liability assessments when it was first adopted, it certainly cannot be contended that the Segal Blend was constructed to increase withdrawal liability assessments.

[4]  For that reason, Manhattan Ford's focus on the Plan's funded level using long-term funding assumptions is but a subterfuge.  Under Manhattan Ford's approach, an actuary would be required to use the long-term funding assumptions even if the Plan were only 50% funded using those assumptions. In fact, Manhattan Ford's expert so testified.  Tr. 70-71.

In *Concrete Pipe*, the only assumption challenged by the employer was the funding interest rate assumption "that must be used for other purposes as well." *Id.*[5]  Of course, that the funding interest rate assumption must be "used for other purposes as well" does not necessarily support the inverse proposition that the funding interest rate, and only the funding interest rate, must be used to calculate withdrawal liability.   In fact, if the Supreme Court had held in *Concrete Pipe* that use of other than the funding discount interest rate in the calculation was *per se* improper, then it would not have been able to affirm the underlying court decisions which, in turn, affirmed a withdrawal liability assessment that used the Segal Blend.   In that regard: 1) the withdrawal liability calculation in *Concrete Pipe* was made by a Segal actuary using the Segal Blend, and the Supreme Court was certainly aware of that fact, since the record before the Supreme Court is replete with references to that blended approach.  (See Concrete Pipe Jt. Appendix at pp. 156-157; 383-384; 393-400 (Josem Decl., Ex. 7); Brief on the Merits by Petitioner Concrete Pipe at p. 14 ((Josem Decl., Ex. 8)), 1992 WL 511948 ("[The Pension Plan], here, uses a blended interest rate consisting of the PBGC published rates for single-employer plan terminations for the month of withdrawal to the extent that assets are presently available and the plan's funding rate of 6% to the extent that vested liabilities exceed assets.")); and 2) the employer in *Concrete Pipe* did *not* attack the use of the Segal Blend or the use of the PBGC rate as part of the Segal Blend; rather, the employer attacked the use for withdrawal liability purposes of the plan's investment return assumption that was used for minimum funding  *See Concrete Pipe*, 508 U.S. 602, 633 (("in fact, the only actuarial assumption or method that Concrete Pipe attacks in terms, (see Reply Brief for Petitioner 18–20) is the critical interest rate assumption that must be used for other purposes as well.").  Josem Decl., Ex. 9, 1992 WL 511950.

20

If, as Manhattan Ford claims, the Supreme Court held that the use of more than one interest rate is *per se* unreasonable, then one is left with the conundrum of the Supreme Court determining that the statutory presumption as to the reasonableness of the actuary's assumptions under Section 4221 was not constitutionally defective, that the employer in in *Concrete Pipe* had met its burden to overcome the presumption by showing that use of the Segal Blend not only would not, but could not have been acceptable to a reasonable actuary (either because the statute required use of the funding rate only to calculate withdrawal liability or because it was *per se* unreasonable not to do so), but that nonetheless the arbitration award would be enforced. The reality, of course, is that the Supreme Court did nothing of the kind. Its decision can only be read as *not* foreclosing the use of other than the funding discount rate to calculate withdrawal liability.[6]

Of course, that is precisely what Judge Posner said in *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346 (7th Cir. 2012). Judge Posner recognized the ambiguity in the *Concrete Pipe* opinion, but understood that when read in context, the decision did not bar the use of a blend. While Manhattan Ford believes that Judge Posner was simply wrong, his reasoned approach

---

[5]   At that time, the funding rate was less than the PBGC rate, so that use of the PBGC rate resulted in a higher withdrawal liability amount.

[6]   The Segal Blend has been upheld in every known arbitration decision that has considered use of that approach to calculate withdrawal liability. Levy Report, para. 4.  *See e.g. Block Communications, Inc. and Central States SE & SW Areas Pension Fund*, AAA Case No. 11 621 2637 09 (2013); *Embassy Industries and Local 365 UAW Pension Trust Fund*, AAA Case No. 13 621 01504 06 (2008); *Widoff's Modern Bakery & B&C Union & Industry International Pension Fund*, AAA Case No. 11 621 01198 06 (2007); *Sotheby's Inc. and Local 814, IBT Pension Fund*, AAA Case No. 13 621 003393 (1994).

acknowledges what the Pension Plan in this case has stated throughout – use of a blend is not foreclosed by *Concrete Pipe*.

**CONCLUSION**

In enacting MPPAA, Congress sought to assure that withdrawn employers paid their fair share of UVBs so that the remaining contributing employers would not be saddled with more than their fair share of those liabilities. While the statutory provisions governing the calculation of withdrawal liability and the provisions setting forth minimum funding requirements use much of the same language, the language of both sections couch that similar language based on the purpose of the calculation. As we have shown, the purpose of a withdrawal liability calculation is to determine a withdrawn employer's fair share of UVBs in a final settlement with a fund. Use of the Segal Blend in that context is not at odds with the statutory language since it simply recognizes that the anticipated experience of a withdrawn employer and an employer that continues to contribute to a fund are different. Nor is the use of the Segal Blend foreclosed by *Concrete Pipe*. In these circumstances, the Court should grant the Plan's Cross-Motion for Summary Judgment, deny Manhattan Ford's Motion for Summary Judgment, and affirm in all respects the Arbitration Award and its sustaining of the Plan's assessment of withdrawal liability.

Respectfully submitted,

CLEARY, JOSEM & TRIGIANI LLP

By:        /s/ William T. Josem
          William T. Josem, Esquire
          Email: wtjosem@cjtlaw.org
          325 Chestnut Street, Suite 200
          Philadelphia, PA 19106
          Telephone:  215-735-9099

          *Attorneys for Defendant,*
          *UAW Local 259 Pension Fund*

Dated: November 20, 2017

22