William T. Josem, Esquire
CLEARY, JOSEM & TRIGIANI LLP
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
Telephone: 215-735-9099

*Attorneys for Defendant,*
*UAW Local 259 Pension Fund*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____ :
                                                 :
MANHATTAN FORD LINCOLN, INC.,                    :
                                                 :
                          Plaintiff,             :  **CIVIL ACTION No. 17-CV-5076**
          v.                                     :
                                                 :
UAW LOCAL 259 PENSION FUND,                      :
                                                 :
                          Defendant              :
_____ :       :


## UAW LOCAL 259 PENSION FUND'S
## REPLY IN SUPPORT OF ITS
## CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION                                                                          1

ARGUMENT                                                                              1

I.      THE ACTUARY'S "BEST ESTIMATE"                                                 1

II.     THE STATUTE AND THE PURPOSE OF A
        WITHDRAWAL LIABILITY CALCULATION                                              3

III.    CONCRETE PIPE AND DEFERENCE TO THE ACTUARY                                    5

IV.     CONCRETE PIPE AND THE "NECESSITY" OF
        APPLYING THE SAME ASSUMPTIONS                                                 6

V.      JUDGE POSNER'S DECISION IN CPC LOGISTICS
        SHOULD NOT BE IGNORED                                                         8

VI.     THE "POLICY" UNDERLYING WITHDRAWAL
        LIABILITY CALCULATIONS                                                        9

CONCLUSION                                                                            11

## <u>TABLE OF AUTHORITIES</u>

*Bd. Of Trs., Mich. United Food Commercial Workers Union
v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987) .......... 2

*Central States, S.E. & S.W.A. Pension Fund v. Santa Fe Industries*,
22 F.3d 725 (7th Cir. 1994) .......... 11

*Chicago Truck Drivers, Helpers and Warehouse Workers Union
(Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346
(7th Cir. 2012) .......... 2, 8

*Concrete Pipe & Products v. Construction Laborers Pension
Trust*, 508 U.S. 602 (1993) .......... *passim*

## <u>STATUTES</u>

29 U.S.C. § 1393 .......... 3, 6, 7, 9

29 U.S.C. § 1082 .......... 7

29 U.S.C. § 1084 .......... 3, 7

29 U.S.C. § 1341a .......... 11

29 U.S.C. § 1401 .......... 7

**INTRODUCTION**

Manhattan Ford's argument in this proceeding can be boiled down to one essential contention, i.e. that the "anticipated experience" of the Plan for withdrawal liability purposes must be the same as the long-term anticipated experience of the Plan for minimum funding purposes. As we have shown, however, that argument misconstrues not only the statute, but the Supreme Court's *Concrete Pipe* decision as well. And, while Manhattan Ford ridicules an interpretation other than its own, its argument simply proceeds from a proposition it posits in its favor, but which either ignores the very purpose of a withdrawal liability calculation or attempts to recharacterize it to fit Manhattan Ford's desired result. Consideration of the statute, the purpose of withdrawal liability, as well as Supreme Court and other precedent, however, compel the conclusion that Manhattan Ford's complaints are overwrought and its conclusions simply incorrect. Put bluntly, nothing in the statute or in the ensuing legal precedent compels a conclusion that the funding rate, and nothing but the funding rate, must be used when an actuary offers a best estimate of the anticipated experience of a plan for withdrawal liability purposes.

**ARGUMENT**

**I.     THE ACTUARY'S "BEST ESTIMATE"**

In its latest brief, Manhattan Ford begins by essentially misrepresenting certain evidence presented to the Arbitrator. To that end, it again asserts that the Plan actuary admitted that she did not employ her best estimate of anticipated experience under the Plan in calculating UVBs for withdrawal liability purposes. Yet the actuary specifically testified that the Segal Blend represents her best estimate of the unfunded vested benefit liabilities for withdrawal liability purposes because the withdrawing employer is effectively terminating its relationship with the Plan and, by paying withdrawal liability, is entering into a final settlement of its obligations. Tr.

1

119; Gleave Dep., 58:10-25.   She distinguished that from her best estimate of 7.5% which she testified was used "for purposes of the ERISA funding requirements."  Tr. 89-90.  Manhattan Ford's attempt to ignore that explicit testimony represents yet further evidence of its avoidance of any facts that might throw cold water on its arguments.

The Segal Blend, by incorporating both a plan's funding rate and the PBGC rates, takes into account a plan's unique characteristics in connection with a withdrawal liability calculation. Manhattan Ford cites *Bd. Of Trs., Mich. United Food Commercial Workers Union v. Eberhard Foods, Inc.*, 831 F.2d 1258, 1263 (6th Cir. 1987) for the proposition that PBGC rates are independent of those unique characteristics, but its position is again based on disagreement as to the purpose of a withdrawal liability calculation.  In any event, it is interesting to note that the *Eberhard Foods* court, in line with Judge Posner's opinion in *CPC Logistics* (see *infra*), agreed that MPPAA "permits an actuary to apply the interest rate used for funding . . . *if* that interest rate is reasonable in the withdrawal context."  *Id.*

Of course, what Manhattan Ford really argues in this connection is that the best estimate of anticipated experience *must* be based on the expected return of a plan's actual portfolio of investments.   Again, then, Manhattan Ford simply posits that the funding rate must be the only rate used to calculate withdrawal liability.  But, as the Arbitrator explained, and as we argued in our opening Brief, the Plan's anticipated experience is different depending on whether an employer continues to contribute to a plan or withdraws.[1]

---

[1]   We recognize that in the Conclusion of our opening brief, we referred to the anticipated experience of a withdrawn employer and a continuing employer, rather than to the anticipated experience under the plan; however, a review of our entire brief makes clear that, throughout, the focus was on the difference in the anticipated experience of the Plan vis a vis a continuing employer and a withdrawn employer.

2

## II.    THE STATUTE AND THE PURPOSE OF A WITHDRAWAL LIABILITY CALCULATION

Manhattan Ford asserts that the purpose of a withdrawal liability calculation and the purpose of a minimum funding calculation, at least with respect to determining the UVBs of a plan, are one and the same.  By so arguing, Manhattan Ford seeks to diminish the importance of the statutory language itself, which specifically provides for the determination of a plan's unfunded vested benefits for "computing withdrawal liability . . . under this part," 29 U.S.C. § 1393(a)(1), and which should be juxtaposed with the minimum funding provisions of ERISA which, while using similar language, provides that the assumptions and methods are to be determined "for the purposes of this section."  29 U. S. C. § 1084(c)(3).

That the differing statutory language is material can be shown by reference to the Supreme Court's focus in *Concrete Pipe* on "what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation."  *Concrete Pipe & Products v. Construction Laborers Pension Trust,* 508 U.S. 602, 635 (1993).  The Actuarial Standards of Practice define that scope of professional acceptability and, as we have shown in our prior brief, ASOP No. 27 accords with 29 U.S.C. §1393 (and with 29 U.S.C. § 1084) in that it specifically instructs that "[t]he purpose of the measurement is a primary factor" in constructing a best estimate investment return and discount rate assumption.  ASOP No. 27 at 5.  That the two statutory provisions each effectively reference the purpose of the calculation, then, cannot be so easily ignored.    Indeed, Section 3.6 of ASOP No. 27, which is titled "Selecting an Investment Return Assumption and a Discount Rate," includes sub-Section 3.6.4(b), which explicitly refers to "[o]ne investment return rate [being] assumed for obligations covered by designated current plan assets on the measurement date, and a different investment

return rate [being] assumed for the balance of the obligations and assets." *Id.* [2]  The statute and the ASOP, then, are aligned in that both recognize that the context in which the calculation will be made is essential.   So, while Manhattan Ford asserts that the purpose of the withdrawal liability and minimum funding calculations are not different with respect to calculating UVBs, it does so only by ignoring that the long-term calculation of UVBs for funding purposes recognizes that future adjustments in contribution rates and benefit accruals can be made for continuing employers and their employees, but those same adjustments will not apply to withdrawn employers.

Of course, just as in *Concrete Pipe*, the funding rate was used here by the actuary to calculate withdrawal liability; it is just that an additional rate, the PBGC rate, was also used. And, while Congress could have said that the same rate had to be used, it did not.  Likewise, while Congress could have explicitly provided that the minimum funding assumptions be used to calculate withdrawal liability, it did not.  Despite Manhattan Ford's protestations to the contrary, the lack of such an explicit connection in the statute cannot simply be ignored.

That Congress, when enacting MPPAA, did not adopt the American Academy of Actuaries' proposal that the PBGC rate be used to calculate withdrawal liability likewise does not require a finding that Congress did the opposite and required use of the funding rate only. Rather, it is every bit as likely that Congress either paid no attention to the proposal or, perhaps more importantly, that it viewed the language of the statute as already permitting, as opposed to mandating, use of the PBGC rate.  Indeed, the American Academy's brief discussion as to why it viewed PBGC rates as being more appropriate for the calculation of withdrawal liability cannot

---

[2]  Manhattan Ford concedes that it is not challenging the assessment here on the ground that it violates "actuarial practice."  Manhattan Ford Reply Brief at p. 9, n. 1.

be read as evidencing some Congressional intent that <u>only</u> the funding rate could be used for that purpose.  Yet again, then, Manhattan Ford's argument is overblown.

## III.    CONCRETE PIPE AND DEFERENCE TO THE ACTUARY

The Plan actuary in this case acted in accordance with ASOP No. 27 and the Arbitrator found the assumptions to be reasonable in the aggregate.  In attacking the Plan actuary's use of the Segal Blend, Manhattan Ford understandably ignores the focus of the Supreme Court in *Concrete Pipe* on the deference to be paid to the actuary in calculating the UVBs.  Indeed, deference is particularly appropriate here where the Plan actuary is asked to make assumptions about anticipated experience within the context of a withdrawal liability, as opposed to a minimum funding calculation.

In *Concrete Pipe*, the Supreme Court said:

> Since the methodology [applied by the actuary] is a subject of technical judgment within a recognized professional discipline, it would make sense to judge the reasonableness of a method by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation. Accordingly, an employer's burden to overcome the presumption in question (by proof by a preponderance that the actuarial assumptions and methods were in the aggregate unreasonable) is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary. In practical terms it is a burden to show something about standard actuarial practice, not about the accuracy of a predictive calculation, even though consonance with professional standards in making the calculation might justify confidence that its results are sound. 508 U.S. at 635.

Use of more than one interest rate to calculate unfunded liability accords with standard actuarial practice.  ASOP No. 27 states, at Section 3.6, that while "generally" a plan's investment rate and its discount rate should be the same, "[t]he purpose of the measurement is a primary factor" in constructing a best estimate investment return and discount rate assumption.  ASOP

No. 27 at 5.  As we explained above, ASOP No. 27 also specifically contemplates the use of more than one interest rate when an actuary makes an unfunded liability calculation.  *See* Section 3.6.4(b) of ASOP No. 27.  ASOP No. 27 at 5.  Manhattan Ford was unable to show that the Segal Blend is at odds with "standard actuarial practice," so it defaults to the argument that the 29 U.S.C. 1393(a)(1) must be read to preclude the applicability of standard actuarial practice, as set for in ASOP No. 27, to a withdrawal liability calculation.   There is certainly nothing in *Concrete Pipe*, however, which can in any way be read to impose such a limitation; rather, the Court's decision suggests precisely the opposite.

## IV.    CONCRETE PIPE AND THE "NECESSITY" OF APPLYING THE SAME ASSUMPTIONS

Manhattan Ford also asserts that the Plan has ignored the Supreme Court's discussion in *Concrete Pipe* of the "necessity for applying the same assumptions and methods in more than one context." Manhattan Ford Brief, at 8; *Concrete Pipe*, 508 U.S. at 632.  But the Supreme Court's analysis is not quite what Manhattan Ford wishes it to be.  In fact, *Concrete Pipe* does not include any discussion of whether and/or why different assumptions for minimum funding and withdrawal liability might be used by an actuary. Although the Court did quote Judge Seitz to the effect that "use of the same language ... tends to check the actuary's discretion in each of them," and that "[u]sing different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review," *see id*. at 633, at no time did it adopt that approach and certainly did not take the additional step of finding the use of different assumptions to be absolutely barred by the statute.

Moreover, the Court's reference to the use of different assumptions was part of its discussion of the fact that at the time of *Concrete Pipe*, both the withdrawal liability provisions

under 29 U.S.C. § 1393, and the minimum funding provisions of 29 U.S.C. § 1084[3], required that the actuarial assumptions be reasonable in the aggregate. *Id.* at 632-33 ("The statutory requirement (of 'actuarial assumptions and methods—which, in the aggregate, are reasonable ...') is not unique to the withdrawal liability context, for the statute employs identical language in 29 U.S.C. § 1082(c)(3) to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements contained in the statute."). Now, however, those statutory provisions are not identical. While Section 1393 continues to focus on the aggregate reasonableness of the actuarial assumptions, the minimum funding provisions of Section 1084(c)(3) now require that *each* actuarial assumption be reasonable. That currently differing language, to be given effect, must be read as *not* requiring that each assumption used in the calculation of withdrawal liability be identical to the same assumption used to calculate minimum funding. Yet, acceptance of Manhattan Ford's arguments would lead to just such a result and would effectively negate the distinction between the two statutory provisions that now exists. In any event, whether the assumptions are unreasonable is, of course, initially subject to arbitral review, pursuant to 29 U.S.C. § 1401(a)(1), and is to be measured in relation to standard actuarial practice.

In addition, and as we discussed in our prior brief, the Supreme Court in *Concrete Pipe* was aware the pension fund was using the Segal Blend to calculate withdrawal liability, but not ongoing funding. While the Supreme Court's grant of certiorari was on limited grounds, the Supreme Court's holding effectively affirmed an arbitrator's award that upheld the use of the Segal Blend and condoned the use of different interest assumptions for withdrawal liability and minimum funding. Given this, the Supreme Court did not hold that an actuary must use the same rate for both purposes. Instead, the other "purposes" and "contexts" that the Supreme Court

---

[3] At the time of *Concrete Pipe*, what is now 29 U.S.C. § 1084 was 29 U.S.C. § 1082.

mentioned was referring to using the minimum funding investment return assumption in a portion of the Segal Blend, as one of the two separate components, not on the propriety or legality of the use of the Segal Blend in general. 508 U.S. at 632.

Boiled to its essence, what Manhattan Ford is really arguing here is that while the Segal Blend was perfectly acceptable when it resulted in a reduced withdrawal liability for employers, now that the PBGC interest rates are generally below plan funding rates, the Blend becomes invalid. So, the argument is a convenient one-way street for Manhattan Ford – if the Segal Blend results in a reduced withdrawal liability, that's okay, but if the opposite occurs, then the Blend becomes defective. That argument is premised on the "opportunity for bias" discussed by the Supreme Court in *Concrete Pipe*. Yet, Manhattan Ford's preferred result would invite bias, whereas the consistent application of the Segal Blend, which utilizes PBGC rates regardless of whether they exceed or are less than funding rates, avoids any such claim of manipulation.

## V.    JUDGE POSNER'S DECISION IN CPC LOGISTICS SHOULD NOT BE IGNORED

Writing for the Court in *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346 (7th Cir. 2012), the esteemed jurist Richard Posner wrote that, while language in the *Concrete Pipe* opinion "could be read to suggest that having two different interest-rate assumptions – one for withdrawal liability and one for avoiding the tax penalty – might make a plan vulnerable to claims that either or both were 'unreasonable' [under ERISA Section 4213] . . . [t]he danger was remote [since] the [Supreme] Court had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible." *Id.* at 354-55. Relying in that case on the fact that the Segal actuary maintained that the Segal Blend, and not the funding interest rate, was the actuary's "best estimate" for

purposes of calculating withdrawal liability, the Court in *CPC Logistics* upheld the arbitrator's award. *Id*. at 356.   In so doing, the court also rejected the argument made by the plan that use of the funding interest rate was de facto reasonable.  Judge Posner wrote that the fact that an actuary "may" rely on a plan's most recent actuarial valuation in determining a plan's unfunded vested benefit liabilities for withdrawal liability purposes [under 29 U.S.C. § 1393(b)(1)] did not override the statutory requirement that the assumptions be based on the actuary's best estimate. *Id*., at 356.  Notably, Judge Posner said "[t]he funding rate *could* be appropriate for use in calculating withdrawal liability, but was not in the circumstances of this case." *Id.* at 356-57 (emphasis supplied).  The same must be said here.

The decision in *CPC Logistics* is directly contrary to Manhattan Ford's position and, despite Manhattan Ford's effort to belittle Judge Posner's opinion, the reality is that Judge Posner's reading is both consistent with the statute and *Concrete Pipe* in effectively finding that the Supreme Court did *not* require that only the funding rate be used to calculate UVBs for withdrawal liability purposes.

## VI.    THE "POLICY" UNDERLYING WITHDRAWAL LIABILITY CALCULATIONS

Manhattan Ford asserts that there is no basis for what it terms as the Plan's "policy" argument regarding the calculation of withdrawal liability.  The Plan's argument, however, is not one of policy; rather, as we have made clear both in this and in our prior brief, it flows from the purpose of the calculation, as the statute requires, and is based on the actuarial standards of practice.

In that connection, and as we previously pointed out, Manhattan Ford misconstrues the Plan's argument when it asserts that the Segal Blend reflects the anticipated experience of a

withdrawn employer, rather than that of the Plan itself. The Segal Blend reflects the experience of the Plan vis a vis a withdrawing employer. Since the withdrawn employer no longer bears any risk, the Segal Blend recognizes the anticipated experience of the plan vis a vis the differing risks attendant to the withdrawing and continuing employers. That is not merely a policy difference; rather, it is an approach that is permitted under the actuarial standards of practice that the Supreme Court highlighted in *Concrete Pipe*.

In that connection, Manhattan Ford asserts that its position is simple as to the measurement of the plan's underfunding: "It is the amount of additional money that the plan needs today in order to fully fund its future liabilities, accounting for the average annual investment return that the plan expects to earn on its pool of assets." Yet, that is merely Manhattan Ford's own definition of the measurement and, again, fails to consider the purposes and context of a withdrawal liability calculation. So, while that postulate may be accurate for purposes of the long-term funding of the Plan, including ERISA's minimum funding requirements, it ignores that the amount of money a plan needs from a continuing employer, whose contribution rates may be adjusted in the future and/or whose employee pension accruals may be adjusted in the future, may be different from the amount of money needed from a withdrawn employer for whom those future adjustments cannot be made. In other words, since the withdrawn employer will no longer participate in the Plan, the Plan need not assure its own future funding based only on the Plan's ability to adjust future contribution rates and benefit accruals for continuing employers; rather, under the statute and ASOP No. 27, the Plan actuary can account for the difference by using different rates for different purposes.

Finally, Manhattan Ford attempts to parry the Plan's reference to a mass withdrawal of employers from a pension plan by asserting that in such a situation, the PBGC uses interest free

10

rates so that it won't be hit with an unreasonable loss.  Manhattan Ford cites 29 U.S.C. § 1341a(f)(2) in support of that assertion, but that statutory provision actually says that the PBGC can prescribe rules for the administration of plans terminated by mass withdrawals "which the corporation considers appropriate to protect the interests of plan participants and beneficiaries *or* to prevent unreasonable loss to the [PBGC]."  (emphasis supplied)

**CONCLUSION**

Withdrawal liability is intended to assure that withdrawing employers pay their fair share of a plan's unfunded vested benefit liabilities by "protect[ing] other employers in the multiemployer plan from having to pay for those benefits which are properly the responsibility of other employers." *Central States, S.E. & S.W.A. Pension Fund v. Santa Fe Industries*, 22 F.3d 725, 726-727 (7th Cir. 1994).  As found by the Arbitrator, the assumptions used by the Plan actuary to calculate Manhattan Ford's withdrawal liability, including the use of the Segal Blend, was reasonable in the aggregate, as the statute requires.  That finding is in accord with the statute itself, as well as legal precedent.  In fact, in the more than 24 years since *Concrete Pipe*, not one court nor one arbitrator has interpreted the Supreme Court's decision as requiring the use of only the funding rate in the calculation of withdrawal liability.

In these circumstances, this Court should grant the Plan's Cross-Motion for Summary Judgment, deny Manhattan Ford's Motion for Summary Judgment, and affirm in all respects the Arbitration Award and its sustaining of the Plan's assessment of withdrawal liability.

Respectfully submitted,

CLEARY, JOSEM & TRIGIANI LLP

By:       /s/ William T. Josem
           William T. Josem, Esquire
           Email: wtjosem@cjtlaw.org
           325 Chestnut Street, Suite 200
           Philadelphia, PA 19106
           Telephone:  215-735-9099

           *Attorneys for Defendant,*
Dated: December 29, 2017      *UAW Local 259 Pension Fund*

12